Filing # 230227865 E-Filed 08/26/2025 11:16:43 AM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2025-013398-CA-01

M.O. and A.O., minor children, by and through
their Next Friend, STEWART COOKE, ESQ.,

        Plaintiffs,

vs.

CITRUS HEALTH NETWORK, INC., d/b/a
CITRUS FAMILY CARE NETWORK;
FAMILY RESOURCE CENTER OF SOUTH
FLORIDA, INC.; FLORIDA DEPARTMENT
OF CHILDREN AND FAMILIES; KENYA
NEELY, individually; MARTA TORRES,
individually; ANTHONY CARVALHO,
individually; NATALIE GREEN, individually;
ANTOINESHA JOHNSON, individually;
MYRLANDE BREEDLOVE, individually;
SANALEE MEIKLE, individually; MARLENE
BAPTISTE, individually; SONIA BROOKS,
individually,

        Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

        YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant:

**FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.**
**c/o Registered Agent, Family Resource Center**
**1393 SW 1st Street**
**Miami, FL 33135**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Stacie J. Schmerling Esquire, Justice for Kids, a division of Kelley Kronenberg, whose address is 10360 West State Road 84, Fort Lauderdale, Florida 33324 within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter.

CASE NO.: 2025-013398-CA-01

If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

DATED on _____8/27/2025_____, 2025.

Juan Fernandez-Barquin, Esq.
As Clerk of the Court

By: _____
As Deputy Clerk

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact *Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone 305-349-7175; TDD 305-349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355* at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente.

CASE NO.: 2025-013398-CA-01

Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con _Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone 305-349-7175; TDD 305-349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355_ por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Si vous êtes une personne handicapée qui a besoin de mesures d'adaptation pour participer à cette procédure, vous avez droit, sans frais pour vous, à une certaine assistance. Veuillez contacter _Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone 305-349-7175; TDD 305-349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355_ au moins 7 jours avant votre comparution prévue au tribunal, ou immédiatement après avoir**

**reçu cette notification si le délai avant la comparution prévue est inférieur à 7 jours; si vous êtes malentendant ou avez un trouble de la parole, appelez le 711.**

<u>ENPÒTAN</u>

Pwosedi legal yo te pran kont ou. Ou gen 20 jou konsekitif ki soti nan dat konklizyon sa a pou ou ranpli yon repons alekri pou plent sa a nan tribinal sa a. Yon apel telefon ki senp se pa ase pou pwoteje ou. Ou oblije ranpli repons alekri ou a, ak nimewo a dosye pi wo a ak non pati yo ki te nonmen isit la, si ou vle tribinal la tande ka w la. Si ou pa ranpli repons alekri ou nan rele egzije a, ou riske pedi koz la ak sale ou, lajan ou, ak pwopriyete ou yo ka mete men sou pita, san okenn lot avi nan tribinal la. Gen lot obligasyon legal epi ou ka mande sevis imedya yon avoka. Si ou pa konnen yon avoka, ou ka rele yon sèvis referans avoka oswa yon biwo ed legal (ki nan lis nan anye telefon).

Si ou chwazi pou ou soumet yon repons alekri tet ou, ou pral bezwen tou voye oswa voye yon kopi repons ekri ou nan fòm sa a an menm tan an tankou fomalite sa a "Avoka Pleyan/ Pwokire a" (Pleyan oswa avoka li) non anba a.

**Si ou se yon moun ki enfim ki bezwen akomodasyon pou w kab patisipe nan pwosedi sa a, ou gen dwa, san ou pa bezwen peye okenn lajan, pou w jwenn yon sèten èd. Tanpri kontakte *Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone <u>305-349-7175</u>; TDD <u>305-349-7174</u>; Email ADA@jud11.flcourts.org; Fax (305) 349-7355* Kòdonatris pwogram Lwa Ameriken pou Moun ki Enfim yo nan, fè sa omwen 7 jou anvan dat ou gen randevou pou parèt nan Tribinal la, oswa fè sa imedyatman apre ou fin resevwa konvokasyon an si dat ou gen pou w parèt nan tribinal la mwens pase 7 jou; si ou gen pwoblèm pou w tande byen oswa pou w pale klè, rele 711.**

JUSTICE FOR KIDS ®
a division of KELLEY KRONENBERG
*Counsel for Plaintiff*
10360 West State Road 84
Ft. Lauderdale, Florida 33324
Telephone:    (754) 888-KIDS
Facsimile:    (954) 644-4848

*s/ Stacie J. Schmerling*
STACIE J. SCHMERLING
Florida Bar No. 83862
LELIA M. SCHLEIER
Florida Bar No. 107019
stacie@justiceforkids.com
lelia@justiceforkids.com
erica@justiceforkids.com

Case 1:25-cv-24196-BB   Document 1-2   Entered on FLSD Docket 09/15/2025   Page 5 of 189

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2025-013398-CA-01

M.O. and A.O., minor children, by and through
their Next Friend, STEWART COOKE, ESQ.,

        Plaintiffs,

vs.

CITRUS HEALTH NETWORK, INC., d/b/a
CITRUS FAMILY CARE NETWORK;
FAMILY RESOURCE CENTER OF SOUTH
FLORIDA, INC.; FLORIDA DEPARTMENT
OF CHILDREN AND FAMILIES; KENYA
NEELY, individually; MARTA TORRES,
individually; ANTHONY CARVALHO,
individually; NATALIE GREEN, individually;
ANTOINESHA JOHNSON, individually;
MYRLANDE BREEDLOVE, individually;
SANALEE MEIKLE, individually; MARLENE
BAPTISTE, individually; SONIA BROOKS,
individually,

        Defendants.

_____/

## **SUMMONS**

THE STATE OF FLORIDA:

To Each Sheriff of the State:

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant:

**NATALIE GREEN**
**1393 SW 1st Street**
**Miami, FL 33135**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Stacie J. Schmerling Esquire, Justice for Kids, a division of Kelley Kronenberg, whose address is 10360 West State Road 84, Fort Lauderdale, Florida 33324 within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter.

CASE NO.: 2025-013398-CA-01

If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

DATED on _____8/27/2025_____, 2025.

Juan Fernandez-Barquin, Esq.
As Clerk of the Court
Juan Fernandez-Barquin,
Clerk of the Court and Comptroller

By: _____
Mclarke
As Deputy Clerk



## **IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact *Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone* 305-349-7175; *TDD* 305-349-7174; *Email ADA@jud11.flcourts.org; Fax (305) 349-7355* at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

## **IMPORTANTE**

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente.

Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con *Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone 305-349-7175; TDD 305-349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355* por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Si vous êtes une personne handicapée qui a besoin de mesures d'adaptation pour participer à cette procédure, vous avez droit, sans frais pour vous, à une certaine assistance. Veuillez contacter *Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone 305-349-7175; TDD 305-349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355* au moins 7 jours avant votre comparution prévue au tribunal, ou immédiatement après avoir**

CASE NO.: 2025-013398-CA-01

reçu cette notification si le délai avant la comparution prévue est inférieur à 7 jours; si vous êtes malentendant ou avez un trouble de la parole, appelez le 711.

<u>**ENPÒTAN**</u>

Pwosedi legal yo te pran kont ou. Ou gen 20 jou konsekitif ki soti nan dat konklizyon sa a pou ou ranpli yon repons alekri pou plent sa a nan tribinal sa a. Yon apel telefon ki senp se pa ase pou pwoteje ou. Ou oblije ranpli repons alekri ou a, ak nimewo a dosye pi wo a ak non pati yo ki te nonmen isit la, si ou vle tribinal la tande ka w la. Si ou pa ranpli repons alekri ou nan rele egzije a, ou riske pedi koz la ak sale ou, lajan ou, ak pwopriyete ou yo ka mete men sou pita, san okenn lot avi nan tribinal la. Gen lot obligasyon legal epi ou ka mande sevis imedya yon avoka. Si ou pa konnen yon avoka, ou ka rele yon sèvis referans avoka oswa yon biwo ed legal (ki nan lis nan anye telefon).

Si ou chwazi pou ou soumet yon repons alekri tet ou, ou pral bezwen tou voye oswa voye yon kopi repons ekri ou nan fòm sa a an menm tan an tankou fomalite sa a "Avoka Pleyan/ Pwokire a" (Pleyan oswa avoka li) non anba a.

**Si ou se yon moun ki enfim ki bezwen akomodasyon pou w kab patisipe nan pwosedi sa a, ou gen dwa, san ou pa bezwen peye okenn lajan, pou w jwenn yon sèten èd. Tanpri kontakte *Aliean Simpkins, the Eleventh Judicial Circuit Court ADA Coordinator Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone* 305-349-7175; *TDD* 305-349-7174; *Email ADA@jud11.flcourts.org; Fax (305) 349-7355* Kòdonatris pwogram Lwa Ameriken pou Moun ki Enfim yo nan, fè sa omwen 7 jou anvan dat ou gen randevou pou parèt nan Tribinal la, oswa fè sa imedyatman apre ou fin resevwa konvokasyon an si dat ou gen pou w parèt nan tribinal la mwens pase 7 jou; si ou gen pwoblèm pou w tande byen oswa pou w pale klè, rele 711.**

JUSTICE FOR KIDS®
a division of KELLEY KRONENBERG
*Counsel for Plaintiff*
10360 West State Road 84
Ft. Lauderdale, Florida 33324
Telephone:    (754) 888-KIDS
Facsimile:    (954) 644-4848

*s/ Stacie J. Schmerling*
STACIE J. SCHMERLING
Florida Bar No. 83862
LELIA M. SCHLEIER
Florida Bar No. 107019
stacie@justiceforkids.com
lelia@justiceforkids.com
erica@justiceforkids.com

## RETURN OF SERVICE

| State of Florida | County of Miami-Dade | Circuit Court |

Case Number: 2025-013398-CA-01

Plaintiff,: **M.O. and A.O., minor children, by and through their Next Friend, STEWART COOKE, ESQ,**

vs.

Defendant,: **CITRUS HEALTH NETWORK, INC., d/b/a CITRUS FAMILY CARE NETWORK; FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.; FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES; KENYA NEELY, Individually; MARTA TORRES, Individually; ANTHONY GARVALHO, Individually; NATALIE GREEN, Individually; ANTOINESHA JOHNSON, Individually; MYRLANDE BREEDLOVE, Individually; SANALEE MEIKLE, Individually; MARLENE BAPTISTE, Individually; SONIA BROOKS, Individually,**

For:

Stacie J. Schmerling, Esquire
Justice for Kids
10360 W State Road 84
Fort Lauderdale, FL 33324

Received by Williams Process Service, Inc. on the 29th day of August, 2025 at 10:27 am to be served on **Family Resource Center of South Florida, Inc. c/o Family Resource Center, Registered Agent, 1393 SW 1st Street, Miami, FL 33135**.

I, Craig Watson, do hereby affirm that on the **8th day of September, 2025** at **1:30 pm, I:**

served a **CORPORATION** bydelivering a true copy of the **20 Day Summons,, Confidential Discovery Material Letter, and Complaint**with the date and hour of service endorsed thereon by me, to: **Yissel Fernandez**as **Director of Case Management**for **Family Resource Center of South Florida, Inc.**, at the address of: **1393 SW 1st Street, Miami, FL 33135,**and informed said person of the contents therein, in compliance with state statutes.
**Description** of Person Served: Age: 45, Sex: F, Race/Skin Color: White, Height: 5'7", Weight: 140, Hair: Red, Glasses: N
Under penalties of perjury, I swear or affirm, pursuant to Fla. Stat. 95.525 that I have read the foregoing and the facts stated herein are true. I am over the age of 18; have no interest in the above action; and am a Certified Process Server in good standing in the circuit in which service was effected in accordance with State Statutes.

**Craig Watson**
CPS No. 333

**Williams Process Service, Inc.**

**721 US Highway 1**
**Suite 121**
**North Palm Beach, FL 33408**
**(561) 881-1442**

Our Job Serial Number: WPS-2025017592



# RETURN OF SERVICE

**State of Florida**                    **County of Miami-Dade**                    **Circuit Court**

Case Number: 2025-013398-CA-01

Plaintiff,: **M.O. and A.O., minor children, by and through their Next Friend, STEWART COOKE, ESQ,**

vs.

Defendant,: **CITRUS HEALTH NETWORK, INC., d/b/a CITRUS FAMILY CARE NETWORK; FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.; FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES; KENYA NEELY, Individually; MARTA TORRES, Individually; ANTHONY GARVALHO, Individually; NATALIE GREEN, Individually; ANTOINESHA JOHNSON, Individually; MYRLANDE BREEDLOVE, Individually; SANALEE MEIKLE, Individually; MARLENE BAPTISTE, Individually; SONIA BROOKS, Individually;**

For:
Stacie J. Schmerling, Esquire
Justice for Kids
10360 W State Road 84
Fort Lauderdale, FL 33324

Received by Williams Process Service, Inc. on the 29th day of August, 2025 at 10:27 am to be served on **Natalie Green, 1393 SW 1st Street, Miami, FL 33135**.

I, David Sueiro Morell, do hereby affirm that on the **8th day of September, 2025** at **1:25 pm, I:**

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **20 Day Summons,, Confidential Discovery Material Letter, and Complaint** with the date and hour of service endorsed thereon by me, to: **Natalie Green** at the address of:**1393 SW 1st Street, Miami, FL 33135**, and informed said person of the contents therein, in compliance with state statutes.
**Description** of Person Served: Age: 55, Sex: F, Race/Skin Color: Black, Height: 5'9", Weight: 160, Hair: Black, Glasses: Y

Under penalties of perjury, I swear or affirm, pursuant to Fla. Stat. 95.525 that I have read the foregoing and the facts stated herein are true. I am over the age of 18; have no interest in the above action; and am a Certified Process Server in good standing in the circuit in which service was effected in accordance with State Statutes.

David Sueiro Morell
ID No. 10149

**Williams Process Service, Inc.**

**721 US Highway 1
Suite 121
North Palm Beach, FL 33408
(561) 881-1442**

Our Job Serial Number: WPS-2025017594



IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: _____


M.O. and A.O., minor children, by and through    :
their Next Friend, STEWART COOKE, ESQ.,           :
                                                  :
                                                  :
                Plaintiffs,                       :
vs.                                               :
                                                  :
CITRUS HEALTH NETWORK, INC., d/b/a                :
CITRUS FAMILY CARE NETWORK;                       :
FAMILY RESOURCE CENTER OF SOUTH                   :
FLORIDA, INC.; FLORIDA DEPARTMENT                 :
OF CHILDREN AND FAMILIES;                         :
KENYA NEELY, individually;                        :
MARTA TORRES, individually;                       :
ANTHONY CARVALHO, individually;                   :
NATALIE GREEN, individually;                      :
ANTOINESHA JOHNSON, individually;                 :
MYRLANDE BREEDLOVE, individually;                 :
SANALEE MEIKLE, individually;                     :
MARLENE BAPTISTE, individually;                   :
SONIA BROOKS, individually,                       :
                                                  :
                Defendants.                       :
_____/

## **COMPLAINT**

The Plaintiffs, M.O. and A.O., by and through their Next Friend, STEWART COOKE,

ESQ., by and through undersigned counsel, hereby sue the Defendants, CITRUS HEALTH

NETWORK, INC. d/b/a CITRUS FAMILY CARE NETWORK; FAMILY RESOURCE

CENTER OF SOUTH FLORIDA, INC.; FLORIDA DEPARTMENT OF CHILDREN AND

FAMILIES, KENYA NEELY, individually, MARTA TORRES, individually, ANTHONY

CARVALHO, individually, NATALIE GREEN, individually, ANTOINESHA JOHNSON,

**EXHIBIT A**

individually, MYRLANDE BREEDLOVE, individually, SANALEE MEIKLE, individually, MARLENE BAPTISTE, individually, and SONIA BROOKS, individually, and allege:

## JURISDICTION AND VENUE

1.      This action is for damages in excess of fifty thousand dollars ($50,000.00), excluding interest, costs, and attorney's fees, and is within the jurisdiction of the Court.

2.      The cause of action accrued in Miami-Dade County, Florida.

3.      Plaintiffs have complied with any and all conditions precedent necessary for the maintenance of this lawsuit.

## THE PARTIES

4.      At all times material hereto, M.O., who was born in 2008, was a minor child residing in Miami-Dade County, Florida.

5.      At all times material hereto, A.O., who was born in 2013, was a minor child residing in Miami-Dade County, Florida.

6.      Due to M.O. and A.O.'s status as minor children, this action is being brought by their Next Friend, STEWART COOKE, ESQ.

7.      STEWART COOKE, ESQ. was M.O.'s Attorney ad Litem in the dependency proceedings and is authorized by M.O. and A.O.'s mother to bring claims on M.O. and A.O.'s behalf.

8.      Due to the nature of the allegations as set forth herein, and due to their status as minors, M.O. and A.O. are using pseudonyms.

9.      At all times material hereto, M.O. and A.O. were children with disabilities requiring accommodations under the law, including Chapter 393 of the Florida Statutes, for their developmental disabilities, including autism.

10.     Defendant, CITRUS HEALTH NETWORK, INC. d/b/a CITRUS FAMILY CARE NETWORK (hereinafter "CFCN"), is a private non-governmental Florida Corporation operating its business in Miami-Dade County, Florida, and at all times material hereto, was the lead agency for community-based care in Miami-Dade County, Florida pursuant to §§ 409.986, et seq., Florida Statutes, and contracted with Florida Department of Children and Families (hereinafter "DCF") under Contract Number KJ138, which is incorporated by reference as if fully set forth herein, as an independent contractor to provide foster care and related services to children in the custody of the State of Florida, including M.O. and A.O.[1]

11.     At all times material hereto, CFCN, as the lead agency for community-based care in Miami-Dade County, was responsible for ensuring the health, welfare, and safety of all foster children in its system of care; ensuring safe and appropriate placement of foster children in Miami-Dade County; licensure and re-licensure of foster homes in Miami-Dade County, including the JERRY JONES (hereinafter "JONES") foster home; and providing support, supervision and monitoring of foster homes in Miami-Dade County, including JONES.

12.     At all times material hereto, CFCN was required to comply with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CFCN Policies and Procedures, CFCN's contracts with DCF, CFCN's contracts with its sub-contractors, and the common law to ensure the health, welfare, and safety of children in the custody of the State of Florida, including M.O. and A.O.

13.     At all times material hereto, CFCN was required to monitor the performance of its sub-contracted providers to ensure compliance with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CFCN Policies and Procedures, CFCN

---

[1] Plaintiffs have requested copies of CFCN's contract(s) with DCF from CFCN and DCF prior to filing this suit, but neither CFCN nor DCF have produced the contract(s).

contracts, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including M.O. and A.O.

14.     Defendant, FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC. ("FRC"), is a private non-governmental Florida Corporation operating its business in Miami-Dade County, Florida, and at all times material hereto, pursuant to § 409.986, et. seq., Florida Statutes, contracted with CFCN under Contract Number 21-02, which is incorporated by reference as if fully set forth herein, as an independent contractor to provide foster care and related services, including, but not limited to, case management services, to children in the custody of the State of Florida, including M.O. and A.O.

15.     At all times material hereto, FRC was required to comply with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, CFCN Policies and Procedures, FRC Policies and Procedures, FRC's contracts with CFCN, and the common law to ensure the health, welfare, and safety of children in the custody of the State of Florida, including M.O. and A.O.

16.     At all times material hereto, CFCN and FRC were independent contractors and were not acting as officers, employees, or agents of the State of Florida for purposes of § 768.28, Florida Statutes.

17.     Defendant, DCF, is the state agency charged with the non-delegable duty of ensuring the health, welfare, and safety of children in state custody; operating and overseeing the state foster care system; performing all child protective investigations in Miami-Dade County; providing substitute care services to children placed in its care; licensing, re-licensing, and monitoring foster homes in Miami-Dade County, including JONES; and licensing and monitoring contracted and subcontracted agencies pursuant to Chapter 409 of the Florida Statutes.

18.     At all times material hereto, Defendant, KENYA NEELY (hereinafter "NEELY"), was a Placement Specialist employed by CFCN.

19.     At all times material hereto, NEELY was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, and CFCN Policies and Procedures regarding placement of foster children., including M.O. and A.O.

20.     NEELY is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

21.     At all times material hereto, Defendant, MARTA TORRES (hereinafter "TORRES"), was the Director of Licensing and Placement employed by CFCN.

22.     At all times material hereto, TORRES was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, and CFCN Policies and Procedures regarding placement of foster children, including M.O. and A.O., licensure of foster homes, re-licensure of foster homes, and monitoring of foster homes in Miami-Dade County, including JONES.

23.     TORRES is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

24.     At all times material hereto, Defendant, ANTHONY CARVALHO (hereinafter "CARVALHO"), was a Foster Parent Liaison employed by CFCN.

25.     At all times material hereto, CARVALHO was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, and CFCN Policies and Procedures regarding monitoring of foster homes in Miami-Dade County, including JONES, to ensure the health, welfare, and safety of foster children placed in those homes, including M.O. and A.O.

26.     CARVALHO is an individual, is being sued in his individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

27.     At all times material hereto, Defendant, NATALIE GREEN (hereinafter "GREEN"), was a Case Manager Supervisor employed by FRC.

28.     At all times material hereto, GREEN was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, CFCN Policies and Procedures, and FRC Policies and Procedures regarding case management of foster children in Miami-Dade County, including M.O. and A.O.

29.     GREEN is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

30.     At all times material hereto, Defendant, ANTOINESHA JOHNSON (hereinafter "JOHNSON"), was a Case Manager and/or a Case Manager Supervisor employed by FRC.

31.     At all times material hereto, JOHNSON was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, CFCN Policies and Procedures, and FRC Policies and Procedures regarding case management of foster children in Miami-Dade County, including M.O. and A.O.

32.     JOHNSON is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

33.     At all times material hereto, Defendant, MYRLANDE BREEDLOVE (hereinafter "BREEDLOVE"), was a Case Manager employed by FRC.

34.     At all times material hereto, BREEDLOVE was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, CFCN Policies and Procedures, and FRC Policies and Procedures regarding case management of foster children in Miami-Dade County, including M.O. and A.O.

35.    BREEDLOVE is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

36.    At all times material hereto, Defendant, SANALEE MEIKLE (hereinafter "MEIKLE"), was a Case Manager employed by FRC.

37.    At all times material hereto, MEIKLE was obligated to comply with all state and federal laws, rules, and regulations, DCF Operating Procedures, CFCN Policies and Procedures, and FRC Policies and Procedures regarding case management of foster children in Miami-Dade County, including M.O. and A.O.

38.    MEIKLE is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

39.    At all times material hereto, Defendant, MARLENE BAPTISTE (hereinafter "BAPTISTE"), was a Child Protective Investigator ("CPI") employed by DCF, who, at all times relevant hereto, investigated allegations that M.O. was being abused and neglected.

40.    At all times relevant hereto, BAPTISTE was obligated to comply with all state and federal laws, rules, and regulations as well as DCF Operating Procedures regarding child protective investigations involving children in state care, including M.O. and A.O.

41.    At all times relevant hereto, BAPTISTE had the ability, authority and the means to remove a child from a placement in which there was a substantial risk of serious harm to the child.

42.    BAPTISTE is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

43.    At all times material hereto, Defendant, SONIA BROOKS (hereinafter "BROOKS"), was a CPI employed by DCF, who, at all times relevant hereto, investigated allegations that M.O. was being abused and neglected.

44.     At all times relevant hereto, BROOKS was obligated to comply with all state and federal laws, rules, and regulations as well as DCF Operating Procedures regarding child protective investigations involving children in state care.

45.     At all times relevant hereto, BROOKS had the ability, authority and the means to remove a child from a placement in which there was a substantial risk of serious harm to the child.

46.     BROOKS is an individual, is being sued in her individual capacity, and upon information and belief is sui juris and a resident of the state of Florida.

## GENERAL ALLEGATIONS

47.     On or about April 20, 2022, DCF removed M.O. and A.O. from their biological parents and placed them in the custody of the State of Florida, due to concerns of a temporary mental health condition of the mother and the father having early onset Alzheimer's.

48.     On or about April 20, 2022, DCF assigned M.O. and A.O.'s case to CFCN to provide foster care and related services.

49.     On or about April 20, 2022, CFCN assigned M.O. and A.O.'s case to FRC to provide foster care and related services, including case management services.

50.     On or about April 20, 2022, FRC assigned JOHNSON as the first case manager for M.O. and A.O.'s case.

51.     As of April 20, 2022, CFCN, FRC, and DCF knew that the plan was for M.O. and A.O. to be reunified with their parents, and their placement in out-of-home care was only temporary.

52.     As of April 20, 2022, DCF, CFCN, FRC, NEELY, TORRES, and GREEN were required to obtain and share information related to M.O. and A.O.'s developmental, educational,

medical, and behavioral health needs to assist in identifying the most appropriate placement able to meet the children's needs.

53.    On or about April 20, 2022, DCF, CFCN, FRC, NEELY, TORRES, GREEN, and JOHNSON knew or should have known that M.O.:

    a.    Was thirteen (13) years old;

    b.    Was diagnosed with Autism Spectrum Disorder;

    c.    Was non-verbal;

    d.    Only ate pureed foods and was only able to chew very little;

    e.    Was not potty trained, wore diapers, and needed assistance with toileting;

    f.    Needed assistance with all activities of daily living;

    g.    Had significant motor skill delays and speech delays;

    h.    Had skill deficits that were severely impacting her performance in everyday life;

    i.    Had been receiving Applied Behavioral Analysis (hereinafter "ABA") therapy twenty-five (25) hours per week prior to removal, the ABA provider recommended in an April 2022 re-assessment that the amount of hours be increased to thirty (30) hours per week, these services were medically necessary, and these services needed to continue in order to improve all areas of M.O.'s life;

    j.    Had been receiving speech therapy and occupational therapy three (3) times per week prior to removal, these services were medically necessary, and these services needed to continue;

    k.    Had previously been determined eligible for Agency for Persons with Disabilities (hereinafter "APD") Developmental Disabilities Home and

Community-Based Services (hereinafter "HCBS"), which were Medicaid Waiver services, and had been on a waitlist for these services since 2016; and

l.  Needed a specialized placement qualified to meet her significant needs.

54.  On or about April 20, 2022, DCF, CFCN, FRC, NEELY, TORRES, GREEN, and JOHNSON, knew or should have known that A.O.:

a.  Was eight (8) years old;

b.  Was diagnosed with Autism Spectrum Disorder;

c.  Had motor skill delays and speech delays;

d.  Had been receiving ABA therapy prior to removal, these services were medically necessary, and these services needed to continue;

e.  Had been receiving speech therapy and occupational therapy three (3) times per week prior to removal, these services were medically necessary, and these services needed to continue; and

f.  Needed a specialized placement qualified to meet her significant needs.

55.  Beginning no later than 2018, four (4) years before M.O. and A.O. were placed under DCF and FRC's care, custody, and control, DCF and FRC knew of deficiencies within the Southern Region system of care, including insufficient placements, failure to maintain an even remotely adequate number and variety of foster homes and other placements for the number of children in the system and their needs, and failure to provide medically necessary therapeutic and behavioral services to address the special needs of children placed in care, as evidenced by a class action lawsuit filed against then DCF Secretary, Mike Carroll, in the case *H.G. and M.G., at al., v. Mike Caroll, in his official capacity as Secretary of DCF*, Case Number 4:18-cv-00100-RH/CAS, filed in the Northern District of Florida, Tallahassee Division (hereinafter "Class Action").

56.     Beginning no later than 2019, when CFCN became the lead agency for foster care and related services in the Southern Region, three (3) years before M.O. and A.O. were placed under CFCN's care, custody, and control, CFCN knew of deficiencies within its system of care including insufficient placements, failure to maintain an even remotely adequate number and variety of foster homes and other placements for the number of children in the system and their needs, and failure to provide medically necessary therapeutic and behavioral services to address the special needs of children placed in care, as evidenced by the Class Action.

57.     DCF, CFCN, and FRC knew that a Settlement Agreement was reached in the Class Action in March 2019, requiring the lack of appropriate placements and provision of services to children placed in foster care in the Southern Region to be addressed and remedied.

58.     However, as of April 20, 2022, DCF, CFCN, and FRC had failed to remedy the lack of sufficient placements and provision of services, there was still a failure to maintain an even remotely adequate number and variety of foster homes and other placements for the number of children in the system and their needs, and there was still a failure to provide medically necessary therapeutic and behavioral services to children served by DCF, CFCN, and FRC in the Southern Region, resulting in large numbers of children, including M.O. and A.O., not having their placement and services needs met and being exposed to harm while in foster care.

59.     On April 20, 2022, CFCN, NEELY, and DCF completed a Comprehensive Placement Assessment for M.O. and inaccurately recorded that she had no special dietary restrictions or needs, no concerning behaviors, no issues with bed-wetting, was not receiving occupational therapy, was high functioning autistic, and was not active with APD.

60.     As of April 20, 2022, DCF, CFCN, FRC, NEELY, TORRES, GREEN, and JOHNSON knew or should have known that M.O. met all three priority levels for APD crisis status pursuant to Florida Administrative Code Rule 65G-1.047, and she qualified for placement in an

APD specialized home with residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living.

61.     On April 20, 2022, despite M.O. and A.O.'s significant needs for specialized placement and services, and M.O.'s qualification for APD crisis services and placement, DCF, CFCN, FRC, NEELY, and GREEN determined that M.O. and A.O. were appropriate for placement in a "family foster home," and identified JONES, a traditional foster parent, which is the lowest level of licensed homes with no specialized training, as a possible foster care placement for M.O. and A.O.

62.     At the time JONES was identified as a possible foster care placement for M.O. and A.O., CFCN and DCF, as the agencies responsible for licensure of the JONES foster home, knew that prior to JONES' initial licensure as a foster parent:

    a.  JONES had a 2008 abuse report against her involving the bone fracture and death of her nephew while in her care;

    b.  JONES had a 1989 arrest where adjudication was withheld for petit larceny and theft charges, which JONES denied, but which was explored no further by CFCN or DCF;

    c.  Law enforcement responded to JONES' home on multiple occasions, including a July 2006 domestic disturbance incident, an August 2015 domestic disturbance incident, a July 2017 investigation, and an August 2019 investigation, which were not addressed during the initial licensure process;

    d.  JONES had a domestic violence case court case and a domestic violence with children case court case, which were not addressed during the initial licensure process;

e.  JONES had at least twelve (12) traffic citations, including careless driving, disobeying traffic laws, driving an unsafe vehicle, and multiple instances of failure to stop;

f.  JONES had an adult son whom she did not raise, JONES' son was instead raised by the child's grandmother since he was six (6) years old, and JONES' son still lived with his grandmother and did not live with JONES;

g.  In her initial licensing paperwork, JONES stated she understood the purpose of discipline, but stated "[w]hen you beat a child, you begin to train them and then they become accustomed to the 'training' and expect it;" and

h.  Prior to being licensed as a foster parent, JONES had never dealt with a child with behavioral or disabilities challenges.

63.  Despite all of the known concerns and red flags found during the initial licensure process, on June 28, 2020, CFCN recommended that JONES be licensed as a foster parent, and on June 29, 2020, DCF licensed JONES as a foster parent for two (2) children aged zero (0) to five (5).

64.  At the time JONES was identified as a possible foster care placement for M.O. and A.O., CFCN and DCF, as the agencies responsible for re-licensure, and monitoring of the JONES foster home, knew that after JONES was initially licensed as a foster parent:

a.  On September 8, 2020, the first (1st) abuse report was received against JONES only nineteen (19) days after the first foster child was placed in JONES' care, alleging:

i.  "Recently there have been concerns for the child;"

ii.  JONES has "erratic behavior and has severe mood swings;"

      iii.  JONES "goes on rants and tirades that seem to indicate some level of mental illness, instability, or substance abuse;" and

      iv.  It was unknown how JONES' behavior was affecting the child; however, JONES had "been observed screaming at strangers for no reason;"

b.  On September 29, 2020, CFCN and DCF participated in a staffing to address the first (1st) abuse report against JONES, and reportedly required JONES to take "additional trainings" as a result of this abuse report;

c.  Between September 9, 2020 and January 19, 2021,

      i.  JONES demanded an enhanced board rate for multiple foster children placed in her care;

      ii.  JONES accused at least one foster child of "playing the victim;"

      iii.  JONES accused foster children placed in her care of lying; and

      iv.  JONES wanted to enroll the foster children in a school of JONES' choice rather than the children's home school;

d.  On January 19, 2021, the second (2nd) abuse report was received against JONES alleging mental injury of a foster child placed in JONES' care, resulting in that child's removal from the JONES foster home at that child's request;

e.  A placement hold was temporarily placed on the JONES foster home because of the abuse report;

f.  On January 21, 2021, an exit interview was completed with a foster child who had been placed with JONES for five (5) months, which put DCF and CFCN on notice that:

      i.  JONES would keep the foster child up until midnight to do chores;

ii. JONES was verbally abusive to the foster child and would insult the child by calling him names such as liar, lazy, and unappreciative;

iii. JONES' "usual way of communication" with the foster child was yelling, screaming, and cursing;

iv. JONES threatened the child with removal several times by telling him to pack his bags;

v. JONES would get mad when the child spoke about his biological family;

vi. JONES spoke negatively about the child's biological father to the child;

vii. JONES would not allow the foster child to have communications with anybody other than JONES' family;

viii. JONES spoke about the child's case manager negatively and told the child she got the case manager fired;

ix. The foster child reported he was "not satisfied" with the care he received in the JONES foster home;

x. The foster child reported he did not feel safe or comfortable in the JONES foster home because JONES' behavior was erratic; and

xi. The foster child was removed from JONES because she was "inappropriate and verbally abusive."

g. On April 7, 2021, CFCN reported that JONES had a difficult time managing simple behavior challenges; CFCN again referred JONES to training, this time for trauma informed "positive parenting;" and a psychologist was supposed to follow-up after the training to assess JONES for "gained insight;" however, upon information and belief, this assessment never took place;

15

h.  Despite the plethora of concerns regarding JONES and two (2) abuse reports against JONES the first year she was licensed as a foster parent, in June 2021, CFCN recommended that JONES be re-licensed as a foster parent and DCF re-licensed JONES as a foster parent for two children aged zero (0) to five (5).

i.  Between July 2, 2021 and March 3, 2022:

   i.  JONES continued to complain about the behaviors of foster children placed in her care;

   ii.  JONES continued to demand enhanced board rates for foster children placed in her care;

   iii.  At least two (2) different foster children ran away from the JONES foster home;

   iv.  Law enforcement responded to the JONES foster home at least seven (7) times since the home was re-licensed, including on July 19, 2021, for a runaway, on September 22, 2021, for a "disturbance" and "domestic dispute," on September 30, 2021, for another runaway, and three times on October 31, 2021, due to altercations with foster children; and

   v.  JONES requested the removal of at least two (2) foster children from her home;

j.  On or about March 3, 2022, despite the mounting plethora of concerns regarding the JONES foster home, including abuse reports, run aways, threats of removal, and law enforcement responses, CFCN requested and DCF approved for JONES to increase her licensed capacity from two (2) foster children to three (3) foster children between the ages of three (3) to fifteen (15);

k. Between March 3, 2022, and April 20, 2022:

    i. A special needs foster child was placed with JONES, resulting in JONES having three (3) foster children placed in her care;

    ii. JONES reported that it was more difficult than she expected with the special needs foster child because the foster child could not do anything for herself;

    iii. JONES accused the special needs child of making "creepy" noises and stating "she wants to be with the devil;"

    iv. JONES threatened removal of the special needs foster child;

    v. JONES demanded an enhanced board rate for the special needs child;

    vi. Another foster child placed with JONES disclosed that JONES did not feed her; and

    vii. JONES accused that foster child of lying and threatened that child's removal from the home; and

l. On April 20, 2022, earlier in the day on the same day M.O. and A.O. were removed from their biological parents' care, the third (3rd) abuse report was received against JONES, this time alleging physical injury of a foster child in JONES' care; however, CFCN and DCF failed to immediately put a placement hold on the JONES foster home as was required to prevent foster children from being placed in a foster home with an open abuse report.

65. Sometime between the late evening of April 20, 2022, and the early morning of April 21, 2022, due to CFCN and DCF's failure to remedy the continued placement crisis in Miami-Dade County, CFCN, FRC, NEELY, TORRES, and GREEN made an operational level determination that the JONES traditional foster home was the most appropriate placement for M.O.

and A.O., despite knowledge that JONES could not meet M.O. and A.O.'s serious behavioral needs, and that M.O. and A.O. needed a higher level of care and supervision than JONES could provide.

66.     At the time CFCN, NEELY, and TORRES decided to place M.O. and A.O. in the JONES foster home, CFCN, NEELY, and TORRES knew or should have known that:

    a.   JONES was a single foster parent who worked full time;

    b.   The JONES foster home was already at her newly increased licensing capacity of three (3) foster children, including at least one (1) foster child who was significantly developmentally delayed;

    c.   Placement of M.O. and A.O. in the JONES foster home would result in the JONES foster home being over its licensed capacity by two (2) foster children;

    d.   There was an open abuse report against JONES which required a placement hold prohibiting placement of any foster child, including M.O. and A.O. in the JONES foster home; and

    e.   The open abuse report was the third (3rd) abuse report against JONES since she was initially licensed as a foster parent less than two (2) years earlier.

67.     Sometime between the late evening of April 20, 2022 and the early morning of April 21, 2022, CFCN, NEELY, and TORRES completed an Over-Capacity Assessment for M.O. and A.O. to be placed in the JONES foster home where CFCN/NEELY:

    a.   Acknowledged that this was a one parent foster home;

    b.   Inaccurately reported that M.O. was "high functioning" autistic;

    c.   Inaccurately reported that there were no active abuse reports on the JONES foster home;

    d.   Inaccurately reported that JONES had displayed the ability to keep foster children safe and protected in her home;

    e.   Acknowledged that one of the foster children currently placed in the JONES foster home had been Baker Acted multiple times due to suicide attempts and animal cruelty and had a history of sexual abuse;

    f.   Acknowledged that M.O. and A.O. would be the vulnerable children in the JONES foster home;

    g.   Acknowledged that a Multi-Disciplinary Team (hereinafter "MDT") Staffing was required, but was not held to discuss this specific placement; and

    h.   Nonetheless determined that placement of M.O. and A.O. in the JONES foster home was the "best option."

68.    Sometime between the late evening of April 20, 2022, and the early morning of April 21, 2022, CFCN, NEELY, and TORRES approved placement of M.O. and A.O. in the over-capacity JONES foster home, where they would not receive critically necessary specialized care and services, because "no other placement options were available," and approved for JONES to be paid an enhanced board rate for both M.O. and A.O.

69.    In the middle of the night on April 21, 2022, FRC transported M.O. and A.O. to the JONES foster home for placement, placing M.O. and A.O. in a foster home where they would not receive critically necessary specialized care and services.

70.    Prior to placing M.O. and A.O. with JONES, CFCN, FRC, DCF, NEELY, TORRES, and GREEN were required to ensure JONES was provided with all the information necessary to ensure she could safely and appropriately meet M.O. and A.O.'s needs, including information regarding their medical, physical and emotional needs and presenting behavioral

health symptoms; however, CFCN, FRC, DCF, NEELY, TORRES, and GREEN failed to provide JONES with critical information as to these subjects and as to M.O.'s actual level of functioning.

71.     On April 21, 2022, within hours of the placement, CFCN/CARVALHO knew that JONES complained that M.O. did not know how to bathe, use the restroom, do her own hair, or eat on her own and that M.O. was a lot more work than CFCN told JONES she was going to be; but CFCN and CARVALHO nonetheless allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they would not receive critically necessary specialized care and services.

72.     Also on April 21, 2022, FRC/JOHNSON completed the first home visit at the JONES foster home and knew that A.O. appeared "nervous and anxious," M.O. presented with both physical and mental delays, and it was not known how M.O. was actually feeling because she was unable to speak and unable to verbalize her feelings; however, FRC/ JOHNSON allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they would not receive critically necessary specialized care and services.

73.     On April 21, 2022, CFCN, FRC, and DCF knew that the Court, at the Shelter Hearing, ordered both M.O. and A.O. to continue receiving the medically necessary therapies in which they were engaged prior to their removal, including, but not limited to, ABA therapy; CFCN, FRC, and DCF, however, continuously violated the Court's order, and neither M.O. nor A.O. consistently received all of the services they had been receiving prior to removal throughout the time the children were placed in the JONES foster home.

74.     Because CFCN and FRC believed neither M.O. nor A.O. were receiving APD services, CFCN and FRC were required to refer both children for assessments to determine eligibility for APD services because both children were diagnosed with Autism Spectrum

Disorder, but, CFCN and FRC continuously failed to do so throughout the time the children were placed in the JONES foster home.

76. Because M.O. was already determined eligible for APD HCBS Waiver Services, CFCN, FRC and DCF were required to staff the case monthly to ensure proper enrollment in the HCBS Waiver managed by APD; however, CFCN, FRC and DCF continuously failed to do so throughout the time the children were placed in the JONES foster home.

76. Services were required to be delivered through a single integrated MDT staffing approach, and a MDT staffing was required to take place with CFCN, FRC, and DCF within seventy-two (72) hours of removal to ensure that the placement was in the best interest of the children; however, CFCN, FRC, and DCF failed to convene a MDT staffing within seventy-two (72) hours to address M.O. and A.O.'s placement in the JONES foster home.

77. On April 22, 2022, the day after M.O. and A.O. were placed in the JONES foster home, DCF and CFCN put a "Placement Hold" on the JONES foster home due to the open abuse investigation that was received before M.O. and A.O. were placed in the home; however, DCF and CFCN allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that had an open abuse investigation and was over its licensed capacity.

78. On April 22, 2022, CFCN was again told by JONES that M.O. was needy, that JONES was unaware she would have to change M.O.'s diaper, and that M.O. only ate food in a pureed form; however, CFCN allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that had an open abuse report and was over its licensed capacity, and where they were not receiving critically necessary specialized care and services.

79. On April 26, 2022, FRC completed a Supervisor Review on the case with JOHNSON documenting that both M.O. and A.O. have mental health and developmental issues; FRC/JOHNSON had information about both children being vulnerable; and an abuse report may

need to be called in because A.O. reported to an FRC employee that JONES would leave the children outside for extended periods of time; however, upon information and belief, FRC/JOHNSON failed to make a report to the abuse hotline and allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

80.     On April 26, 2022, CFCN completed a licensing visit at the JONES foster home and was required to ensure that both M.O. and A.O. were receiving all services necessary; however, CFCN merely documented that the licensing specialist was unable to speak to either M.O. or A.O. due to their disabilities, failed to address any of the children's medically necessary services or the fact that they were not receiving them, and CFCN allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that had an open abuse investigation and was over its licensed capacity.

81.     Between April 27, 2022 and August 12, 2022, instead of ensuring that M.O. received the medically necessary services she had been receiving prior her removal, CFCN paid for one-to-one services from a home health aide who was not a board-certified behavior analyst, not a registered behavior technician (hereinafter "RBT"), not trained in ABA, and was just acting as a babysitter to feed and bathe M.O., clean the home, and do laundry, anywhere from four (4) to eleven (11) hours per day, anywhere from four (4) to seven (7) days per week.

82.     On April 28, 2022, FRC transported M.O. to the doctor for her school health exam and M.O. was documented to weigh fifty-three (53) kilograms, which was one hundred sixteen (116) pounds, yet by July 2023, more than a year later, M.O. weighed only seventy-seven (77) pounds.

83.     CFCN/TORRES was required to facilitate a rapid review of the children's adjustment to the JONES foster home and progress on ensuring that the children were receiving

all necessary services within ten (10) days of M.O. and A.O.'s placement in the JONES foster home. However, upon information and belief, CFCN/TORRES failed to do so and failed to ensure M.O. and A.O. received all of the medically necessary services they had been receiving prior to their removal which the Court ordered them to continue receiving.

84.     Between May 5, 2022 and May 17, 2022, FRC/ JOHNSON was contacted at least three (3) times by a service provider referred to complete a psychiatric evaluation and intensive therapy recommended by the Child Protection Team (hereinafter "CPT") for A.O. prior to her removal; however, FRC/JOHNSON repeatedly failed to respond, and when she did finally respond, FRC/JOHNSON was aware that this service provider did not perform psychiatric evaluations, yet FRC/JOHNSON failed to make referrals to any other agency for this recommended evaluation.

85.     On May 9, 2022, APD confirmed that M.O. was still on the wait list for HCBS; however, CFCN and FRC failed to learn this and failed to ensure M.O. immediately received APD crisis services and placement.

86.     On May 10, 2022, FRC/JOHNSON completed a home visit to the JONES foster home and knew that:

        a.   A.O. still wished to go home;

        b.   JONES sometimes forgets to give M.O. and A.O. their medication;

        c.   A.O. had been sleeping in class because she was up late watching tv; and

        d.   The children were "pending" ABA and individual therapy;

        e.   Nonetheless, FRC/JOHNSON allowed M.O. and A.O. to remain placed in this inadequate and unsuitable foster home where they were not receiving critically necessary specialized care and services.

23

87.     On May 12, 2022, CFCN, FRC, DCF, BROOKS participated in a Licensing Staffing on the JONES foster home due to other children's case managers, including some who worked for FRC, expressing concern that JONES would not transport children to medical appointments and felt that it was not her job, JONES was braiding the children's hair too tightly, and JONES would turn the air conditioner off during the day to force the children to go outside; however, CFCN, FRC, and DCF disregarded the concerns and allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that still had an open abuse investigation and was over its licensed capacity, and where they were not receiving critically necessary specialized care and services.

88.     On May 16, 2022, JONES was asking for an increased board rate for M.O., CFCN/CARVALHO asked JONES to provide support for her request, and CFCN/CARVALHO knew that:

a.   JONES had five (5) children placed in her foster home;

b.   JONES reported she was told both M.O. and A.O. were high functioning autistic prior to their placement in her foster home;

c.   M.O. is in diapers 24/7 and does not eat, shower, brush her teeth, dress, or use the bathroom by herself;

d.   M.O. doesn't speak other than to say her name and no to everything;

e.   JONES has to make M.O. different food because she only eats soft, blended food;

f.   JONES tried to potty train M.O. but she was not responding to that;

g.   JONES has to wake M.O. up in the middle of the night to change her diaper or she will wet the bed;

h.   M.O. has bowel movements every morning and has to be cleaned and bathed;

i.   JONES had one-to-one services for M.O. but they were not there 24/7;

j.   JONES does a lot for M.O. that was not told to her prior to placement; and

k.   JONES accused A.O. of lying a lot.

89.     Rather than recognizing that M.O. needed specialized placement in a skilled home that was qualified to care for her and meet her needs, CFCN/CARVALHO allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that still had an open abuse investigation and was over its licensed capacity, and where they were not receiving critically necessary specialized care and services.

90.     No later than May 17, 2022, CFCN, CARVALHO, FRC, and JOHNSON knew that A.O. reported that she was afraid of JONES; however, when JONES was told about the concerns, JONES accused A.O. of lying and threatened her removal.

91.     Rather than finding out why A.O. was afraid of JONES or removing M.O. and A.O. from this inadequate and unsuitable placement where their needs were not being met, CFCN, CARVALHO, FRC, and JOHNSON allowed M.O. and A.O. to remain in the placement that still had an open abuse investigation and was over its licensed capacity and CFCN/CARVALHO thanked JONES for all of the positive things she had done for children in her care.

92.     On May 19, 2022, CFCN and DCF participated in a Licensing Staffing on the JONES foster home to address the third (3rd) abuse report against JONES; however, rather than addressing the concerns reported against JONES, the outcome of the staffing was to have the child who was the subject of the abuse report get a psychological evaluation, and CFCN and DCF allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that was still over its licensed capacity.

93.     The initial Over-Capacity Waiver for M.O. and A.O.'s placement in the JONES foster home could not exceed thirty (30) days and needed to be reviewed and approved by

CFCN/TORRES; however, there is no evidence that another waiver was approved by CFCN/TORRES, and CFCN/TORRES allowed M.O. and A.O. to remain placed in this inadequate and unsuitable over-capacity foster home where their needs were not being met.

94.     On or about May 23, 2022, CFCN, FRC/JOHNSON received M.O.'s Comprehensive Behavioral Health Assessment (hereinafter "CBHA") and knew that:

    a.  M.O. cried for an entire week after she was placed with JONES;

    b.  JONES reported that M.O. curses at her when she is angry, but M.O. is non-verbal;

    c.  M.O. has difficulty chewing her food and it must be pureed;

    d.  M.O.'s mother was very worried about the care M.O. was receiving because she was losing weight;

    e.  M.O. requires assistance with using the toilet, bathing, and dressing;

    f.  M.O. received behavioral therapy, speech therapy, and occupational therapy prior to her removal;

    g.  M.O. had not received any of those services since being placed in foster care, the services had been suspended, and another provider was going to be identified but that was still pending;

    h.  The CBHA recommended that M.O. continue receiving ABA services in order to increase her ability to function independently;

    i.  The CBHA recommended that M.O. continue receiving speech/language therapy to improve her ability to communicate; and

    j.  The CBHA recommended that M.O. continue receiving occupational therapy in order to improve her ability to eat independently and dress herself.

95.     On or about May 23, 2022, CFCN and FRC/JOHNSON received A.O.'s CBHA and knew that:

a.  A.O. allegedly reported that the other girls in the JONES foster home decided to tell "lies" about JONES because they were angry with her, so A.O. joined in;

b.  A.O. had been receiving seventeen (17) hours of behavioral therapy, three (3) hours of speech therapy, and three (3) hours of occupational therapy per week prior to her removal from her biological parents' home;

c.  A.O. had not received any of those services since being placed in foster care, the services had been suspended, and another provider was going to be identified but that was still pending;

d.  A.O. continued to present with deficits in her social skills, social judgment, self-awareness, and concentration;

e.  The therapy and medication A.O. had been receiving for her disorders seemed to be helpful;

f.  A.O. had previously been diagnosed with PTSD, but based on her current presentation, the CBHA assessor did not think A.O. met the full criteria for the disorder;

g.  A.O. was "quite suggestible" and should be closely supervised;

h.  A.O. and her mother seemed to have a close relationship;

i.  The CBHA recommended that A.O. have an evaluation to determine if she continues to require ABA services, speech therapy, and occupational therapy;

j.  The CBHA recommended that A.O. participate in family therapy with her mother; and

k.  The CBHA recommended that A.O. consult periodically with a pediatric neurologist.

96.     The purpose of the CBHA was to, *inter alia*, provide recommendations for treatment and placement based upon professional judgment, CFCN was required to schedule a staffing with FRC within fourteen (14) days of receiving the CBHAs to review the recommendations and discuss any barriers to implementing the needed behavioral health services, CFCN and FRC were also required to ensure recommendations from the CBHA were completed within seven business (7) days, and CFCN was required to monitor the case for a minimum of three (3) months to obtain updates on the children's progress with the recommended services and determine if anything further was needed for behavioral health stability. But CFCN, FRC/JOHNSON failed to participate in this required staffing and CFCN, JOHNSON, BREEDLOVE, MEIKLE, and GREEN continuously failed to ensure that the recommendations from the CBHAs were complied with throughout the time the children were placed in the JONES foster home.

97.     CFCN, FRC, and JOHNSON knew or should have known that despite M.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued to receive them:

a.  On May 27, 2022, M.O. had her first ABA session since her removal more than a month earlier;

b.  This ABA session was only two and a half hours and took place at M.O.'s aftercare;

c.  This was the only ABA session M.O. had in the month of May 2022;

d.  M.O.'s May 2022 ABA report documented that:

       i.  M.O. was very affected by the change in her life being placed in foster care;

      ii.  M.O.'s ABA therapy was not meeting the corresponding objectives since the total assigned hours were not available and M.O. was not cooperating in the same way that she had advanced with the ABA therapy prior to her removal; and

     iii.  The ABA provider did not know who M.O.'s foster parent was and had not had any contact with JONES; however,

e.  CFCN, FRC, and JOHNSON allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that was still over its licensed capacity, and where they were not receiving critically necessary specialized care and services.

98.    On or about June 1, 2022, CFCN requested and DCF granted a thirty (30) day extension for JONES' foster care license because CFCN had not timely submitted the documents for re-licensure to DCF; however, the license was only for JONES to have two (2) foster children, and there were five (5) foster children placed in this home making JONES over her licensed capacity by three (3) foster children, including M.O. and A.O., whose needs were not being met.

99.    On June 9, 2022, CFCN, TORRES, and DCF participated in another Licensing Staffing for the JONES foster home, this time because there had been three (3) abuse reports against JONES in the less than two (2) years she had been licensed as a foster parent, and during the staffing, the following was discussed:

a.  JONES was a single family home with five (5) children who have special needs;

b.  It had been determined that JONES was better suited for younger children;

c.  The age range was changed for the home in order to avoid issues the older teens had in the home;

d.  The children in the JONES foster home currently were functioning at younger levels than their chronological age;

e.  The one-to-one went to the programs the children were in, then went to the home until bedtime and then would leave, and there was a desire to maintain one-to-one providers in the home;

f.  There was no immediate transition coming for these children and there were no immediate options to transition the children to a different appropriately licensed foster home;

g.  The licensing waiver had reportedly been extended by CFCN/TORRES and a capacity increase would be presented by CFCN the following week to have JONES' licensing capacity increased to five (5) children to keep the children in the home, including M.O. and A.O., "stably placed;"

h.  The staffing participants were to ensure that additional services were not needed and that CFCN was comfortable with the level of services being provided; and

i.  CFCN, TORRES, and DCF allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that was still over its licensed capacity, and where they were not receiving critically necessary specialized care and services.

100.  As of June 30, 2022, CFCN, CARVALHO, and TORRES knew that JONES continued demanding an even higher board rate for M.O., and to support this demand:

a.  JONES stated she had been caring for M.O. and A.O. for almost three (3) months;

b.  JONES stated she was told by CFCN prior to placement that both M.O. and A.O. were high functioning autistic;

c.  JONES stated M.O. uses a diaper and had no clue if she has to go to the bathroom or when she was hungry;

d.  JONES stated she has to do everything for M.O.;

e.  JONES stated she was assigned a one-to-one for M.O, who was just a home health aide with no specific training or qualifications to address M.O.'s disability needs, and whom JONES said "does NOTHING," and JONES still had to care for M.O. while the one-to-one plays on her phone all day;

f.  JONES complained that M.O. was wiping poop on the walls, JONES had to spoon feed M.O. four meals a day, and JONES had to buy diapers and wipes for M.O.;

g.  JONES complained that the money CFCN was spending on one-to-ones, who were just home health aides with no specific training or qualifications to address M.O.'s disability needs, and the nurses' aides CFCN wanted to hire, could be used to pay JONES for expenses JONES was facing to care for M.O. instead of getting M.O. services;

h.  JONES advised she would not accept less than one hundred fifty dollars ($150.00) per day and weekly wipes and laundry detergent to care for M.O.;

i.  JONES advised that she was providing notice for removal of M.O. but that she was willing to keep A.O. if permitted.

101.  In response to JONES' demands, which supported moving M.O. to a specialized placement that could meet her needs and provide her with medically necessary services and not paying JONES more money, CFCN/TORRES thanked JONES for all that she does "to provide

quality care for the children," and CFCN, CARVALHO, and TORRES allowed M.O. and A.O. to remain in this inadequate and unsuitable placement that was still over its licensed capacity, and where they were not receiving critically necessary specialized care and services.

102.    In June 2022, CFCN and DCF completed the re-licensure process for the JONES foster home and knew that:

     a.   Law enforcement had responded to the JONES foster home eight (8) times during the previous licensing year;

     b.   JONES had another abuse report against her during the previous licensing year, making three (3) abuse reports in the first two (2) years she was licensed;

     c.   JONES' biological son was no longer a frequent visitor to the foster home, but there was no inquiry into why;

     d.   According to the re-licensure documents, JONES was caring for five (5) special needs children; and

     e.   JONES had received at least two (2) negative case manager reviews stating that JONES was adamant she would not assist with medical appointments for the children in her care and would not transport foster children anywhere because she felt it was not her job.

103.    Despite the abundance of concerns regarding JONES, CFCN again recommended that JONES be re-licensed as a traditional foster home and that her licensed capacity be increased from three (3) children to five (5) children and on July 1, 2022, DCF re-licensed JONES and increased her licensed capacity to five (5) foster children, and CFCN and DCF allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

104.    On July 5, 2022, FRC/JOHNSON transported A.O. to and participated in a therapy intake appointment for her, during which:

     a.  JOHNSON reported she was unaware that A.O. had an autism diagnosis despite being the case manager for more than two (2) months;

     b.  A.O. and JOHNSON reported A.O. was very close to her mother;

     c.  JOHNSON reported that A.O. exhibited some worries about not staying in foster care due to becoming attached to JONES;

     d.  JOHNSON reported A.O. was beginning to say she wanted to get adopted by JONES;

     e.  A recommendation was made that A.O. receive in person trauma-focused cognitive behavioral therapy;

     f.  A recommendation was made that a caregiver be involved in the therapy with A.O.; and

     g.  A recommendation was made that A.O.'s mother be engaged in the services with A.O.; however,

     h.  FRC/JOHNSON failed to comply with these recommendations.

105.    On July 6, 2022, FRC/JOHNSON participated in a biopsychosocial assessment for A.O. with a different therapeutic provider and knew that A.O. reported having crying spells, bouts of sadness, fearfulness, and feeling worried; A.O. reported a close and good relationship with her mother and that she missed her mother a lot; and individual therapy was also recommended by this provider, but through telehealth.

106.    On July 14, 2022, FRC/JOHNSON completed a home visit with M.O. and A.O. in the JONES foster home during which:

     a.  A.O. ignored FRC/JOHNSON;

b.  JONES told FRC/JOHNSON that A.O. was upset with her because JOHNSON told the mother that A.O. wants to stay in foster care with JONES;

c.  FRC/JOHNSON asked JONES if she was still indecisive about M.O. remaining in her home as JONES had complained about M.O. in the past;

d.  JONES reported that for now M.O. could remain in the home;

e.  FRC/JOHNSON told JONES that FRC wanted to keep the siblings together so if JONES asked for M.O. to be removed, FRC would also look for A.O. to be placed elsewhere with M.O.; and

f.  JONES reported that M.O. and A.O. were receiving ABA services, occupational therapy, and speech therapy, but only at camp or at the office location; however,

g.  FRC/JOHNSON allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

107.   Also in July 2022, JONES began making allegations to CFCN and FRC that A.O. said that she was sexually abused by her biological mother and that the biological mother was shaving M.O.'s private area during supervised visits.

108.   On July 28, 2022, FRC/JOHNSON was transporting A.O. home from an occupational therapy and speech therapy appointment and asked A.O. about the sexual abuse allegations JONES made against the mother, and while alone with FRC/JOHNSON outside of JONES' presence, A.O. denied the allegations and denied ever telling JONES that her mother touched her inappropriately; however, after FRC/JOHNSON dropped A.O. off, JONES contacted FRC/JOHNSON saying A.O. lied to FRC/JOHNSON.

109.     On July 28, 2022, DCF received the first in a series of three (3) abuse reports called in to the DCF Abuse Hotline alleging that the biological mother sexually abused A.O. and M.O., based on JONES' repeated accusations.

110.     On July 28, 2022, DCF interviewed A.O. about the allegations against the mother, and in response A.O. began to hum, asked to speak to DCF in private, when asked about discipline in the JONES foster home, A.O. said she did not want to talk about it and appeared very nervous, and A.O. refused to answer any more questions; however, DCF allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

111.     On August 4, 2022, the Court entered an order prohibiting all parties to the case and/or individuals with knowledge of or involvement in the case, including JONES, from speaking with the children regarding the case or the underlying causes of the case, and ordering that any violations of the Order would result in removal from the case. But, CFCN and FRC knew that the Order was repeatedly violated throughout the time the children were placed in the JONES foster home and did nothing about it.

112.     On or about August 4, 2022, FRC assigned BREEDLOVE as the next case manager and JOHNSON became the supervisor on the case.

113.     At the time BREEDLOVE was assigned the case, BREEDLOVE knew or should have known that:

    a.  M.O. was diagnosed with Autism Spectrum Disorder;

    b.  M.O. was non-verbal;

    c.  M.O. only ate pureed foods and was only able to chew very little;

    d.  M.O. was not potty trained, wore diapers, and needed assistance with toileting;

    e.  M.O. needed assistance with all activities of daily living;

f.  M.O. had significant motor skill delays and speech delays;

g.  M.O. had skill deficits that were severely impacting her performance in everyday life;

h.  M.O. had been receiving ABA therapy twenty-five (25) hours per week prior to removal, the ABA provider had recommended in an April 2022 re-assessment that the amount of hours be increased to thirty (30) hours per week, these services were medically necessary and Court ordered to continue, but M.O. was only receiving a fraction of the ABA services allotted to her;

i.  M.O. had been receiving speech therapy and occupational therapy three (3) times per week prior to removal, these services were medically necessary, and these services were Court ordered to continue;

j.  M.O. had previously been determined eligible for APD HCBS Waiver services and had been on a waitlist for these services since 2016;

k.  M.O. needed a specialized placement qualified to meet her significant needs;

l.  A.O. was diagnosed with Autism Spectrum Disorder;

m.  A.O. had motor skill delays and speech delays;

n.  A.O. had been receiving ABA therapy prior to removal, these services were medically necessary, these services were Court ordered to continue, A.O. was only receiving a fraction of the ABA services allotted to her at times, and none whatsoever at other times;

o.  A.O. had been receiving speech therapy and occupational therapy three (3) times per week prior to removal, these services were medically necessary, and these services were Court ordered to continue; and

p.  A.O. needed a specialized placement qualified to meet her significant needs.

36

114.   In August 2022, CFCN/TORRES approved another enhanced board rate for JONES to receive for M.O.'s placement retroactive to July 1, 2022, and CFCN/TORRES justified their decision based on the following:

   a.   M.O. qualified for the Developmental Tier Rate of $60.00 per day due to documented and observed developmental delays, concurred by a service provider, of impaired daily functioning requiring more supervision and support from the caregiver and/or will also require the caregiver to assist with the coordination of specialized services to address noted delays;

   b.   M.O. requires a high level of involvement from the caregiver for daily living tasks (outside of age-appropriate range);

   c.   At the time of initial placement on April 20, 2022, M.O. was approved for crisis rate of $80.00 per day;

   d.   JONES reports that M.O. needs assistance with eating, showering, brushing her teeth and dressing;

   e.   JONES advised that M.O. is not independent and must have assistance with everything;

   f.   JONES reported that although M.O. wears diapers, she smears her waste on the walls, and JONES must wake up in the middle of the night, and often change M.O.'s bedding;

   g.   JONES has expressed that M.O.'s "needs have increased further;"

   h.   M.O. "is stable in her placement with increased supervision and extra support not only from the caregiver but also via one to one staff;"

   i.   one to one service was an added support service within 30 days of the initial placement;

j.  As of August 5, 2022, the one to one service hours are 8am-5pm Monday through Friday at the day summer program, and 5:30pm-8pm Monday and Wednesday at the foster home;

k.  JONES advised that in the past three (3) months, M.O. has gone through three (3) different beddings and two (2) mattresses;

l.  JONES reported she purchases extra detergent, diapers, and cleaning supplies to support M.O.;

m.  M.O. is nonverbal and does not verbalize when she is hungry;

n.  JONES must spoon feed M.O. four (4) meals a day and four (4) to five (5) snacks a day and M.O.'s food must be pureed;

o.  M.O.'s CBHA confirmed M.O.'s autism diagnosis, her limited functioning, and her need for ABA therapy, RBT therapy, occupational therapy, and speech therapy;

p.  CFCN's Early Childhood Manager reported that M.O. is not an approved APD client nor is she on the APD waitlist, even though she was approved for APD services, was placed on the waitlist in 2016, and was still on the waitlist at this time;

q.  "Given M.O.'s complex needs, in addition to ongoing authorization for one [on] one services as needed to support [JONES, M.O.] is approved for an additional enhancement to $100/day;"

r.  This additional enhancement "is not a crisis rate," and this "is the rate [M.O.] is currently assessing for given the level of care she is requiring to meet her daily needs is equivalent to Residential Level 2;"

s.  There are four (4) other foster children currently in the home;

t. "[t]he enhanced rate is requested to support [JONES'] ability to access additional resources and have increased flexibility to provide the required supervision and support to [M.O.] including but not limited to encouraging attendance to needed services to address the history of trauma, delays and or mental health symptoms;" and

u. CFCN/TORRES allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services that JONES was getting paid to ensure they received.

115. On August 9, 2022, CFCN, CARVALHO, FRC, and BREEDLOVE participated in a Staffing regarding the JONES foster home, where the following was discussed:

a. JONES had been talking inappropriately about the children's mother in front of the children and their case manager;

b. A.O. stated she has heard JONES say their mother "is crazy and is the devil;"

c. JONES only met the mother once, but the team felt the mother "is great with the kids;"

d. FRC/BREEDLOVE did not feel that the JONES foster home was a fit for M.O. and A.O.;

e. The "team" felt that JONES was "putting fear into the children;"

f. A.O. again stated that JONES does not always give them their medication; and

g. The "team as a whole feels that a 30 day removal" needed to be put in place, and the "team [was] in agreement with having [M.O. and A.O.] replaced from the [JONES] foster home ideally within a 30-day time frame."

116.    Despite the fact that "the team" had decided that removal of M.O. and A.O. from the JONES foster home was in the children's best interest, they were not removed, and CFCN, CARVALHO, FRC, BREEDLOVE, and JOHNSON allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

117.    On August 23, 2022, FRC/BREEDLOVE completed a home visit with M.O. and A.O. in the JONES foster home, during which:

a.   JONES reported that M.O. comes home from visits with her mother crying and tapping her hands on the side of her head, which JONES claimed was an indication that M.O. did not want to go around her mother. The FRC visitation supervisor, however, told BREEDLOVE that the visits with the mother were going well, and M.O. is seen hugging and kissing her mother all the time;

b.   A.O. told FRC/BREEDLOVE that she no longer wanted to stay in her school, and she wanted to change to the school the other children placed in the JONES foster home went to;

c.   JONES stated it was very sad that the girls can't change schools to the school of JONES' choice;

d.   A.O. told FRC/BREEDLOVE that she was told she would be changing homes and asked if that was true, and in response FRC/BREEDLOVE advised it was and that a request had been sent out;

e.   A.O. advised FRC/BREEDLOVE that she wanted to stay with JONES so FRC/BREEDLOVE said they would look into it further before anything happens;

  f. JONES reported that A.O. said she would kill herself if she was removed from the foster home;

  g. JONES reported that M.O. was now potty trained;

  h. JONES alleged that when the girls were first placed with her, M.O. would masturbate in front of the other children; and

  i. JONES then made sexual abuse allegations against the mother again; however,

  j. FRC/BREEDLOVE allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

118. On August 31, 2022, CFCN, CARVALHO, TORRES, FRC, and BREEDLOVE participated in a Stability Staffing to keep M.O. and A.O. in the JONES foster home, in a change of course from the last staffing, and during the staffing CFCN/TORRES stated that she believed that the JONES foster home was the "best placement" for the children, and FRC/BREEDLOVE then agreed to speak internally about switching M.O. and A.O.'s schools to the school JONES wanted them to attend contrary to section 39.4023, Florida Statutes, and the "team" allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

119. CFCN, FRC, BREEDLOVE, and JOHNSON knew or should have known that despite M.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued receiving them, in August 2022, M.O.'s ABA provider expressed the following concerns:

  a. Despite being assigned to work with M.O. twenty-five (25) hours per week and having recommended that this be increased to thirty (30) hours per week in

April 2022, M.O. was only receiving one third of the service hours deemed medically necessary;

b.  M.O. was only receiving ABA services at camp or aftercare or during supervised visits;

c.  Since M.O. had been placed in foster care, she had been going to school dirty with poor hygiene, and M.O. appeared to be poorly cared for;

d.  M.O. is not a functional child, and many of her personal care tasks must have physical or verbal help, and since she did not have the help, she was not able to take care of herself properly;

e.  M.O. was always tired and sleepy and cried a lot, but she could not express how she feels since she is non-verbal;

f.  M.O. does not tolerate a wide variety of foods, and since her diet is not current, she had lost approximately thirty (30) pounds since entering foster care;

g.  The ABA provider had not had any contact with JONES;

h.  JONES did not participate in information gathering for the ABA provider;

i.  JONES did not participate in the parenting training component of ABA therapy so she could know how to properly take care of M.O. and reinforce positive behaviors at home; and

j.  M.O.'s ABA provider submitted similar reports expressing concerns that were ignored on a monthly basis; however,

k.  CFCN, FRC, BREEDLOVE, and JOHNSON allowed M.O. and A.O. to remain in this inadequate and unsuitable placement where they were not receiving critically necessary specialized care and services.

42

120.    On or about September 6, 2022, CFCN, FRC, DCF, CARVALHO, BREEDLOVE, and JOHNSON participated in an Education MDT Staffing and determined that it was not in M.O. and A.O.'s best interest to remain in the school or program of origin, the basis for this decision was that JONES wanted them enrolled in a school near her home, and a decision was made by CFCN, FRC, DCF, CARVALHO, BREEDLOVE, and JOHNSON to change both M.O. and A.O.'s schools despite the fact that both children were special needs and had specialized services at their schools of origin, contrary to section 39.4023, Florida Statutes.

121.    On or about September 12, 2022, FRC/BREEDLOVE transported M.O. to a neurology follow-up appointment where:

    a.  M.O. was noted to appear more anxious than in prior visits;

    b.  M.O. had lost twenty-one (21) pounds since her appointment last year;

    c.  M.O. weighed the same weight she had weighed at her last in person appointment two (2) years earlier;

    d.  Behavior analyst services and occupation therapies were medically recommended to continue; and

    e.  It was recommended that M.O. follow-up with her primary care physician regarding her weight loss; however,

    f.  FRC, BREEDLOVE, and JOHNSON allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services and did not investigate M.O.'s weight loss.

122.    On or about September 13, 2022, FRC and DCF participated in a hearing where, because of JONES' repeated allegations of sexual abuse, the Court ordered that the mother's visits be reduced, changed to therapeutic, and that she have supervision at every moment of the visit,

including any restroom visit or walking in the hallway. However, upon information and belief, FRC and DCF failed to inform the Court at this hearing, prior hearings, and subsequent hearings, that neither M.O. nor A.O. were consistently receiving the medically necessary therapies the Court ordered them to continue receiving five (5) months earlier, that M.O. had lost significant weight since entering out of home care, and that M.O. and A.O. required specialized placement by a caregiver who could meet their needs and provide necessary services.

123.    Moreover, even after visits with the mother were supervised at every moment, JONES continued to make sexual abuse allegations against the mother claiming that the mother shaved M.O.'s private area during a visit; in fact, however, FRC supervised the visit at FRC's office, and no such thing occurred.

124.    On or about September 16, 2022, FRC/BREEDLOVE completed a home visit with M.O. and A.O. in the JONES foster home, during which:

   a.   A.O. reported she no longer wanted to visit with her mother because she complains about JONES too much and because of the sexual abuse allegations that started with JONES;

   b.   A.O. reported she no longer wants to go back to her mother;

   c.   A.O. had started wetting her bed at night;

   d.   A.O. defecated in her underwear and stuffed it inside M.O.'s drawer because "she didn't want to get a beating;"

   e.   M.O. was non-verbal and unable to tell FRC/BREEDLOVE if she feels safe; and

   f.   JONES reported she was changing the girls' aftercare for at least the second time; however,

     g.  FRC, BREEDLOVE, and JOHNSON allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services and did not investigate M.O.'s weight loss.

125.    On or about September 26, 2022, M.O.'s speech and language and occupational therapy provider completed updated assessments and plans, which FRC, CFCN, BREEDLOVE, and JOHNSON knew or should have known reported:

     a.  It was evident that M.O.'s skill deficits were impeding her ability to function during play, social, school, and home routines and were severely impacting her performance in everyday life;

     b.  The service provider had not had any contact with JONES, and M.O. was transported to these sessions by FRC;

     c.  M.O. was recommended to continue receiving speech and occupational therapies three (3) times per week as this was medically necessary; and

     d.  It was recommended that M.O's weight loss during the last four (4) months be assessed; however,

     e.  CFCN, FRC, BREEDLOVE, and JOHNSON allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services and did not investigate M.O.'s weight loss.

126.    Although A.O. received speech therapy and occupational therapy occasionally since coming into care when FRC would transport her, these medically necessary services stopped completely in September 2022.

127.    On or about October 19, 2022, FRC, BREEDLOVE, JOHNSON, and DCF submitted a Judicial Review Social Studies Report to the Court, advising the Court that:

    a.   A.O. was doing well at her current placement;

    b.   A.O. has recently developed negative behavior about wanting to see her mother and returning home when she used to be happy and eager to see her mother;

    c.   A.O. was now requesting to be adopted by JONES;

    d.   A.O. was unable to state what had caused her change, but FRC noted that she was a "follower;"

    e.   JONES recorded allegations made against the mother and in the recording, JONES was demanding and loud and A.O. sounded afraid and confused;

    f.   A.O. was not consistently taking her medication, and JONES reported that A.O. did not need medication;

    g.   A.O. no longer wanted to participate in ABA services, speech therapy, or occupational therapy;

    h.   Inaccurately reporting that M.O. was consistently engaged in ABA services, speech therapy, and occupational therapy;

    i.   Inaccurately reporting that M.O.'s last medical visit was in April 2022 and there were no health concerns for M.O.;

    j.   Inaccurately reporting that the children did not change schools;

    k.   Placement in the JONES foster home was appropriate, in the children's best interest, and consistent with their special needs;

    l.   JONES was ensuring the safety and well-being of the children;

    m.   JONES was meeting the children's needs and there were no concerns about their well-being; and

n.   The children were safe in their current placement.

128.   CFCN, FRC, BREEDLOVE, and JOHNSON knew or should have known that despite M.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued to receive them, in October 2022, M.O.'s ABA provider expressed additional concerns that very little or almost none of the twenty-five (25) hours assigned to work with M.O. were being worked because the provider was only able to meet with M.O. when possible at aftercare, and these concerns continued to be repeated monthly.

129.   On or before November 3, 2022, FRC assigned MEIKLE as the next case manager and GREEN as the supervisor of M.O. and A.O.'s case.

130.   At the time MEIKLE and GREEN were assigned the case, they knew or should have known that:

a.   M.O. was diagnosed with Autism Spectrum Disorder;

b.   M.O. was non-verbal;

c.   M.O. only ate pureed foods and was only able to chew very little;

d.   M.O. was not potty trained, wore diapers, and needed assistance with toileting;

e.   M.O. needed assistance with all activities of daily living;

f.   M.O. had significant motor skill delays and speech delays;

g.   M.O. had skill deficits that were severely impacting her performance in everyday life;

h.   M.O. had been receiving ABA therapy twenty-five (25) hours per week prior to removal, the ABA provider recommended in an April 2022 re-assessment that the amount of hours be increased to thirty (30) hours per week, these services were medically necessary and Court ordered to continue, but M.O. was only receiving a fraction of the ABA services allotted to her;

i.   M.O. had been receiving speech therapy and occupational therapy three (3) times per week prior to removal, these services were medically necessary, and these services were Court ordered to continue;

j.   M.O. had previously been determined eligible for APD HCBS Waiver services and had been on a waitlist for these services since 2016;

k.   M.O. needed a specialized placement qualified to meet her significant needs;

l.   A.O. was diagnosed with Autism Spectrum Disorder;

m.   A.O. had motor skill delays and speech delays;

n.   A.O. had been receiving ABA therapy prior to removal, these services were medically necessary, these services were Court ordered to continue, A.O. was only receiving a fraction of the ABA services allotted to her at times, and none whatsoever at other times;

o.   A.O. had been receiving speech therapy and occupational therapy three (3) times per week prior to removal, these services were medically necessary, and these services were Court ordered to continue; and

p.   A.O. needed a specialized placement qualified to meet her significant needs.

131.   On or about November 15, 2022, FRC, MEIKLE, GREEN, and CFCN knew or should have known that A.O. was discharged from in person therapy due to lack of attendance because of FRC transportation issues while the case was assigned to BREEDLOVE and JOHNSON and JONES' refusal to transport A.O., and A.O. was recommended to continue receiving therapy with a clinician who specialized in trauma treatment; however, FRC, MEIKLE, GREEN, and CFCN failed to ensure A.O. continued receiving trauma therapy.

132.   On or about November 16, 2022, FRC, MEIKLE, GREEN, CFCN, CARVALHO, and TORRES participated in a staffing during which:

a. FRC/MEIKLE reported she was having an issue with JONES not taking M.O. and A.O. to medical and therapy appointments, which was a known ongoing pattern with JONES and every child placed in her care;

b. JONES advised the staffing participants that she was not going to leave work early to transport the children to their medically necessary appointments;

c. FRC/MEIKLE/GREEN advised they would transport the children to school if JONES would transport them to appointments;

d. JONES agreed to transport the children to appointments if she knew about them in advance; however, JONES did not coordinate any of the appointments with the children's providers, and she again refused to transport them after this staffing; and

e. FRC, MEIKLE, GREEN, CFCN, CARVALHO, and TORRES allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

133. Sometime before the end of 2022, CFCN and DCF knew that a fourth (4th) abuse report was received against JONES, this time alleging mental injury of another foster child in JONES' care, and the investigation was closed by DCF with "Not Substantiated" findings, meaning there was credible evidence to support the allegations; however, CFCN and DCF allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

134. Between November 2022 and the beginning of January 2023, CFCN, CARVALHO, TORRES, FRC, MEIKLE, and GREEN knew or should have known that:

a. M.O. was observed at different times with unexplained bruises on her ear, her nose, and her scalp;

b.  M.O. was losing her hair when it was combed;

c.  M.O. would make sounds as if she wanted to communicate, but was unable to because of her disabilities;

d.  M.O.'s behavioral services had stopped and were pending a change in providers;

e.  All of A.O.'s services had terminated;

f.  A.O. was making allegations against the mother consistent with the allegations JONES had made;

g.  A.O. was still refusing to visit with her mother and did not want to be reunified;

h.  A.O. was speaking as if she had been influenced by what she had either heard from JONES or was told by JONES;

i.  A.O. appeared to be parentified toward M.O.;

j.  JONES was still refusing to transport the children to medical and therapeutic appointments;

k.  JONES changed the children's aftercare again;

l.  JONES had cut the children's hair several times without permission;

m.  JONES continued to threaten removal of the children; and

n.  JONES was refusing to allow the Guardian ad Litem (hereinafter "GAL") to visit with the children in the home.

135.  On January 27, 2023, CFCN, CARVALHO, FRC, MEIKLE and GREEN knew that:

a.  When FRC/MEIKLE responded to the JONES foster home for an announced visit, an unknown Hispanic male opened the gate for FRC/MEIKLE;

b. When FRC/MEIKLE knocked on the door she found A.O. and other foster children home alone;

c. A.O. answered the door in just a tee shirt and underwear;

d. A.O. told FRC/MEIKLE she was not to be at the home;

e. A.O. had a bruise on her shoulder but refused to allow FRC/MEIKLE to photograph it;

f. FRC/MEIKLE called JONES who demanded that FRC/MEIKLE leave the home;

g. JONES arrived home shortly after, almost crashed through the gate, ran past FRC/MEIKLE slamming the door shut, and was yelling at the foster children trying to find out who let FRC/MEIKLE in the home;

h. FRC/MEIKLE observed JONES go to an RV on the side of the home where two (2) unknown males were living whom JONES identified as her "backup" caregivers and told FRC that CFCN was aware of them; however, JONES had no identified backup caregivers approved through CFCN's licensing department;

i. M.O. arrived home with diapers her mother sent home, and JONES yelled at FRC that M.O. was potty trained and she does not need diapers anymore; and

j. M.O. was observed by FRC during a supervised visit and later by MEIKLE to have an unexplained bruise and scar on her eye; however,

k. CFCN, CARVALHO, FRC, MEIKLE and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

136.    CFCN, FRC, MEIKLE, and GREEN knew or should have known that despite A.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued to receive them, in January 2023, A.O. received an ABA evaluation from the same provider she had received services from prior to her removal, which documented:

a.  Since A.O.'s placement in foster care in April 2022, the provider had struggled to provide ABA services to A.O. due to instability and non-compliance with the schedule by JONES;

b.  July 2022 was the last month the ABA provider worked with A.O. because A.O. decided she did not want to receive therapy anymore;

c.  A.O. did not have RBT services as a result of instability in therapies, which had significantly affected the efficacy of ABA therapy;

d.  The ABA provider had not been allowed to meet JONES or go to the residence where A.O. lived;

e.  The ABA provider did not know where A.O. lived, whom she lived with, or who was in charge of helping her with her daily tasks and needs;

f.  Because A.O. had been without ABA services for so long, the January 2023 assessment was written as an Initial Assessment instead of a Re-Assessment;

g.  The ABA provider had not been able to collect any data on A.O. since July 2022;

h.  Since being placed in foster care, A.O. had shown a new behavior of isolating herself from all the people she knew prior to her removal and displaying a tough and sometimes offensive character;

i.  A.O. had lost a considerable amount of weight since being placed in foster care;

j.  A.O.'s physical condition had deteriorated since being placed in foster care;

k.   Since being placed in foster care, A.O. has begun displaying a very bad temper, refusing activities, and refusing to do school assignments;

l.   All of the environmental changes observed since her removal, the instability with services, and only being able to provide a few of the therapy hours allotted to A.O., resulted in an increase in the frequency and intensity of all behaviors and goals; and

m.   It was in A.O.'s best interest to start ABA services again to work on A.O.'s maladaptive behaviors and incorporate new skills; however,

n.   CFCN, FRC, MEIKLE, and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

137.   CFCN, FRC, MEIKLE, and GREEN knew or should have known that despite M.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued to receive them, in January 2023 and February 2023, M.O.'s ABA provider expressed additional concerns that:

a.   M.O did not have any ABA services the first half of January because JONES changed the after-school program and the provider was not told where the new after school program was;

b.   M.O. only received ABA services on two days during the whole month of January;

c.   Every time M.O. has been seen for ABA services since her removal she has been dirty with unwashed skin and hair, with poor hygiene, tired, and cried a lot;

d.   M.O.'s diet was still not correct which resulted in significant weight loss; and

  e. ABA services were only able to be provided twelve (12) of the twenty-five (25) hours allotted for M.O. in February 2023; however,

  f. CFCN, FRC, MEIKLE, and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

138. On or about March 22, 2023, FRC, MEIKLE, GREEN, and DCF submitted a Judicial Review Social Studies Report to the Court advising the Court that:

  a. There had been no significant changes since the last Judicial Review;

  b. M.O. and A.O. were doing well at their current placement;

  c. Inaccurately reporting that M.O. was consistently engaged in ABA services, speech therapy, and occupational therapy with the same frequency as prior to her removal;

  d. Inaccurately reporting that M.O. was in good health;

  e. A.O. no longer wanted to participate in ABA services, speech therapy, or occupational therapy, but a new referral had been made for these services;

  f. A.O. was unable to control her emotions and would shut down when speaking to anyone;

  g. Placement in the JONES foster home was appropriate, in the children's best interest, and consistent with their special needs;

  h. JONES was ensuring the safety and well-being of the children;

  i. JONES was meeting the children's needs and there were no concerns about their well-being; and

  j. The children were safe in their current placement.

139.    On March 23, 2023, FRC and DCF participated in a hearing and the Court ordered a staffing to address the underlying issues of the case involving services and visitation for both children, including the underlying diagnoses of both children and needed services.  However, upon information and belief, this staffing did not occur.

140.    CFCN, FRC, MEIKLE, and GREEN knew that on March 29, 2023, M.O. had a Neuropsychological Evaluation which:

    a.  FRC transported her to;

    b.  Diagnosed M.O. with Autism Spectrum Disorder with accompanying intellectual and language impairment (Level 2 and Level 3);

    c.  Recommended that M.O. receive in-home based therapy to specifically target the improvement of M.O.'s functional communication and adaptive skills;

    d.  Recommended that given the importance of JONES' involvement in M.O.'s behavioral interventions and self-care, JONES should have the training and support provided to foster parents of children and adolescents with a therapeutic level of need;

    e.  Recommended that JONES learn to implement the behavioral strategies and supports recommended by M.O.'s behavior therapist to ensure that M.O.'s skills generalize across settings;

    f.  Recommended that M.O.'s team consult with a speech and language therapist with competency in assessing and treating feeding disorders;

    g.  Recommended that M.O. continue receiving occupational therapy; and

    h.  Recommended that professionals at UM/NSU Center for Autism and Related Disabilities be consulted as needed.

141. FRC, MEIKLE, GREEN, and CFCN were required to comply with the recommendations in this evaluation, but failed to do so, failed to ensure M.O. received the services she required to treat her disability, and allowed M.O. to remain in the inadequate and unsuitable JONES foster home where she was not receiving critically necessary specialized care and services.

142. CFCN, FRC, MEIKLE, and GREEN knew or should have known that, despite M.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued receiving them, in March and April 2023, M.O.'s ABA provider expressed additional concerns that:

   a. M.O. had changed the way of expressing her stereotypical behavior by making movements of opening her mouth very wide, and at the same time touching her ear with her finger, and it was believed this change was due to the very difficult process M.O. was going through in foster care which had been documented by the provider each month;

   b. M.O. only received three (3) hours of ABA services the month of March 2023; and

   c. M.O.'s ABA services lapsed completely in April 2023; however,

   d. CFCN, FRC, MEIKLE, and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

143. CFCN, FRC, MEIKLE, and GREEN knew that on April 3, 2023, A.O. had a Neuropsychological Evaluation which:

   a. FRC transported her to over the course of three (3) sessions;

   b. A.O. attempted to hide from FRC/MEIKLE when she arrived to transport her from a session;

c.  Documented that A.O. demonstrated a high level of independence which was atypical for her age;

d.  A.O. exhibited significant resistance to discussing topics that were uncomfortable for her;

e.  Documented that when the examiner would shift to another type of assessment task, A.O. asked if the examiner was going to ask about her mother or "trauma" because she wanted to talk about these topics;

f.  Reported that JONES rated A.O. in the "very superior range" for overall adaptive behavior and daily living skills and rated A.O. in the "superior range" for communication skills and socialization;

g.  Reported that no parent or teacher rating scales could be obtained because JONES returned the form blank, and the teacher did not return the form at all;

h.  A.O. refused to answer questions regarding her relationship with her mother when completing the questionnaires but continued to report allegations similar to those JONES had made about the mother;

i.  A.O. reported she "wants to get back at her mother for what happened" and "expressed wanting to kill her mother;"

j.  Diagnosed A.O. with Autism Spectrum Disorder with accompanying language impairment, Specific Learning Disorder, with impairment in reading (reading comprehension), and Post-Traumatic Stress Disorder; and

k.  Recommended that:

   i.  A.O. continue seeing a child psychiatrist for medication management;

   ii.  A.O. continue to participate in individual psychotherapy;

iii.  A.O. be transported by JONES or a preferred transportation driver, not MEIKLE, due to her "irritability in response to her case manager;"

iv.  A.O. not be forced to attend visitations with her mother until she has developed more adaptive coping skills;

v.  A.O. continue to participate in language therapy to improve her language, social communication, and social problem-solving skills;

vi.  A.O.'s caretakers and teacher learn how to support her ability to apply social learning concepts at home and school to enhance and generalize her social learning;

vii.  A.O.'s caregivers or teachers receive the support of a behavioral therapist to help with implementation of behavior strategies;

viii.  Professionals at UM/NSU CARD be consulted;

ix.  Periodic meetings with A.O.'s intervention team take place to help determine if intervention strategies and goals should be modified; and

x.  A.O. be re-evaluated in three years.

144.  FRC, MEIKLE, GREEN, and CFCN were required to comply with the recommendations in this evaluation, but failed to do so, and the only recommendation followed was that A.O. not be forced to visit with her mother.

145.  In April 2023, CFCN, CARVALHO, FRC, MEIKLE, and GREEN knew or should have known that:

a.  JONES took A.O. to the doctor, which, upon information and belief, was the only appointment JONES had transported either child to in the year they had been placed with her;

b.  This was the doctor A.O. and M.O. went to prior to removal;

c.  After the visit, JONES accused the doctor of sexually abusing A.O., and JONES demanded that CFCN and FRC change A.O.'s doctor;

d.  Neither M.O. nor A.O. had been to the dentist in the year they were placed in foster care so they missed two dental appointments;

e.  A.O. continued speaking negatively about her mother, and this was encouraged by JONES;

f.  JONES told FRC/MEIKLE that it was not her job to work towards reunification of the children with their mother;

g.  JONES alleged that M.O.'s behavior changes after visits with her mother and she returns to the home nasty to JONES and the other children;

h.  JONES requested that M.O. and A.O. receive individual therapy to address alleged sexual abuse by the mother, while refusing to participate in or transport the children to medically necessary therapies for their disabilities;

i.  M.O. received a mental health evaluation at JONES' request but was determined to be inappropriate for that type of counseling, and it was the clinical opinion of the evaluation that M.O. would benefit from ABA therapy; and

j.  A.O. continued to refuse to participate in therapy, and she was discharged; however,

k.  CFCN, CARVALHO, FRC, MEIKLE, and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

146.  On April 28, 2023, CFCN, CARVALHO, FRC, MEIKLE, and GREEN knew that M.O. arrived to a supervised visit with her mother with an unexplained bruise on the left side of

her face; however, CFCN, CARVALHO, FRC, MEIKLE, and GREEN failed to report this injury to the abuse hotline and allowed M.O. to return to the JONES foster home.

147.   On May 1, 2023, CFCN, CARVALHO, FRC, MEIKLE, GREEN, DCF, and BAPTISTE knew that an abuse report was received alleging that this morning, M.O. was screaming for help at school, M.O. currently had a mark on the right side of her face near her ears, it was unknown how she sustained the mark, and this was the fifth (5th) abuse report regarding a child in JONES' care; however, CFCN, FRC, MEIKLE, GREEN, DCF, and BAPTISTE allowed M.O. and A.O. to remain in the JONES foster home, and CFCN/CARVALHO told JONES an abuse report had been received.

148.   On May 1, 2023, DCF/BAPTISTE began an investigation; DCF/BAPTISTE met with M.O.'s ESE teacher who advised that M.O. was language impaired and that another teacher observed the bruises on M.O.; was unable to interview M.O. due to her autism and language impairment; and observed M.O. to have a faded bruise on each side of her face and a mark near her ear.  DCF/BAPTISTE nonetheless did not speak with the other teacher who had observed the bruises, did not go to the JONES foster home, did not interview JONES, did not interview any of the other foster children placed in the JONES foster home, did not make any attempts to learn how M.O. sustained her injuries, took no further investigative actions that day, and allowed M.O to return to the JONES foster home with knowledge that she was at substantial risk of serious harm.

149.   On May 2, 2023, CFCN, FRC, MEIKLE, GREEN, DCF, and BAPTISTE knew that another abuse report was received alleging that M.O. was observed with bruises on both sides of her face on her cheek area and in front of her ears, her left eye looked swollen, M.O. was unable to state what happened, M.O. currently lived in a foster home with other autistic children, and this was the sixth (6th) abuse report regarding a child in JONES' care.  CFCN, FRC, MEIKLE, GREEN, DCF, and BAPTISTE nevertheless allowed M.O. and A.O. to remain in the JONES foster home.

60

150.     Despite receiving another abuse report, DCF/BAPTISTE did not go to the JONES foster home, did not interview JONES, did not interview any of the other foster children in the JONES foster home, did not make any attempts to learn how M.O. sustained her injuries, took no further investigative actions that day, and allowed M.O to remain in the JONES foster home with knowledge that she was at substantial risk of serious harm.

151.     On May 3, 2023, two (2) days after the abuse report was received and two (2) days after DCF/BAPTISTE observed bruises on M.O.'s face, DCF/BAPTISTE contacted CPT because this was a mandatory referral to them; however, when CPT asked if any injuries were observed to determine whether to schedule an immediate examination of M.O., DCF/BAPTISTE failed to respond.

152.     On May 4, 2023, three (3) days after the abuse report was received and three (3) days after JONES was aware there was an open investigation, DCF/BAPTISTE:

     a.   Spoke with FRC/MEIKLE who expressed no concerns for M.O. in the JONES foster home;

     b.   Responded to the JONES foster home and allegedly interviewed the foster children, who advised that M.O. harms herself and trips when walking; and

     c.   Interviewed JONES who claimed she did not know how M.O. was injured and that DCF should investigate the mother.

153.     On May 5, 2023, FRC/MEIKLE transported M.O. to CPT for an examination, and CPT observed yellow/purple bruising to the back of M.O.'s right shoulder, yellow/brown bruising on M.O.'s temple and upper right cheek, and M.O. weighed only eighty-three (83) pounds, and CPT concluded that M.O. had been the victim of physical abuse; however, DCF/BAPTISTE took no further investigative action to learn how M.O. sustained her injuries, and CFCN, FRC, MEIKLE, GREEN, DCF, and BAPTISTE allowed M.O. to return to the JONES foster home.

154.    On May 7, 2023, CFCN completed a licensing visit with JONES, but failed to address the open abuse reports, and allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

155.    On May 18, 2023, CPT conducted a Specialized Interview of JONES, expressed concerns that there was no explanation as to how M.O. sustained her injuries, determined that M.O.'s autism and ADHD make her more vulnerable to maltreatment, recommended that both M.O. and A.O. be monitored for their safety in JONES' care, and again concluded that M.O. had been the victim of physical abuse; however, DCF/BAPTISTE took no further investigative action to learn how M.O. sustained her injuries, and CFCN, FRC, MEIKLE, GREEN, DCF, and BAPTISTE allowed M.O. to return to the JONES foster home.

156.    On May 23, 2023, FRC/MEIKLE completed an announced home visit with M.O. and A.O. in the JONES foster home during which:

   a.   When FRC/MEIKLE arrived to the home for the scheduled visit, the gate was locked restricting FRC/MEIKLE's access to the home;

   b.   The children were not home from aftercare yet despite it being after 8:00 p.m.;

   c.   When A.O. finally arrived home, she told FRC/MEIKLE to tell her "fake mom," referring to her biological mother, not to send her any clothes or gifts anymore, and that JONES was her "real mom;"

   d.   A.O. stated she does not want to go home and does not want any therapy;

   e.   JONES told A.O. to tell FRC/MEIKLE her feelings because JONES was being blamed that she was coercing A.O. on what to say;

   f.   JONES again stated it was not her job to prepare the children for reunification with their mother;

g.   A.O. was very reserved and refused to speak with FRC/MEIKLE at times but was very vocal when in the presence of JONES, as if she had something to prove to her; and

h.   A.O. was always on the "defense;"

i.   Nonetheless, FRC, MEIKLE, and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care.

157.   On May 25, 2023, FRC and DCF participated in a hearing.  At the hearing, however, upon information and belief, FRC and DCF failed to inform the Court that M.O. had a pattern of unexplained injuries, failed to inform the Court that there were two (2) open abuse reports regarding unexplained injuries to M.O., failed to inform the Court that neither M.O. nor A.O. were receiving the medically necessary services the Court ordered over a year earlier, failed to inform the Court of the concerns expressed by M.O. and A.O.'s multiple service providers over the past year, failed to inform the Court that M.O. and A.O. needed specialized placement, and instead lead the Court to believe that the children were in a safe environment in the JONES foster home.

158.   On June 15, 2023, CFCN and DCF participated in a Licensing Staffing on the JONES foster home due to the open abuse reports regarding M.O.; however, the only recommendation was to review the discipline policy with JONES, and CFCN and DCF decided to move forward with the re-licensure process for the JONES foster home, and allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

159.   On June 15, 2023, FRC/MEIKLE completed an announced home visit with M.O. and A.O. in the JONES foster home during which:

a. FRC/MEIKLE arrived for the scheduled visit at 8:30 p.m., JONES was outside sweeping the front porch, FRC/MEIKLE asked JONES to go inside to speak with the children, but JONES refused and told FRC/MEIKLE she had to wait until JONES finished what she was doing;

b. FRC/MEIKLE reported that this was "not a free access home, you have to be let in and out with a key that only [JONES] has;"

c. FRC/MEIKLE reported that "there are limitations when it comes to this foster parent in anything pertaining to the children;"

d. FRC/MEIKLE asked Jones about terminating services with the individual counseling recently referred for A.O. and told JONES the children need to be in services and JONES shouldn't be canceling services without speaking to the agency;

e. A.O. again stated that she did not want to attend therapy;

f. A.O. again said she did not want anything from the mother when FRC/MEIKLE attempted to give her a gift card;

g. A.O. told FRC/MEIKLE she "wish[es] her bio mom would die;"

h. A.O. again told FRC/MEIKLE "her bio mother is not her mother, [JONES] is her mother and she tells her that she can live with her as long as she wants;"

i. A.O. told FRC/MEIKLE "she can leave now, she does not want to talk anymore because all the [FRC] does is lie because the [FRC] wants to take her away from the foster mom;"

j. A.O. refused to talk to FRC/MEIKLE any further;

k. FRC/MEIKLE felt it "appears [A.O.] is being influence[d]" by JONES; however,

64

l.  FRC, MEIKLE, and GREEN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

160.  On June 16, 2023, CFCN, CARVALHO, FRC, MEIKLE, and GREEN knew that:

a.  When FRC picked M.O. up to transport her for a supervised visit, she had an unexplained black eye on her left eye;

b.  When M.O. arrived at FRC for the visit she was not dressed well, her clothing was disheveled, and her left eye was bruised;

c.  FRC's visitation supervisor reported that M.O.'s weight loss was very noticeable;

d.  M.O. appeared to be in pain and cried a lot;

e.  FRC/MEIKLE contacted FRC's on-site therapist to process the situation with the mother because it was "too severe for [MEIKLE] and the FRC visitation supervisor to convey to the mother;"

f.  FRC contacted CFCN to inform them of the situation;

g.  M.O.'s visit with her mother was cut short so M.O. could receive medical attention;

h.  FRC/MEIKLE transported M.O. to the hospital where she was treated for the eye injury which doctors determined was a result of "a direct blow;" and

i.  JONES denied knowledge of how M.O. sustained the injury; however,

j.  After M.O. was discharged from the hospital that night, FRC, MEIKLE, GREEN, CFCN, and CARVALHO allowed M.O. to return to the JONES foster home.

161.    On June 16, 2023, CFCN, FRC, DCF, MEIKLE, GREEN, and BAPTISTE knew that another abuse report was received alleging M.O. had another unexplained bruise, this time on her left eye, M.O. has autism, M.O. is non-verbal, and this was the seventh (7th) abuse report regarding a child in JONES' care; however, CFCN, FRC, DCF, MEIKLE, GREEN, and BAPTISTE allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home.

162.    Although this abuse report alleged new injuries to M.O.'s face and should have been coded as an additional abuse report requiring an immediate response by DCF and an investigation, DCF incorrectly coded the report as a supplemental report, and DCF/BAPTISTE failed to investigate the new injuries or take protective action for M.O.

163.    On or about June 17, 2023, FRC, MEIKLE, and GREEN, submitted a request to CFCN to change M.O. and A.O.'s placement due to numerous abuse reports and unexplained events/injuries; however, FRC, MEIKLE, GREEN, CFCN, CARVALHO, and TORRES, failed to immediately remove M.O. and A.O. from the JONES foster home.

164.    On or about June 19, 2023, CFCN completed a Unified Home Study for Re-Licensure of JONES as a foster parent and documented:

   a. JONES was a single parent foster home with five (5) children who had special needs;

   b. There were multiple incident reports regarding the JONES foster home and the children placed there, including M.O. and A.O., over the past licensing year; and

   c. JONES continued to bring up allegations against M.O. and A.O.'s biological mother which "continue[d] to destroy the relationship with the birth mom;" however,

66

d.   CFCN determined there were no concerns about the safety of the children in the JONES foster home;

e.   CFCN recommended that JONES be re-licensed as a traditional foster parent for five (5) children within the age range of 3-10 years old with no restrictions; and

f.   CFCN allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

165.   On June 26, 2023, ten (10) days after the most recent abuse report was received, and fifty-six (56) days into the investigation while M.O. remained at substantial risk of serious harm in the JONES foster home, DCF/BAPTISTE:

a.   Acknowledged receiving the CPT report, reviewing the report, and knowing that CPT concluded M.O. had been physically abused, but was unable to determine where and how the injuries were sustained;

b.   Spoke with FRC/MEIKLE, who reported M.O. was seen on June 15, 2023, for a home visit with no injuries, and had a new black eye when she came to FRC for a supervised visit on June 16, 2023, no one seemed to know how M.O. sustained her injuries, and M.O. had sustained multiple unexplained injuries;

c.   Spoke with the FRC transportation driver who first saw M.O.'s black eye when M.O. was picked up from her summer program on June 16, 2023;

d.   Spoke with the summer program who observed M.O.'s black eye and stated M.O. was picked up from the JONES foster home that way;

e.   Completed another home visit to the JONES foster home;

    f.   Interviewed JONES who again denied knowledge of how M.O. sustained her black eye, reported that M.O. would run without paying attention, M.O. spread feces all over the wall the day before, and JONES did not want to lose her license; and

    g.   Allegedly interviewed the other foster children placed in the JONES foster home who reported that M.O. bruised herself by running without paying attention when she fell and hit her face near the doorknob; however,

    h.   DCF/BAPTISTE allowed M.O. and A.O. to remain in the JONES foster home with knowledge that they were at substantial risk of serious harm.

166.    On or about June 27, 2023, DCF/BAPTISTE completed a Family Functioning Assessment, listed the alleged perpetrator of M.O.'s injuries as "unknown," found no impending danger threats for M.O., determined that M.O. was safe, and allowed M.O. and A.O. to remain in the JONES foster home with knowledge that they were at substantial risk of serious harm.

167.    On June 28, 2023, DCF/BAPTISTE closed the three (3) open abuse reports with "Not Substantiated" findings of physical injury, meaning there was credible evidence to support the allegations, left the perpetrator as "unknown" because "[t]he problem is that no one [is] able to tell how the bruises occurred," and allowed M.O. and A.O. to remain in the JONES foster home with knowledge that they continued to be at substantial risk of serious harm.

168.    Also on June 28, 2023, FRC, MEIKLE, GREEN, CFCN, and CARVALHO knew that:

    a.   The mother met FRC/MEIKLE, M.O., and A.O. at the dentist per the Court's order to get the mother involved with the children's services for normalcy;

    b.   A.O. was very rude to FRC/MEIKLE and did not want to be at the dentist or know why she was going;

c.  M.O. saw the mother first and gestured for the mother to come to her;

d.  When A.O. saw the mother, she ran off screaming, told the mother she didn't want to see her and not to touch her, and FRC/MEIKLE had to "run her down and hold her" because she was "running into the streets;"

e.  FRC/MEIKLE stated "you would have thought someone was trying to kill her;"

f.  FRC reported this was causing too much trauma to the children and they needed a plan for therapeutic intervention;

g.  M.O. was calm and did not understand what was going on, but when she did not see her mother anymore she was whining and murmuring for her mother;

h.  This was too difficult for M.O. and it was hard for her to process emotions because she is low functioning;

i.  FRC/MEIKLE believed that A.O.'s behavior was also affecting M.O.;

j.  FRC/MEIKLE contacted the CFCN therapist to assure that A.O. would be able to process her feelings and emotions; and

k.  FRC/MEIKLE/GREEN referred the children to the services they had been discharged from, including ABA therapy, speech therapy, and occupational therapy.

169.  CFCN, FRC, MEIKLE, and GREEN knew or should have known that, despite M.O. requiring medically necessary therapies to address her disabilities and being under a Court order to ensure she continued to receive them, in June 2023, M.O.'s ABA provider expressed additional concerns that:

a.  Therapy had not been stable for M.O. and M.O. had been "greatly affected" because of this;

b.  M.O. only had six (6) hours of ABA therapy in the month of June;

c. M.O. did not have any RBT therapy the entire month of June due to instability with services;

d. JONES had not participated in the caregiver training component of ABA services; and

e. The provider did not have data collected since April 2022 because they had not had any contact with JONES; however,

f. CFCN, FRC, MEIKLE, and GREEN allowed M.O. and A.O to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

170.   On June 30, 2023, FRC/MEIKLE/GREEN knew that when M.O. arrived at FRC for a supervised visit with her mother, she kissed her mother; M.O. then became upset, agitated and cried because she wanted to eat the homemade food her mother had brought for her but she had an upset stomach, the mother was concerned about M.O.'s upset stomach, FRC ended the visit early so M.O. could be taken to the doctor, and FRC transported M.O. to the hospital to avoid possible dehydration. FRC/MEIKLE/GREEN nonetheless then took M.O. back to the inadequate and unsuitable JONES foster home where she was not receiving critically necessary specialized care and services.

171.   On July 1, 2023, DCF re-licensed JONES as a traditional foster parent for five (5) children despite the abundance of concerns regarding JONES, including three (3) abuse reports since May 1, 2023, involving unexplained bruises to M.O., which CPT confirmed were due to physical abuse; M.O. losing a significant amount of weight since being placed in foster care; A.O. refusing to visit with her mother due to what appeared to be influencing or coaching by JONES; and M.O. and A.O. not receiving medically necessary services since being placed in foster care,

and DCF allowed M.O. and A.O. to remain placed in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

172.    On July 7, 2023, FRC/MEIKLE/GREEN knew that:

    a.    When M.O. arrived at FRC for a supervised visit with her mother, she had several marks, bruises, and scratches on her face and body;

    b.    When the mother asked M.O. what happened to her face M.O. began to cry and handed her mother a tissue to wipe her eyes;

    c.    FRC and the mother then observed more bruises on M.O.'s arms, legs, and on her back;

    d.    M.O. was unable to explain how she sustained the injuries;

    e.    FRC's visitation supervisor took photos of the injuries and sent them to MEIKLE and GREEN; however,

    f.    FRC/MEIKLE/GREEN failed to immediately report this ongoing pattern of unexplained injuries on M.O. to the abuse hotline;

    g.    FRC/MEIKLE/GREEN failed to notify CFCN of yet another set of injuries to M.O.; and

    h.    FRC/MEIKLE/GREEN allowed M.O. to go back to the JONES foster home.

173.    On July 11, 2023, CFCN, FRC, DCF, MEIKLE, GREEN, and BROOKS knew that another abuse report was received alleging that M.O. was seen with a two inch bruise on her thorax, an inch long bruise on her arm, and bruises to her knees on July 7, 2023, during a supervised visit, it was unknown how M.O. sustained these injuries,  this was the eighth (8th) abuse report regarding a child in JONES' care, and this was the fourth (4th) abuse report regarding unexplained injuries to M.O. since May 1, 2023; however, CFCN, FRC, DCF, MEIKLE, GREEN, and BROOKS

allowed M.O. and A.O. to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

174.    Also on July 11, 2023, FRC had a covering case manager complete a home visit with M.O. and A.O. at the JONES foster home, during which:

    a.  JONES reported that M.O. was very loving towards her, but on Fridays when she comes back from visits she is angry and aggressive;

    b.  JONES reported that M.O. was potty trained but had to be constantly reminded to use the restroom;

    c.  JONES reported she still has to bathe M.O. but has M.O. clean her own genitalia;

    d.  JONES stated that M.O. needed to be in a facility that could cater to and meet her needs;

    e.  CFCN called during the visit to talk to A.O. about a staffing that was going to be taking place, presumably about changing placements;

    f.  JONES stated that A.O. has stated in the past that she would harm herself if she was removed from JONES; and

    g.  JONES reported that A.O. was very bonded to her and called her "mommy;" however,

    h.  FRC allowed M.O. and A.O to remain in the inadequate and unsuitable JONES foster home where they were not receiving critically necessary specialized care and services.

175.    On July 12, 2023, DCF/BROOKS began an investigation and:

a. Contacted M.O.'s mother who confirmed that she observed marks on M.O.'s knees, arm and face at a supervised visit on July 7, 2023, M.O. was autistic, and M.O. could not explain how she got the marks;

b. Responded to the JONES foster home and interviewed JONES who advised:

   i. She has five (5) foster children in her home;

   ii. M.O. was the only child in her home with disabilities;

   iii. She did not know M.O. had bruises on July 7, 2023, because no one told her;

   iv. M.O. fell three (3) weeks ago and hit her face on the cabinet;

   v. M.O. falls a lot and hits herself in the face a lot;

   vi. She was unaware of M.O. having any current injuries;

   vii. Every time M.O. comes back from a visit with the mother she is violent; and

   viii. She has asked for M.O. to be removed from her home in the past because she thinks M.O. needs to be in a home where she can be monitored all the time;

c. Met with M.O. at her summer program, observed M.O. to be a "very thin/slender 14-year-old girl who did not appear her age," and took photos of scratches that were observed on M.O.'s knee but did not observe marks on M.O.'s thorax, back or neck;

d. Completed a Risk Assessment determining that M.O. was at Moderate Risk for future abuse; and

e. Contacted CPT because this was a mandatory referral and sent CPT photos, but when CPT said the pictures were black and white, they could not see anything

in them, and asked if M.O. had visible marks that day, DCF/BROOKS failed to respond so M.O. could be examined by child abuse medical professionals.

176.    DCF/BROOKS did not interview the FRC visitation supervisor who also observed the bruises on M.O. on July 7, 2023, did not interview any of the other foster children placed in the JONES foster home, did not contact the FRC case management team, did not contact CFCN, took no further investigative action, and allowed M.O. and A.O. to return to the inadequate and unsuitable JONES foster home with knowledge that they remained at substantial risk of serious harm.

177.    On July 14, 2023, two (2) days after CPT asked DCF/BROOKS about M.O.'s current injuries, DCF/BROOKS responded, advising that M.O. only had scratches to her hand and her knee and DCF/BROOKS was more concerned about M.O.'s weight because she was extremely thin; however, DCF/BROOKS took no further action.

178.    Later that day, on July 14, 2023, CFCN, FRC, MEIKLE, and GREEN knew that:

a.  When M.O. arrived at FRC for a supervised visit with her mother, M.O. greeted her mother by whining saying "help" and "sorry;"

b.  M.O. cried a lot during the visit;

c.  M.O. was observed by FRC to have injuries to her buttocks;

d.  FRC contacted law enforcement who responded to the FRC office and observed "serious" bruises on M.O.'s buttocks; and

e.  Law enforcement contacted the abuse hotline and waited for a DCF CPI to respond.

179.    On July 14, 2023, CFCN, FRC, DCF, MEIKLE, GREEN, CARVALHO, TORRES, and BROOKS knew that the ninth (9th) abuse report regarding a child in JONES' care was

74

received, this was the fifth (5ᵗʰ) abuse report regarding unexplained injuries to M.O. since May 1, 2023, and the report alleged that:

   a.   M.O. "was observed with fresh bruises all over her buttocks while she was being assisted in the restroom during a supervised visit;"

   b.   About three weeks ago, M.O. had a bruise on her eye that appeared to be a black eye;

   c.   M.O. has had bruises that have not been consistent with the story being told;

   d.   JONES had been consistently cutting M.O.'s hair without permission;

   e.   When the mother would ask JONES not to cut M.O.'s hair, M.O. would come to a visit the following week with her hair even shorter;

   f.   M.O.'s hair was down her back when she entered foster care and it was now on her neck;

   g.   M.O. had been observed consistently hungry and eats all of the food her mother brings her during visits; and

   h.   M.O. is autistic, has very limited communication, and is not able to say what happened to her.

180.   An on-call DCF CPI responded to the FRC office immediately and "observed huge purple and blue marks going across [M.O.'s] buttock area" and broken skin on M.O.'s left butt cheek.

181.   DCF and law enforcement then responded to the JONES foster home, during which:

   a.   JONES immediately began yelling that they were investigating the wrong people;

   b.   JONES advised that DCF needed to be investigating the mother, as she is the one abusing M.O., even though her visits were supervised;

    c.   JONES was advised the other children were being removed so a full investigation could be completed;

    d.   JONES began yelling for DCF not to take her children;

    e.   JONES was asked what happened to M.O. and she could not provide an explanation;

    f.   While JONES was screaming and yelling about the foster children being removed, the children started behaving in an "irate manner;"

    g.   One of the foster children ran and hid in a closet, another attempted to run out the back door and jump the fence, and A.O. was crying uncontrollably;

    h.   The foster children could not be interviewed because of how upset and aggressive they all were at the time;

    i.   DCF requested that the case management agencies come to the JONES foster home to assist with removal of all of the children; and

    j.   FRC and DCF finally removed A.O. from the JONES foster home.

182.   Meanwhile, M.O. was transported to the hospital where she:

    a.   Was admitted for thirty-six (36) days;

    b.   Was observed to have extensive bilateral bruising on her buttocks and hips in different stages of healing;

    c.   Was observed to have a pressure ulcer on her left buttock;

    d.   Was observed as emaciated with a distended abdomen;

    e.   Had marked weight loss and muscle wasting;

    f.   Weighed only seventy-seven (77) pounds, down from the one hundred sixteen (116) pounds she weighed when she entered foster care;

g.   Was at severe risk for cardiovascular compromise due to severe malnutrition; and

h.   Was diagnosed with nonaccidental trauma, physical abuse, and failure to thrive.

183.   At all times material hereto, CFCN, NEELY, TORRES, CARVALHO, FRC, JOHNSON, BREEDLOVE, MEIKLE, GREEN, DCF, BAPTISTE, and BROOKS knew that JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time; and JONES' home was an inadequate and unsuitable placement for M.O. and A.O. that could not meet their serious medical, disability, and behavioral health needs and could not meet M.O. and A.O.'s immediate need for protection and safety.

184.   On July 17, 2023, FRC and CFCN finally complete an APD referral for M.O. to receive APD services, fifteen (15) months after M.O. came into care and only after M.O. was admitted to the hospital.

185.   On July 17, 2023, FRC/GREEN and DCF submitted a Status Report to the Court, for the first time notifying the Court of the series of abuse reports received regarding unexplained injuries to M.O. since May 1, 2023.

186.   On July 20, 2023, CFCN, FRC, GREEN, and BROOKS participated in a Licensing Staffing regarding the open abuse reports during which it was reported that a medical foster home or APD home were finally being sought for M.O.

187.   On August 19, 2023, M.O. was discharged from the hospital and placed in another foster home.

188.   On August 24, 2023, M.O. was placed on an extended visit with her mother.

189. On September 8, 2023, DCF/BROOKS closed the abuse reports with verified findings of failure to protect, inadequate supervision, medical neglect, and substance misuse, and no indicators of physical injury.

190. On or about September 10, 2023, A.O. began engaging in individual therapy again.

191. On September 10, 2023, DCF received another abuse report, the tenth (10th) abuse report regarding a child in JONES' care, this time alleging abuse and neglect of both A.O. and M.O. when they had been placed in the JONES foster home, which was closed with verified findings of inadequate supervision.

192. FRC subsequently referred A.O. to reunification therapy, which she participated in with her mother.

193. On or about January 16, 2024, A.O. was reunified with her mother.

194. M.O. and A.O. remain at home with their parents to date, where they are receiving the necessary and Court-ordered treatment of which they were deprived during the time they were under the Defendants' care, custody, and supervision.

195. The harm to M.O. and A.O. from the acts and omissions of DCF, CFCN, and FRC was ongoing and continuous from April 20, 2022, through July 14, 2023.

196. The harm to M.O. and A.O. from the acts and omissions of NEELY, TORRES, CARVALHO, GREEN, JOHNSON, BREEDLOVE, MEIKLE, BAPTISTE, and BROOKS was ongoing and continuous from the first dates of their involvement in the case through July 14, 2023.

## COUNT I - NEGLIGENCE CLAIM AGAINST DEFENDANT, CITRUS HEALTH NETWORK, INC. D/B/A CITRUS FAMILY CARE NETWORK

197. Plaintiffs hereby reaver and reallege paragraphs 1 through 196 as if fully set forth herein.

198. Defendant, CFCN, as the lead community-based agency contracted to provide child

welfare services in Miami-Dade County, owed M.O. and A.O. the following statutory, contractual, and common law duties:

a.  To protect M.O. and A.O.'s health, welfare, and safety while under its care, custody, and supervision;

b.  To protect M.O. and A.O. from harm while under its care, custody, and supervision;

c.  To provide a safe, secure environment where M.O. and A.O. were free from unreasonable risk of harm;

d.  To comply with all applicable statutes, including Chapters 39, 409, and 393 of the Florida Statutes; Florida Administrative Code Rules, including Chapters 65C-15, 65C-28, 65C-30, 65C-45, 65G-1, 65G-4, 65G-5, 65G-11 and 65G-13; policies and procedures, including DCF Operating Procedures Chapters 170, 175, and 215, and CFCN's Policies and Procedures; and contracts, including, CFCN's contracts with DCF, and CFCN's contracts with FRC;

e.  To use reasonable care in placing M.O. and A.O. in an out-of-home placement that was safe and could meet their needs;

f.  To use reasonable care in the oversight and supervision of M.O. and A.O.;

g.  To have available an appropriate continuum of specialized placements including medical foster homes, specialized therapeutic foster homes, and utilization of APD homes for disabled children in its system of care, including M.O. and A.O.;

h.  To have available an appropriate continuum of services to address M.O. and A.O.'s therapeutic needs, behavioral needs, and disability needs;

i.  To search for specialized placements including medical foster homes, specialized therapeutic foster homes, and utilization of APD homes for disabled children out of county when such placements do not exist within CFCN's system of care;

j.  To investigate the fitness of any proposed placement for M.O. and A.O., taking into account their individualized physical, emotional, behavioral, and social needs, as well as their background and history;

k.  To ensure that all available information was provided to foster parents regarding the foster children placed therein, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including M.O. and A.O., pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 170-11, and CFCN Policies and Procedures;

l.   To recommend against licensure and re-licensure of the JONES foster home when it was known that there were concerns with JONES being a licensed foster parent;

m.   Not to place M.O. and A.O. in the JONES foster home when it was known that JONES was an unsafe placement that could not meet their significant special needs and there was an open abuse report prohibiting the placement of any children in the foster home;

n.   To continually assess the adequacy and safety of M.O. and A.O.'s placement in the JONES foster home;

o.   To have M.O. and A.O. immediately removed from the JONES foster home when it was known that JONES was unable and/or unwilling to protect M.O. and A.O. from harm;

p.   To assess and obtain services including placement services, disability services, and enrollment on the Medicaid Waiver and to ensure rights pursuant to Chapter 393, Florida Statutes;

q.   To use reasonable care to ensure all necessary and appropriate assessments and evaluations for M.O. and A.O. were completed in a timely manner, including, but not limited to, medical evaluations, disability evaluations, speech therapy evaluations, occupational therapy evaluations, behavioral evaluations, neurological evaluations, psychological evaluations, neuropsychological evaluations, mental health evaluations, and psychiatric evaluations;

r.   To use reasonable care to ensure that all recommendations from assessors, evaluators, and other professionals regarding M.O. and A.O., were followed and implemented in a timely manner;

s.   To use reasonable care to ensure that M.O. and A.O. timely and consistently received all necessary and appropriate services to meet their needs, including, but not limited to, ABA services, speech therapy, occupational therapy, APD services, individual counseling, education services, behavioral services, and medication management;

t.   To follow and ensure complete compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

u.   To report all reasonable suspicions of abuse or neglect to the Abuse Hotline;

v.   To arrange for the handling of any special management issues identified in history and assessments to ensure that all foster children, including M.O. and A.O., were safe, appropriately cared for, and adequately supervised;

w.  To use reasonable care to establish and maintain an adequate system for case management and ensure appropriate oversight of subcontracted agencies;

x.  To continually monitor the performance of sub-contracted agencies, including FRC, to ensure they were meeting children's needs for services and safety and to ensure their compliance with Florida Statutes, Florida Administrative Code, DCF Operating Procedures, and CFCN policies and procedures;

y.  To place sub-contracted agencies, including FRC, on corrective action when their systemic deficiencies result in dangerous placements and/or lack of services for children in the custody of the State and harm to said children; and

z.  To require sub-contracted agencies, including FRC, to comply with corrective action plans to remedy systemic deficiencies including shortages of appropriate placements and services for children in the custody of the State or to immediately terminate their contract(s) for failure to comply with corrective action.

199.    CFCN breached said non-discretionary and non-delegable duties.

200.    As a direct and proximate result of the aforementioned breaches, M.O. and A.O. suffered emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse; bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable compensatory damages.   These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant, CITRUS HEALTH NETWORK, INC. D/B/A CIRTUS FAMILY CARE NETWORK for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT II – CULPABLE NEGLIGENCE CLAIM AGAINST
## CITRUS HEALTH NETWORK, INC. D/B/A CITRUS FAMILY CARE NETWORK

201.    Plaintiffs hereby reaver and reallege paragraphs 1 through 196 as if fully set forth herein.

202.    Defendant, CFCN, owed M.O. and A.O. the following statutory duties pursuant to section 409.993, Florida Statutes:

    a.   To not act in a culpably negligent manner while providing foster care and related services to M.O. and A.O.;

    b.   To not act with reckless indifference of human life while providing foster care and related services to M.O. and A.O.; and

    c.   To not act with grossly careless disregard of human life while providing foster care and related services to M.O. and A.O.

203.    Defendant, CFCN, breached the above statutory duties, and its actions demonstrate that CFCN acted with willful and wanton disregard of human rights, safety, and/or property in its provision of foster care and related services to M.O. and A.O. and/or acted with reckless indifference and/or grossly careless disregard of human life in its provision of foster care and related services to M.O. and A.O. based upon the following facts:

    a.   No later than July 1, 2019, when CFCN took over the contract with DCF to be the lead community-based care agency for foster care and related services in the Southern Region, CFCN was on notice that it was taking over a system of care that had historically been in crisis and continued to be in crisis with a critical shortage of placements, including specialized placements for children with medical needs, disabilities, and mental health needs, and lack of services to meet the special needs of children served by CFCN's system of care in Miami-Dade County;

    b.   No later than July 1, 2019, when CFCN took over the contract with DCF to be the lead community-based care agency for foster care and related services in the Southern Region, CFCN knew that a Class Action had been filed in 2018 due to deficiencies within the Southern Region which was harming a large

population of children in foster care, including failure to maintain a remotely adequate number and variety of foster homes and other placements for the number of children in the system and their special needs, and failure to provide medically necessary therapeutic and behavioral services to address the special needs of children placed in care.

c.  No later than July 1, 2019, when CFCN took over the contract with DCF to be the lead community-based care agency for foster care and related services in the Southern Region, CFCN knew that a Settlement Agreement had been reached in the Class Action in March 2019, requiring the lack of appropriate placements and failure to provide medically necessary services to children placed in foster care in the Southern Region, to be addressed and remedied.

d.  No later than July 1, 2019, when CFCN took over the contract with DCF to be the lead community-based care agency for foster care and related services in the Southern Region, CFCN was required to take corrective action to address and remedy the lack of appropriate placements and failure to provide medically necessary services to children placed in foster care in the Southern Region.; however, CFCN failed to do so, and the same deficiencies still existed throughout this case.

e.  No later than July 1, 2019, CFCN was on notice of deficiencies within its system of care, including insufficient placements, failure to maintain a remotely adequate number and variety of foster homes and other placements for the number of children in the system and their needs, and failure to provide medically necessary therapeutic and behavioral services to address the special needs of children placed within CFCN's system of care.

f.  As of April 20, 2022, CFCN continued to operate a system of care that was in crisis, dangerous to children, and harming children in the Southern Region due to an ongoing critical shortage of placements, including specialized placements for children with medical needs, disabilities, behavioral health needs, and mental health needs; insufficient placements to appropriately meet foster children's needs, including M.O. and A.O.; and failure to provide medically necessary services to meet the special needs of children in care, including M.O. and A.O.

g.  Prior to April 2022, and through July 2023, CFCN over utilized the placement of special needs foster children, who needed a higher level of care, including M.O. and A.O., in untrained traditional foster homes that were overcrowded and/or over their licensed capacity, with knowledge that these children would be exposed to harms, including abuse, neglect, and deterioration.

h.  CFCN failed to ensure that M.O. and A.O. were immediately placed in a specialized placement, such as an APD home, a medical foster home, or a therapeutic foster home when it was clear they needed a higher level of care than a traditional foster home due to their autism diagnoses and significant special needs, which qualified them for APD crisis placement.

i.  CFCN placed M.O. and A.O. in the JONES traditional foster home knowing that:

   i.  The JONES foster home was already at its licensed capacity of three (3) children, and placing M.O. and A.O. in this foster home would place the home over its licensed capacity by two (2) children;

   ii.  JONES was a single foster parent who worked full time;

84

     iii.  There was already a series of abuse reports against JONES alleging abuse and neglect of foster children in her care, including at least two prior abuse reports before April 20, 2022, and a report received on April 20, 2022, the day M.O. and A.O. came into care, which should have prohibited their placement in the JONES foster home for that reason alone; and

     iv.  There had already been complaints against the JONES foster home with concerns that JONES was not meeting the needs of foster children placed in her care, she refused to transport children to medically necessary evaluations, therapies, and appointments, and she did not support reunification of children with their biological families.

j.  CFCN failed to ensure that M.O. and A.O. immediately and continuously received medically necessary services to address their disabilities and special needs, including APD HCBS Medical Waiver services, ABA therapy, speech therapy, occupational therapy, and individual and family therapy for A.O., despite knowledge that they had been receiving these services prior to their removal, these services were professionally recommended, these services were Court ordered to continue, and these services were medically necessary to continue to ensure M.O. and A.O's safety and prevent them from deteriorating.

k.  CFCN failed to remove M.O. and A.O. from the JONES traditional foster home and place them in a specialized placement such as an APD home, a medical foster home, or a therapeutic foster home despite knowing that:

i.   JONES was a single foster parent who worked full time and had five (5) children placed in her care, some of whom had special needs, including M.O. and A.O.;

ii.  The JONES foster home was over its licensed capacity for the first two (2) months M.O. and A.O. were placed there;

iii. The JONES foster home had an open abuse report against her for the first two (2) months the children were placed there;

iv.  There was a series of abuse reports against JONES alleging abuse and neglect of other foster children in her care, including at least two prior abuse reports before April 20, 2022; a report received on April 20, 2022, the day M.O. and A.O. came into care, which remained open for two (2) months; and another abuse report received at the end of 2022, which was closed with credible findings of abuse and neglect;

v.   There was a series of at least four (4) abuse reports alleging unexplained injuries to M.O. between May 1, 2023 and July 11, 2023, with medical findings from CPT that M.O. was the victim of abuse;

vi.  JONES admitted that M.O.'s special needs were more than she was equipped to handle, and she demanded more money for M.O. to remain placed in her home, which CFCN paid instead of finding an appropriate and suitable placement that could meet her needs;

vii. JONES repeatedly threatened CFCN with removal of M.O. and A.O. from her home unless her demands were met, including a higher board rate, changing the children's schools to a school that was more convenient for her even though it was not in the children's best interest,

changing the children's doctors, and limiting and/or stopping the mother's contact with the children;

viii. JONES refused to transport M.O. and A.O. to and participate in medical appointments, evaluations, and medically necessary therapy and services;

ix. JONES did not support reunification of M.O. and A.O. with their biological parents and continuously made false allegations of sexual abuse against the biological mother, even after her visits were supervised at every moment.

204. As a direct and proximate result of CFCN's breaches, M.O. and A.O. suffered bodily injury, mental injury, psychological trauma, emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable compensatory damages. These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

205. The caps and limitations of § 409.993, Florida Statutes, are inapplicable to M.O. and A.O.'s damages, which are described in paragraph 204, because of CFCN's reckless, willful, wanton, grossly careless, and/or dangerous acts which proximately caused M.O. and A.O.'s injuries.

WHEREFORE, Plaintiffs demand judgment for damages in excess of the statutory caps found in § 409.993, Florida Statutes, against Defendant, CITRUS HEALTH NETWORK, INC. D/B/A CITRUS FAMILY CARE NETWORK.

## COUNT III – 42 U.S.C. § 1983 CLAIM AGAINST
## CITRUS HEALTH NETWORK, INC. D/B/A CITRUS FAMILY CARE NETWORK

206.     Plaintiffs reaver and reallege paragraphs 1 through 196 as if fully set forth herein.

207.     This count arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

208.     At all times material hereto, CFCN was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

209.     At all times material hereto, pursuant to § 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive prerogative of the State of Florida, CFCN assumed responsibility as a private non-governmental entity.

210.     At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including M.O. and A.O., had the constitutionally and federally protected right to be safe and free from unreasonable risk of harm and to receive placement and services in accordance with professional judgment.

211.     CFCN established and enforced a custom, policy, or practice on a widespread basis that resulted in a placement crisis by failing to have or obtain sufficient specialized placements for children with medical needs, disabilities, and mental health needs, in accordance with professional judgment, including a lack of available APD placements that could be utilized for children with disabilities, specialized therapeutic foster homes, and medical foster homes.

212.     CFCN established and enforced a custom, policy, or practice on a widespread basis of allowing foster children with known disabilities, behavioral health needs, mental health needs, and medical needs, to be placed in untrained traditional foster homes that were overcrowded and/or

over their licensed capacity, despite knowledge that these children needed a higher level of care and would be exposed to the substantial risk of serious harm.

213.    CFCN established and enforced a custom, policy, or practice on a widespread basis of failing to appropriately staff cases and assess children to ensure appropriate placement, services, and a plan of care to prevent deterioration while in care.

214.    CFCN established and enforced a custom, policy, or practice on a widespread basis that failed to ensure that disability needs, behavioral health needs, mental health needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

215.    CFCN established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from CBHAs, neuropsychological evaluations, psychological evaluations, psychiatric evaluations, mental health evaluations, medical professionals, disability providers, and therapeutic providers to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

216.    CFCN established and enforced a custom, policy, or practice on a widespread basis that failed to ensure that foster children in state custody with disability needs, behavioral health needs, mental health needs, and medical needs received services in accordance with professional judgment, including APD services, ABA services, speech therapy, occupational therapy, and individual counseling, thereby exposing children in its care to the substantial risk of serious harm.

217.    CFCN was responsible for, but failed to ensure that children under its care, including M.O. and A.O., had a complete and accurate plan of care that addressed their needs consistent with their disabilities, known diagnoses, CBHA recommendations, medical evaluations,

and mental health evaluations, and failed to continually assess and determine any need for specialized placement and/or services in accordance with professional judgment.

218.    CFCN established and enforced a custom, policy, or practice of failing to follow and ensure complete compliance with all Court Orders from the Dependency Court, including Orders regarding placement, services, supervision, and monitoring of children in foster care.

219.    CFCN established and enforced a custom, policy, or practice of failing to appropriately monitor its subcontracted providers and of deliberately failing to learn of the dangers that children in its custody were exposed to.

220.    CFCN established and maintained an unconstitutional system of care that resulted in the widespread harm to foster children, including M.O. and A.O., because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm resulting in a child welfare system that blatantly ignored and/or deliberately failed to learn of the plethora of red flags, dangers and warning signs that M.O. and A.O.'s needs were not being properly addressed and provided for.

221.    At all times material hereto, CFCN did not provide services or placements in accordance with professional judgment to M.O. and A.O., who were in the physical and legal custody of CFCN, and CFCN was deliberately indifferent and/or acted with reckless disregard to M.O. and A.O.'s health, safety, and welfare and Constitutional and federal rights.

222.    CFCN violated M.O. and A.O.'s Constitutional rights and exposed them to a substantial risk of serious harm by:

   a.   Failing to have appropriate and available specialized placements for foster children in Miami-Dade County, including M.O. and A.O., during the time they were in out-of-home care;

b.  Failing to refer M.O. and A.O. for APD crisis placement and services immediately at the time of their initial removal from their parents, and continuously throughout the case;

c.  Failing to place M.O. and A.O. in a specialized placement qualified to meet their needs, including an APD home, specialized therapeutic foster home, or medical foster home, contrary to professional judgment;

d.  Failing to place M.O. and A.O. in a safe environment that could meet their special needs;

e.  Approving placement of M.O. and A.O. in a traditional single parent foster home despite knowledge that JONES had an open abuse report which should have resulted in a placement hold and prevented any child, including M.O. and A.O., from being placed there;

f.  Approving an Over-Capacity Waiver for M.O. and A.O. to be placed in the JONES traditional foster home, despite knowledge that JONES was a single parent who worked full time, was already at her newly increased licensed capacity of three (3), including at least one (1) special needs child, and had an open abuse report which prevented her from being over her licensed capacity;

g.  Placing M.O. and A.O. in a single parent foster home despite knowledge that JONES had a pattern of abuse reports against her, and M.O. and A.O. needed a higher level of care;

h.  Failing to remove M.O. and A.O. from the JONES foster home, despite ongoing knowledge that there was an open abuse report and the home was over its licensed capacity for the first two (2) months of M.O. and A.O.'s placement;

i.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her to handle;

j.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

k.   Failing to remove M.O. and A.O. from the JONES foster home when the August 9, 2022, Staffing determined that they needed to be removed from this placement;

l.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time CFCN was aware that M.O. had unexplained injuries;

m.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time CFCN was aware that an abuse report was received due to M.O. having unexplained injuries;

n.   Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother, refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments, refused to participate in treatment with M.O. and A.O., demanded that M.O. and A.O. change schools, refused to support reunification, and was influencing and/or coaching A.O. to make statements consistent with JONES' allegations against the mother;

o.   Failing to ensure that M.O. and A.O. received APD HCBS Medicaid Waiver services;

p.   Failing to ensure that M.O. and A.O. consistently received ABA services as often as was medically necessary, as professionally recommended, and as Court ordered;

q.   Failing to ensure that M.O. and A.O. consistently received speech therapy as necessary, as professionally recommended, and as Court ordered;

r.   Failing to ensure that M.O. and A.O. consistently received occupational therapy as necessary, as professionally recommended, and as Court ordered;

s.   Failing to ensure that services professionally recommended in M.O. and A.O.'s CBHAs were implemented in a timely manner;

t.   Failing to ensure that services professionally recommended in M.O. and A.O.'s Neuropsychological Evaluations were implemented in a timely manner;

u.   Failing to ensure that M.O. received medical treatment and assessment to address her weight loss during her placement in out-of-home care;

v.   Failing to ensure that A.O. received a psychiatric evaluation as professionally recommended;

w.   Failing to ensure that A.O. consistently received trauma-based individual counseling as necessary, as professionally recommended, and as Court ordered;

x.   Failing to ensure that A.O. received family therapy with her mother as professionally recommended;

y.   Failing to staff M.O. and A.O.'s case and determine the need for enhanced services and change of placement each time concerns were raised regarding the JONES foster home;

z.   Failing to follow and ensure compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

aa. Failing to monitor its subcontractors to ensure child safety; and

bb. By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

223. CFCN was deliberately indifferent to the serious disability, behavioral, medical, psychiatric and psychological needs of children in its care and custody, including M.O. and A.O.

224. Despite possessing the authority and means to remedy the unconstitutional treatment of M.O. and A.O. and seek a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs, CFCN was deliberately indifferent to the substantial risk that M.O. would be harmed and would deteriorate in the JONES foster home, and CFCN knowingly and recklessly disregarded an excessive risk to M.O. and A.O.'s health and safety.

225. Despite possessing the authority and means to remedy the unconstitutional treatment of M.O. and A.O. to ensure they received medically necessary, professionally recommended, and Court ordered evaluations, treatment, and services, CFCN was deliberately indifferent to M.O. and A.O.'s right to receive treatment for their serious disabilities and special needs, and CFCN knowingly and recklessly disregarded an excessive risk which subjected M.O. and A.O. to harm and deterioration.

226. CFCN took said actions described herein knowing it was exposing children who were in State custody, including M.O. and A.O., to a substantial risk of serious harm.

227. CFCN violated M.O. and A.O.'s fundamental right of physical safety subjecting them to a substantial risk of serious harm.

228. CFCN's actions and failures to act were done with knowledge that said actions would deprive M.O. and A.O. of their constitutional rights to be free from harm.

229.   As a direct and proximate result of CFCN's deliberate indifference and/or recklessness, M.O. and A.O. suffered emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages. These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

230.   Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs pray that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, CITRUS HEALTH NETWORK, INC., d/b/a CITRUS FAMILY CARE NETWORK, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IV - NEGLIGENCE CLAIM AGAINST DEFENDANT, FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.

231.   Plaintiffs hereby reaver and reallege paragraphs 1 through 196 as if fully set forth herein.

232.   The negligence claim against FRC set forth in this count is based on FRC's own direct acts and omissions of placing M.O. and A.O. in the JONES foster home, allowing M.O. and A.O. to remain placed in the JONES foster home, and failing to ensure M.O. and A.O. received medically necessary evaluations, treatment, and services, and shall in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster

home.

233.     Defendant, FRC, as the sub-contracted community-based agency contracted to provide child welfare services in Miami-Dade County, including case management services, owed M.O. and A.O. the following statutory, contractual, and common law duties:

a.   To protect M.O. and A.O.'s health, welfare, and safety while under its care, custody, and supervision;

b.   To protect M.O. and A.O. from harm while under its care, custody, and supervision;

c.   To provide a safe, secure environment where M.O. and A.O. were free from unreasonable risk of harm;

d.   To comply with all applicable statutes, including Chapters 39, 409, and 393 of the Florida Statutes; Florida Administrative Code Rules, including Chapters 65C-15, 65C-28, 65C-30, 65C-45, 65G-1, 65G-4, 65G-5, 65G-11 and 65G-13; policies and procedures, including DCF Operating Procedures Chapters 170, 175, and 215, CFCN Policies and Procedures and FRC Policies and Procedures; and contracts, including FRC's contract with CFCN;

e.   To use reasonable care in placing M.O. and A.O. in an out-of-home placement that was safe and could meet their needs;

f.   To use reasonable care in the oversight and supervision of M.O. and A.O.;

g.   To have available an appropriate continuum of services to address M.O. and A.O.'s therapeutic needs, behavioral needs, and disability needs;

h.   To investigate the fitness of any proposed placement for M.O. and A.O., taking into account their individualized physical, emotional, behavioral, and social needs, as well as their background and history;

i.   To ensure that all available information was provided to foster parents regarding the foster children placed therein, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including M.O. and A.O., pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 170-11, CFCN Policies and Procedures, and FRC Policies and Procedures;

j.   Not to place M.O. and A.O. in the JONES foster home when it was known that JONES was an unsafe placement that could not meet their significant special needs and there was an open abuse report prohibiting the placement of any children in the foster home;

96

k.  To continually assess the adequacy and safety of M.O. and A.O.'s placement in the JONES foster home;

l.  To immediately remove M.O. and A.O. from the JONES foster home when it was known that she was unable and/or unwilling to protect M.O. and A.O. from further harm;

aa. To assess and obtain services including placement services, disability services, and enrollment on the Medicaid Waiver and to ensure rights pursuant to Chapter 393, Florida Statutes;

m.  To use reasonable care to ensure all necessary and appropriate assessments and evaluations for M.O. and A.O. were completed in a timely manner, including, but not limited to, medical evaluations, disability evaluations, speech therapy evaluations, occupational therapy evaluations, behavioral evaluations, neurological evaluations, psychological evaluations, neuropsychological evaluations, mental health evaluations, and psychiatric evaluations;

n.  To use reasonable care to ensure that all recommendations from assessors, evaluators, and other professionals regarding M.O. and A.O., were followed and implemented in a timely manner;

o.  To use reasonable care to ensure that M.O. and A.O. timely and consistently received all necessary and appropriate services to meet their needs, including, but not limited to, ABA services, speech therapy, occupational therapy, APD services, individual counseling, education services, behavioral services, and medication management;

p.  To follow and comply with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

q.  To report all reasonable suspicions of abuse or neglect to the Abuse Hotline; and

r.  To arrange for the handling of any special management issues identified in history and assessments to ensure that all foster children, including M.O. and A.O., were safe, appropriately cared for, and adequately supervised.

234.  FRC breached these duties.

235.  As a direct and proximate result of Defendant FRC's breaches, M.O. and A.O. suffered emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental

anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable compensatory damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant, FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

### COUNT V – CULPABLE NEGLIGENCE CLAIM AGAINST FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.

236.     Plaintiffs hereby reaver and reallege paragraphs 1 through 196 as if fully set forth herein.

237.     The culpable negligence claim against FRC set forth in this count is based on FRC's own direct acts and omissions of placing M.O. and A.O. in the JONES foster home, allowing M.O. and A.O. to remain placed in the JONES foster home, and failing to ensure M.O. and A.O. received medically necessary evaluations, treatment, and services, and shall in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster home.

238.     Defendant, FRC, owed M.O. and A.O. the following statutory duties pursuant to section 409.993, Florida Statutes:

     d.  To not act in a culpably negligent manner while providing foster care and related services to M.O. and A.O.;

     e.  To not act with reckless indifference of human life while providing foster care and related services to M.O. and A.O.; and

     f.  To not act with grossly careless disregard of human life while providing foster care and related services to M.O. and A.O.

239.    Defendant, FRC, breached the above statutory duties, and its actions demonstrate that FRC acted with willful and wanton disregard of human rights, safety, and/or property in its provision of foster care and related services to M.O. and A.O. and/or acted with reckless indifference and/or grossly careless disregard of human life in its provision of foster care and related services to M.O. and A.O. based upon the following facts:

a.  No later than 2018, FRC was on notice that its system of care in Miami-Dade County had historically been in crisis and continued to be in crisis with a critical shortage of placements, including specialized placements for children with medical needs, disabilities, and mental health needs; children being placed in improper placements that could not meet their special needs; and lack of services to meet the special needs of children served by FRC;

b.  No later than 2018, FRC knew that a Class Action had been filed due to deficiencies within the Southern Region which was harming a large population of children in foster care served by FRC, including failure to maintain a remotely adequate number and variety of foster homes and other placements for the number of children in the system and their special needs, and failure to provide medically necessary therapeutic and behavioral services to address the special needs of children placed in care.

c.  In March 2019, FRC knew that a Settlement Agreement had been reached in the Class Action, requiring the lack of appropriate placements and failure to provide medically necessary services to children placed in foster care in the Southern Region, to be addressed and remedied.

d.  In March 2019, FRC was required to take corrective action to address and remedy children being placed in improper placements and the failure to provide medically necessary services to children placed in foster care being served by FRC; however, FRC failed to do so, and the same deficiencies still existed throughout this case.

e.  As of April 20, 2022, FRC continued to operate a system of care that was in crisis, dangerous to children, and harming children served by FRC due to an ongoing critical shortage of placements, including specialized placements for children with medical needs, disabilities, behavioral health needs, and mental health needs; insufficient placements to appropriately meet foster children's needs, including M.O. and A.O.; and a failure to provide medically necessary services to meet the special needs of children in care, including M.O. and A.O.

f.  Prior to April 2022, and through July 2023, FRC over utilized the placement of special needs foster children, who needed a higher level of care, including M.O. and A.O., in untrained traditional foster homes that were overcrowded and/or over their licensed capacity, with knowledge that these children would be exposed to harms, including abuse, neglect, and deterioration.

g.  FRC failed to ensure that M.O. and A.O. were immediately placed in a specialized placement, such as an APD home, a medical foster home, or a therapeutic foster home when it was clear they needed a higher level of care than a traditional foster home due to their autism diagnoses and significant special needs, which qualified them for APD crisis placement.

h.  FRC agreed with M.O. and A.O. being placed in the JONES traditional foster home knowing that:

100

i.   The JONES foster home was already at its licensed capacity of three (3) children, and placing M.O. and A.O. in this foster home would place the home over its licensed capacity by two (2) children;

ii.   JONES was a single foster parent who worked full time;

iii.   There was already a series of abuse reports against JONES alleging abuse and neglect of foster children in her care, including at least two prior abuse reports before April 20, 2022, and a report received on April 20, 2022, the day M.O. and A.O. came into care, which should have prohibited their placement in the JONES foster home for that reason alone; and

iv.   There had already been complaints against the JONES foster home with concerns that JONES was not meeting the needs of foster children placed in her care, she refused to transport children to medically necessary evaluations, therapies, and appointments, and she did not support reunification of children with their biological families.

i.   FRC failed to ensure that M.O. and A.O. immediately and continuously received medically necessary services to address their disabilities and special needs, including APD HCBS Medical Waiver services, ABA therapy, speech therapy, occupational therapy, and individual and family therapy for A.O., despite knowledge that they had been receiving these services prior to their removal, these services were professionally recommended, these services were Court ordered to continue, and these services were medically necessary to continue to ensure M.O. and A.O's safety and prevent them from deteriorating.

j.  FRC failed to remove M.O. and A.O. from the JONES traditional foster home and place them in a specialized placement such as an APD home, a medical foster home, or a therapeutic foster home despite knowing that:

i.  JONES was a single foster parent who worked full time and had five (5) children placed in her care, some of whom had special needs, including M.O. and A.O.;

ii.  The JONES foster home was over its licensed capacity for the first two (2) months M.O. and A.O. were placed there;

iii.  The JONES foster home had an open abuse report against her for the first two (2) months the children were placed there;

iv.  There was a series of abuse reports against JONES alleging abuse and neglect of other foster children in her care, including at least two prior abuse reports before April 20, 2022; a report received on April 20, 2022, the day M.O. and A.O. came into care, which remained open for two (2) months; and another abuse report received at the end of 2022, which was closed with credible findings of abuse and neglect;

v.  There was a series of at least four (4) abuse reports alleging unexplained injuries to M.O. between May 1, 2023 and July 11, 2023, with medical findings from CPT that M.O. was the victim of abuse;

vi.  JONES admitted that M.O.'s special needs were more than she was equipped to handle, and she demanded more money for M.O. to remain placed in her home;

vii.  JONES repeatedly threatened FRC with removal of M.O. and A.O. from her home unless her demands were met, including a higher board rate,

changing the children's schools to a school that was more convenient for her even though it was not in the children's best interest, changing the children's doctors, and limiting and/or stopping the mother's contact with the children;

viii.   JONES refused to transport M.O. and A.O. to and participate in medical appointments, evaluations, and medically necessary therapy and services; and

ix.   JONES did not support reunification of M.O. and A.O. with their biological parents and continuously made false allegations of sexual abuse against the biological mother, even after her visits were supervised at every moment.

240.   As a direct and proximate result of FRC's breaches, M.O. and A.O. suffered bodily injury, mental injury, psychological trauma, emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable compensatory damages.   These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future

241.   The caps and limitations of § 409.993, Florida Statutes, are inapplicable to M.O. and A.O.'s damages, which are described in paragraph 240, because of FRC' reckless, willful, wanton, grossly careless, and/or dangerous acts which proximately caused M.O. and A.O.'s injuries.

WHEREFORE, Plaintiffs demand judgment for damages in excess of the statutory caps found in § 409.993, Florida Statutes, against Defendant, FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.

### COUNT VI – 42 U.S.C. § 1983 CLAIM AGAINST FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC.

242.    Plaintiffs reaver and reallege paragraphs 1 through 196 as if fully set forth herein.

243.    This count arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

244.    The 42 U.S.C. § 1983 claim against FRC set forth in this count is based on FRC's own acts and omissions which violated M.O. and A.O.'s civil rights, and shall in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster home.

245.    At all times material hereto, FRC was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

246.    At all times material hereto, pursuant to § 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive prerogative of the State of Florida, FRC assumed responsibility as a private non-governmental entity.

247.    At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including M.O. and A.O., had the constitutionally and federally protected right to be safe and free from unreasonable risk of harm and to receive placement and services in accordance with professional judgment.

104

248.     FRC established and enforced a custom, policy, or practice on a widespread basis of allowing foster children with known disabilities, behavioral health needs, mental health needs, and medical needs, to be placed in untrained traditional foster homes that were overcrowded and/or over their licensed capacity, despite knowledge that these children needed a higher level of care and would be exposed to the substantial risk of serious harm.

249.     FRC established and enforced a custom, policy, or practice on a widespread basis of failing to appropriately staff cases and assess children to ensure appropriate placement, services, and a plan of care to prevent deterioration while in care.

250.     FRC established and enforced a custom, policy, or practice on a widespread basis that failed to ensure that disability needs, behavioral health needs, mental health needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

251.     FRC established and enforced a custom, policy, or practice on a widespread basis that failed to follow and comply with recommendations from CBHAs, neuropsychological evaluations, psychological evaluations, psychiatric evaluations, mental health evaluations, medical professionals, disability providers, and therapeutic providers, in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

252.     FRC established and enforced a custom, policy, or practice on a widespread basis that failed to ensure that foster children in state custody with disability needs, behavioral health needs, mental health needs, and medical needs received services in accordance with professional judgment, including APD services, ABA services, speech therapy, occupational therapy, and individual counseling, thereby exposing children in its care to the substantial risk of serious harm.

253.    FRC was responsible for, but failed to ensure that children under its care, including M.O. and A.O., had a complete and accurate plan of care that addressed their needs consistent with their disabilities, known diagnoses, CBHA recommendations, medical evaluations, and mental health evaluations, and failed to continually assess and determine any need for specialized placement and/or services in accordance with professional judgment.

254.    FRC established and enforced a custom, policy, or practice of failing to follow and ensure complete compliance with all Court Orders from the Dependency Court, including Orders regarding placement, services, supervision, and monitoring of children in foster care.

255.    FRC established and maintained an unconstitutional system of care that resulted in the widespread harm to foster children, including M.O. and A.O., because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm resulting in a child welfare system that blatantly ignored and/or deliberately failed to learn of the plethora of red flags, dangers and warning signs that M.O. and A.O.'s needs were not being properly addressed and provided for.

256.    At all times material hereto, FRC did not provide services or placements in accordance with professional judgment to M.O. and A.O., who were in the physical and legal custody of FRC, and FRC was deliberately indifferent and/or acted with reckless disregard to M.O. and A.O.'s health, safety, and welfare and Constitutional and federal rights.

257.    FRC violated M.O. and A.O.'s Constitutional rights and exposed them to a substantial risk of serious harm by:

   a.   Failing to refer M.O. and A.O. for APD crisis placement and services immediately at the time of their initial removal from their parents, and continuously throughout the case;

b. Failing to ensure M.O. and A.O. were placed in a specialized placement qualified to meet their needs, including an APD home, specialized therapeutic foster home, or medical foster home, contrary to professional judgment;

c. Failing to ensure M.O. and A.O. were placed in a safe environment that could meet their special needs;

d. Agreeing with placement of M.O. and A.O. in a traditional single parent foster home despite knowledge that JONES had an open abuse report which should have resulted in a placement hold and prevented any child, including M.O. and A.O., from being placed there;

e. Agreeing with placement of M.O. and A.O. in a single parent foster home despite knowledge that JONES had a pattern of abuse reports against her, and M.O. and A.O. needed a higher level of care;

f. Failing to remove M.O. and A.O. from the JONES foster home, despite ongoing knowledge that there was an open abuse report and the home was over its licensed capacity for the first two (2) months of M.O. and A.O.'s placement;

g. Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her to handle;

h. Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

i. Failing to remove M.O. and A.O. from the JONES foster home when the August 9, 2022, Staffing determined that they needed to be removed from this placement;

107

j.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time FRC was aware that M.O. had unexplained injuries;

k.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time FRC was aware that an abuse report was received due to M.O. having unexplained injuries;

l.   Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother, refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments, refused to participate in treatment with M.O. and A.O., demanded that M.O. and A.O. change schools, refused to support reunification, and when FRC believed JONES was influencing and/or coaching A.O. to make statements and allegations against the mother which FRC stated was destroying A.O.'s relationship with her mother;

m.   Failing to ensure that M.O. and A.O. received APD HCBS Medicaid Waiver services;

n.   Failing to ensure that M.O. and A.O. consistently received ABA services as often as was medically necessary, as professionally recommended, and as Court ordered;

o.   Failing to ensure that M.O. and A.O. consistently received speech therapy as necessary, as professionally recommended, and as Court ordered;

p.   Failing to ensure that M.O. and A.O. consistently received occupational therapy as necessary, as professionally recommended, and as Court ordered;

q.   Failing to ensure that services professionally recommended in M.O. and A.O.'s CBHAs were implemented in a timely manner;

r.   Failing to ensure that services professionally recommended in M.O. and A.O.'s Neuropsychological Evaluations were implemented in a timely manner;

s.   Failing to ensure that M.O. received medical treatment and assessment to address her weight loss during her placement in out-of-home care;

t.   Failing to ensure that A.O. received a psychiatric evaluation as professionally recommended;

u.   Failing to ensure that A.O. consistently received trauma-based individual counseling as necessary, as professionally recommended, and as Court ordered;

v.   Failing to ensure that A.O. received family therapy with her mother as professionally recommended;

w.   Failing to staff M.O. and A.O.'s case and determine the need for enhanced services and change of placement each time concerns were raised regarding the JONES foster home;

x.   Failing to follow and ensure compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

y.   Failing to inform the Court that M.O. and A.O. were not consistently receiving medically necessary, professionally recommended, and Court ordered services;

z.   Failing to inform the Court of multiple unexplained injuries to M.O. beginning in April 2023, and multiple abuse reports received regarding unexplained injuries to M.O. between May 1, 2023 and July 11, 2023; and

aa. By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

258.   FRC was deliberately indifferent to the serious disability, behavioral, medical, psychiatric and psychological needs of children in its care and custody, including M.O. and A.O.

259.    Despite possessing the authority and means to remedy the unconstitutional treatment of M.O. and A.O. and seek a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs, FRC was deliberately indifferent to the substantial risk that M.O. would be harmed and would deteriorate in the JONES foster home, and FRC knowingly and recklessly disregarded an excessive risk to M.O. and A.O.'s health and safety.

260.    Despite possessing the authority and means to remedy the unconstitutional treatment of M.O. and A.O. to ensure they received medically necessary, professionally recommended, and Court ordered evaluations, treatment, and services, FRC was deliberately indifferent to M.O. and A.O.'s right to receive treatment for their serious disabilities and special needs, and FRC knowingly and recklessly disregarded an excessive risk which subjected M.O. and A.O. to harm and deterioration.

261.    FRC took said actions described herein knowing it was exposing children who were in State custody, including M.O. and A.O., to a substantial risk of serious harm.

262.    FRC violated M.O. and A.O.'s fundamental right of physical safety subjecting them to a substantial risk of serious harm.

263.    FRC's actions and failures to act were done with knowledge that said actions would deprive M.O. and A.O. of their constitutional rights to be free from harm.

264.    As a direct and proximate result of FRC's deliberate indifference and/or recklessness, M.O. and A.O. suffered emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

265.   Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs pray that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, FAMILY RESOURCE CENTER OF SOUTH FLORIDA, INC, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VII – NEGLIGENCE CLAIM AS TO M.O. AGAINST FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES

266.   Plaintiff, M.O., hereby reavers and realleges paragraphs 1 through 196 as if fully set forth herein.

267.   All conditions precedent pursuant to § 768.28, Florida Statutes, have been performed.

268.   Defendant, DCF, as the state agency charged with the non-delegable duty of ensuring the health, welfare, and safety of children in the state, conducting child protective investigations in Miami-Dade County, Florida, and licensing and re-licensing foster homes in Miami-Dade County, Florida, had the following non-delegable statutory, contractual, and common law duties:

   a.   To protect the health, welfare, and safety of M.O. while in its care, custody, and supervision;

   b.   To protect M.O. from abuse, neglect, and harm while under its care, custody, and supervision;

   c.   To provide a safe, secure environment where M.O. was free from unreasonable risk of harm;

   d.   To comply with all applicable statutes, including Chapters 39, 409, and 393 of the Florida Statutes; Florida Administrative Code Rules, including Chapters 65C-28, 65C-29, 65C-30, 65C-45, 65G-1, 65G-4, 65G-5, 65G-11 and 65G-1;

111

policies and procedures, including DCF Operating Procedures Chapters 170, 175, and 215; and contracts, including DCF's contracts with CFCN;

e.   To use reasonable care in the oversight and supervision of M.O.;

f.   To use reasonable care in placing M.O. in an out-of-home placement that was safe and could meet her needs;

g.   To have available an appropriate continuum of specialized placements including medical foster homes, specialized therapeutic foster homes, and utilization of APD homes for disabled children in its system of care, including M.O.;

h.   To have available an appropriate continuum of services to address M.O.'s therapeutic needs, behavioral needs, and disability needs;

i.   To investigate the fitness of any proposed placement for M.O., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

j.   To ensure that all available information was provided to foster parents regarding the foster children placed therein, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including M.O., pursuant to F.A.C. 65C-28.004 and DCF Operating Procedure 170-11;

k.   To not license and re-license the JONES foster home when it was known that there were concerns with her being a licensed foster parent;

l.   Not to place M.O. in the JONES foster home when it was known that JONES was a unsafe placement that could not meet her significant special needs and there was an open abuse report prohibiting the placement of any children in the foster home;

m.   To continually assess the adequacy and safety of M.O. and A.O.'s placement in the JONES foster home;

n.   To investigate reports of abuse and/or neglect of M.O. when such reports were made to the Abuse Hotline;

o.   To use reasonable care in the investigation of abuse and/or neglect reports, institutional abuse and/or neglect reports, and foster care referrals;

p.   To detect child abuse and neglect;

q.   To immediately prevent further harm to M.O. when reports of child abuse and/or neglect were received;

r.  To immediately remove M.O. from the JONES foster home when it was known that she was unable and/or unwilling to protect M.O. from further harm and M.O. had been the victim of abuse and neglect;

s.  To determine the protective, treatment, and ameliorative services necessary to safeguard and ensure M.O.'s safety and well-being and development, and cause the delivery of those services;

t.  To assess risk based upon all available relevant information;

u.  To timely respond to and investigate all new allegations reported to the Abuse Hotline which warranted a response and investigation;

v.  To gather and consider all available relevant information when assessing risk to M.O.;

w.  To make all relevant collateral contacts with persons who have had contact with the children, the alleged perpetrator, the family, all household members, and persons who have direct knowledge or information regarding the children's situation;

x.  To report all reasonable suspicions of abuse or neglect to the Abuse Hotline;

y.  To assess and obtain services including placement services, disability services, and enrollment on the Medicaid Waiver and to ensure rights pursuant to Chapter 393, Florida Statutes;

z.  To use reasonable care to ensure all necessary and appropriate assessments and evaluations for M.O. were completed in a timely manner, including, but not limited to, medical evaluations, disability evaluations, speech therapy evaluations, occupational therapy evaluations, behavioral evaluations, neurological evaluations, psychological evaluations, neuropsychological evaluations, mental health evaluations, and psychiatric evaluations;

aa.  To use reasonable care to ensure that all recommendations from assessors, evaluators, and other professionals regarding M.O., were followed and implemented in a timely manner;

bb.  To use reasonable care to ensure that M.O. timely and consistently received all necessary and appropriate services to meet her needs, including, but not limited to, ABA services, speech therapy, occupational therapy, APD services, education services, behavioral services, and medication management services;

cc.  To follow and ensure complete compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O.;

113

dd. To arrange for the handling of any special management issues identified in history and assessments to ensure that all foster children, including M.O., were safe, appropriately cared for, and adequately supervised;

ee. To continually monitor the performance of contracted agencies to ensure they were meeting children's needs for services and safety and to ensure their compliance with Florida Statutes, Florida Administrative Code, and DCF Operating Procedures;

ff. To place contracted agencies, including CFCN, on corrective action when their systemic deficiencies resulted in shortage of appropriate placements and services for children in the custody of the State and harm to said children; and

gg. To use reasonable care to ensure that contracted agencies, including CFCN, complied with corrective action plans to remedy systemic deficiencies including shortages of appropriate placements and services for children in the custody of the State or to immediately terminate their contract(s) for failure to comply with corrective action.

269.    DCF breached said non-discretionary and non-delegable duties.

270.    As a direct and proximate result of the aforementioned breaches, M.O. suffered emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable compensatory damages.  These losses are either permanent or continuing in nature, and M.O. will suffer such losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT VIII – 42 U.S.C. § 1983 CLAIM AGAINST KENYA NEELY

271.    Plaintiffs hereby reaver and reallege paragraphs 18 through 20, 52 through 70, and 182 through 196, as if fully set forth herein.

272.     This count arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

273.     At all times relevant hereto, NEELY, as a CFCN Placement Specialist, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

274.     At all times material hereto, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

275.     At all times material hereto, NEELY was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

276.     NEELY violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

     a.   Failing to immediately seek specialized placement for M.O. and A.O., such as an APD home, a specialized therapeutic foster home, or a medical foster home, when NEELY was the CFCN Placement Specialist assigned to M.O. and A.O.'s case on April 20, 2022;

     b.   Failing to immediately contact APD for crisis placement and services pursuant to Florida Administrative Code Rule 65G-1.047, despite knowledge that M.O. qualified for placement in an APD specialized home with residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living;

c.  Determining that M.O. and A.O. were appropriate for placement in a "family foster home," despite knowledge that M.O. and A.O. were both autistic; M.O. was non-verbal; M.O. was unable to perform any aspects of daily living independently; M.O. was not potty trained and still wore diapers at thirteen (13) years of age; M.O. only ate pureed foods and had difficulty chewing; M.O. and A.O. both required special services to address their autism and special needs, including ABA therapy, speech therapy, and occupational therapy; M.O. had previously been determined eligible for APD HCBS Medicaid Waiver services and had been on a waitlist for these services since 2016; and both children needed a higher level of care than a traditional foster home;

d.  Inaccurately reporting that M.O. had no special dietary restrictions or needs, no concerning behaviors, no issues with bed-wetting, was not receiving occupational therapy, was high functioning autistic, and was not active with APD, when NEELY completed a Comprehensive Placement Assessment for M.O. and A.O. on April 20, 2022;

e.  Identifying JONES, a traditional foster parent, as a possible foster care placement for M.O. and A.O., despite knowledge that M.O. and A.O. needed a higher level of care and a qualified caregiver who could meet their special needs;

f.  Failing to recognize that M.O. and A.O. could not be placed in the JONES foster home because there was an open abuse report received against JONES earlier in the day on April 20, 2022, which required a placement hold prohibiting placement of any foster child, including M.O. and A.O., in the JONES foster home;

116

g.   Failing to recognize that, in addition to M.O. and A.O. needing a higher level of care and there being an open abuse report, JONES was an inadequate and unsuitable placement for M.O. and A.O. because she was a single foster parent who worked full time; she was already at her newly increased licensing capacity of three (3) foster children, including at least one (1) foster child who was significantly developmentally delayed; placement of M.O. and A.O. in the JONES foster home would result in the JONES foster home being over its licensed capacity by two (2) foster children; and the open abuse report was the third (3rd) abuse report against JONES since she was initially licensed as a foster parent less than two (2) years earlier;

h.   Failing to convene an MDT Staffing when one was required before placing M.O. and A.O. in the JONES foster home;

i.   Requesting that JONES be able to exceed her licensed capacity of three (3) children to place M.O. and A.O. in the JONES foster home for a total of five (5) children to be placed in the single parent JONES foster home;

j.   Inaccurately reporting that there were no active abuse reports on the JONES foster home and that M.O. was "high functioning" autistic in the Over-Capacity Assessment NEELY completed for JONES to exceed her licensed capacity;

k.   Failing to share critical information with JONES as to M.O.'s significant special needs and her true level of functioning, including that she was non-verbal, not potty trained, only ate pureed food, and could not perform any aspects of daily living independently;

l.   Determining that JONES was the most appropriate placement for M.O. and A.O. and the "best option" because "no other placement options were available;" and

m.  Placing M.O. and A.O. in the JONES foster home despite knowing that JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time; and the JONES' foster home was an inadequate and unsuitable placement for M.O. and A.O. that could not meet their serious medical, disability, and behavioral health needs and could not meet M.O. and A.O.'s immediate need for protection and safety.

277.   NEELY took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm and that M.O. and A.O. would be deprived of their constitutional rights.

278.   Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O. by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs where they would receive all necessary care, treatment, services, and supervision, NEELY was deliberately indifferent to the substantial risk that M.O. and A.O. would be harmed and would deteriorate in the JONES foster home, and NEELY knowingly and recklessly disregarded an excessive risk to M.O. and A.O.'s health and safety.

279.   NEELY's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O.

suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

280.    Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, KENYA NEELY, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT IX – 42 U.S.C. § 1983 CLAIM AGAINST MARTA TORRES

281.    Plaintiffs hereby reaver and reallege paragraphs 21 through 23 and 52 through 196, as if fully set forth herein.

282.    This count arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

283.    At all times relevant hereto, TORRES, as the CFCN Director of Licensing and Placement, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

284.   At all times material hereto, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

285.   At all times material hereto, TORRES was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

286.   TORRES violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

a. Failing to ensure specialized placement for M.O. and A.O. was immediately sought, such as an APD home, a specialized therapeutic foster home, or a medical foster home, when TORRES was responsible for overseeing M.O. and A.O.'s placement as CFCN's Director of Licensing and Placement as of April 20, 2022;

b. Failing to ensure APD was immediately contacted for crisis placement and services pursuant to Florida Administrative Code Rule 65G-1.047, despite knowledge that M.O. qualified for placement in an APD specialized home with residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living;

c. Agreeing that M.O. and A.O. were appropriate for placement in a "family foster home," despite knowledge that M.O. and A.O. were both autistic; M.O. was non-verbal; M.O. was unable to perform any aspects of daily living independently; M.O. was not potty trained and still wore diapers at thirteen (13) years of age; M.O. only ate pureed foods and had difficulty chewing; M.O. and

120

A.O. both required special services to address their autism and special needs, including ABA therapy, speech therapy, and occupational therapy; M.O. had previously been determined eligible for APD HCBS Medicaid Waiver services and had been on a waitlist for these services since 2016; and both children needed a higher level of care than a traditional foster home;

d. Failing to recognize that M.O. and A.O. could not be placed in the JONES foster home because there was an open abuse report received against JONES earlier in the day on April 20, 2022, which required a placement hold prohibiting placement of any foster child, including M.O. and A.O., in the JONES foster home;

e. Failing to recognize that, in addition to M.O. and A.O. needing a higher level of care and there being an open abuse report, JONES was an inadequate and unsuitable placement for M.O. and A.O. because she was a single foster parent who worked full time; she was already at her newly increased licensing capacity of three (3) foster children, including at least one (1) foster child who was significantly developmentally delayed; placement of M.O. and A.O. in the JONES foster home would result in the JONES foster home being over its licensed capacity by two (2) foster children; and the open abuse report was the third (3rd) abuse report against JONES since she was initially licensed as a foster parent less than two (2) years earlier;

f. Failing to convene an MDT Staffing when one was required before placing M.O. and A.O. in the JONES foster home;

g. Agreeing that JONES was the most appropriate placement for M.O. and A.O. and the "best option" because "no other placement options were available;" and

h. Approving and/or directing the approval of an Over Capacity Waiver so that JONES could exceed her licensed capacity for placement of M.O. and A.O. without reconciling information, including the fact that there was an open abuse report, or recognizing that the JONES foster home was an inadequate and unsuitable placement for M.O. and A.O. where their needs would not be met;

i. Authorizing placement of M.O. and A.O. in the JONES foster home despite knowing that JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time; and the JONES' foster home was an inadequate and insufficient placement for M.O. and A.O. that could not meet their serious medical, disability, and behavioral health needs and could not meet M.O. and A.O.'s immediate need for protection and safety.

j. Failing to facilitate a rapid review of M.O. and A.O.'s adjustment to the JONES foster home and progress on ensuring M.O. and A.O. were receiving all necessary services within ten (10) days of M.O. and A.O.'s placement in the JONES foster home;

k. Failing to ensure M.O. and A.O. received all of the medically necessary services they had been receiving prior to their removal which the Court ordered them to continue receiving;

l. Failing to remove M.O. and A.O. from the JONES foster home, despite ongoing knowledge that there was an open abuse report and the home was over its licensed capacity for the first two (2) months of M.O. and A.O.'s placement;

m.  Failing to review and approve another Over Capacity every thirty (30) days that the JONES foster home was over its licensed capacity;

n.  Failing to address the pattern of abuse reports and concerns against JONES when TORRES participated in a Licensing Staffing for the JONES foster home on June 9, 2022, because there had been three (3) abuse reports against JONES in the less than two (2) years she had been licensed as a foster parent, and instead determining JONES' licensing capacity would be increased to five (5) children to keep the children in the home, including M.O. and A.O., "stably placed,"

o.  Failing to ensure that medically necessary, professionally recommended, and Court ordered services were being provided to M.O. and A.O. after agreeing to allow them to remain the JONES foster home as of June 2022;

p.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

q.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her to handle and instead thanking JONES for all that she does "to provide quality care for the children," when JONES demanded an increased board rate for M.O. because of her significant needs;

r.  Approving an enhanced board rate for JONES to be paid $100.00 a day to care for M.O. in August 2022, instead of removing M.O. and A.O. from the JONES foster home, based on the following:

i.  M.O. qualified for the Developmental Tier Rate of $60.00 per day due to documented and observed developmental delays, concurred by a

service provider, of impaired daily functioning requiring more supervision and support from the caregiver and/or will also require the caregiver to assist with the coordination of specialized services to address noted delays;

ii. M.O. requires a high level of involvement from the caregiver for daily living tasks (outside of age-appropriate range);

iii. At the time of initial placement on April 20, 2022, M.O. was approved for a crisis rate of $80.00 per day;

iv. JONES reported that M.O. needs assistance with eating, showering, brushing her teeth and dressing;

v. JONES advised that M.O. is not independent and must have assistance with everything;

vi. JONES reported that although M.O. wears diapers, she smears her waste on the walls, and JONES must wake up in the middle of the night, and often change M.O.'s bedding;

vii. JONES has expressed that M.O.'s "needs have increased further;"

viii. M.O. "is stable in her placement with increased supervision and extra support not only from the caregiver but also via one to one staff;"

ix. one to one service was an added support service within 30 days of the initial placement;

x. As of August 5, 2022, the one to one service hours are 8am-5pm Monday through Friday at the day summer program, and 5:30pm-8pm Monday and Wednesday at the foster home;

xi. JONES advised that in the past three (3) months, M.O. has gone through three (3) different beddings and two (2) mattresses;

xii. JONES reported she purchases extra detergent, diapers, and cleaning supplies to support M.O.;

xiii. M.O. is nonverbal and does not verbalize when she is hungry;

xiv. JONES must spoon feed M.O. four (4) meals a day and four (4) to five (5) snacks a day and M.O.'s food must be pureed;

xv. M.O.'s CBHA confirmed M.O.'s autism diagnosis, her limited functioning, and her need for ABA therapy, RBT therapy, occupational therapy, and speech therapy;

xvi. CFCN's Early Childhood Manager reported that M.O. is not an approved APD client nor is she on the APD waitlist, even though she was approved for APD services, was placed on the waitlist in 2016, and was still on the waitlist at this time;

xvii. "Given M.O.'s complex needs, in addition to ongoing authorization for one [on] one services as needed to support [JONES, M.O.] is approved for an additional enhancement to $100/day;"

xviii. This additional enhancement "is not a crisis rate," and this "is the rate [M.O.] is currently assessing for given the level of care she is requiring to meet her daily needs is equivalent to Residential Level 2;"

xix. There are four other foster children currently in the home; and

xx. "[t]he enhanced rate is requested to support [JONES'] ability to access additional resources and have increased flexibility to provide the required supervision and support to [M.O.] including but not limited to

encouraging attendance to needed services to address the history of trauma, delays and or mental health symptoms;"

s. Failing to remove M.O. and A.O. from the JONES foster home when the August 9, 2022, Staffing determined that they needed to be removed from this placement;

t. Changing course and participating in a Stability Staffing on August 31, 2022, to keep M.O. and A.O. in the JONES foster home, where TORRES stating that she believed that the JONES foster home was the "best placement" for M.O. and A.O.;

u. Failing to immediately remove M.O. and A.O. from the JONES foster home when, during a staffing on November 16, 2022, TORRES knew that JONES was not taking M.O. and A.O. to medical and therapy appointments, which was a known ongoing pattern with JONES and every child placed in her care, and JONES advised the staffing participants that she was not going to leave work early to transport the children to their medically necessary appointments, even though TORRES approved JONES getting paid $100.00 per day to make sure M.O. got to all of her appointments;

v. Failing to immediately remove M.O. and A.O. from the JONES foster home each time TORRES was aware that M.O. had unexplained injuries;

w. Failing to immediately remove M.O. and A.O. from the JONES foster home each time TORRES was aware that an abuse report was received due to M.O. having unexplained injuries;

x. Failing to immediately remove M.O. and A.O. from the JONES foster home when a change of placement request was submitted to TORRES on or about

126

June 17, 2023, due to numerous abuse reports and unexplained events/injuries; and

y.  By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

287.    TORRES took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm and that M.O. and A.O. would be deprived of their constitutional rights.

288.    Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O. by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs where they would receive all necessary care, treatment, services, and supervision, TORRES was deliberately indifferent to the substantial risk that M.O. and A.O. would be harmed and would deteriorate in the JONES foster home, and TORRES knowingly and recklessly disregarded an excessive risk to M.O. and A.O.'s health and safety.

289.    TORRES' deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse; bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

290.     Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, MARTA TORRES, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT X – 42 U.S.C. § 1983 CLAIM AGAINST ANTHONY CARVALHO

291.     Plaintiffs hereby reaver and reallege paragraphs 24 through 26 and 71 through 196, as if fully set forth herein.

292.     This count arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

293.     At all times relevant hereto, CARVALHO, as the CFCN Foster Parent Liaison assigned to monitor the JONES foster home, was acting under color of state law and was acting or purporting to act in the performance of his official duties.

294.     At all times material hereto, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

295.     At all times material hereto, CARVALHO was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

296.     CARVALHO violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

a. Failing to immediately remove M.O. and A.O. from the JONES foster home when, on April 21, 2022, within hours of M.O. and A.O.'s placement in the JONES foster home, JONES complained to CARVALHO, the CFCN Foster Parent Liaison assigned to monitor the JONES foster home, that M.O. did not know how to bathe, use the restroom, do her own hair, or eat on her own and M.O. was a lot more work than CFCN told JONES she was going to be, and it was apparent that both M.O. And A.O. needed a higher level of care than a traditional foster home;

b. Failing to recognize that JONES was an inadequate and unsuitable placement for M.O. and A.O. because there was an open abuse report against JONES at the time of M.O. and A.O.'s placement, which required a placement hold prohibiting placement of any foster child, including M.O. and A.O., in the JONES foster home; JONES was a single foster parent who worked full time; JONES was already at her newly increased licensing capacity of three (3) foster children, including at least one (1) foster child who was significantly developmentally delayed; JONES was over her licensed capacity by two (2) foster children; the open abuse report was the third (3rd) abuse report against JONES since she was initially licensed as a foster parent less than two (2) years earlier; JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; and JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time;

c.  Failing to remove M.O. and A.O. from the JONES foster home, despite ongoing knowledge that there was an open abuse report and the home was over its licensed capacity for the first two (2) months of M.O. and A.O.'s placement;

d.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her;

e.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

f.  Submitting a request for JONES to receive an enhanced board rate for M.O. in May 2022, instead of removing M.O. and A.O. from the JONES foster home, based on the following:

   i.  JONES had five (5) children placed in her foster home;

   ii.  JONES was told both M.O. and A.O. were high functioning autistic prior to their placement in her foster home;

   iii.  M.O. is in diapers 24/7 and does not eat, shower, brush her teeth, dress, or use the bathroom by herself;

   iv.  M.O. doesn't speak other than to say her name and no to everything;

   v.  JONES has to make M.O. different food because she only eats soft, blended food;

   vi.  JONES tried to potty train M.O. but she was not responding to that;

   vii.  JONES has to wake M.O. up in the middle of the night to change her diaper or she will wet the bed;

   viii.  M.O. has bowel movements every morning and has to be cleaned and bathed;

   ix.  JONES had one-to-one services for M.O., but they were not there 24/7;

    x.   JONES does a lot for M.O. that was not told to her prior to placement; and

   xi.   JONES accused A.O. of lying a lot.

g.   Failing to remove M.O. and A.O. from the JONES foster home when CARVALHO knew no later than May 17, 2022, that A.O. was afraid of JONES, and instead of making a report to the Abuse Hotline or addressing the pattern of concerns received against JONES, thanking JONES for all of the positive things she had done for children in her care;

h.   Submitting another request for JONES to receive an enhanced board rate for M.O. in June 2022, instead of removing M.O. and A.O. from the JONES foster home, based on the following:

    i.   JONES stated she had been caring for M.O. and A.O. for almost three (3) months;

   ii.   JONES stated she was told by CFCN prior to placement that both M.O. and A.O. were high functioning autistic;

  iii.   JONES stated M.O. uses a diaper and had no clue if she has to go to the bathroom or when she was hungry;

  iv.   JONES stated she has to do everything for M.O.;

   v.   JONES stated she was assigned a one-to-one for M.O. who JONES said "does NOTHING," and JONES still had to care for M.O. while the one-to-one plays on her phone all day;

  vi.   JONES complained that CFCN now wanted to send a nurse's assistant to care for M.O. and pay other people to provide therapy to M.O. instead of increasing JONES' board rate;

    vii.   JONES complained that M.O. was wiping poop on the walls, JONES had to spoon feed M.O. four meals a day, and JONES had to buy diapers and wipes for M.O.;

   viii.   JONES complained that the money being spent to hire one-to-ones and nurses aides could be used to take care of the expenses JONES was facing to care for M.O.;

    ix.   JONES advised she would not accept less than one hundred fifty dollars ($150.00) per day and weekly wipes and laundry detergent to care for M.O.; and

    x.   JONES advised that she was providing notice for removal of M.O. but was willing to keep A.O. if permitted.

i.   Failing to remove M.O. and A.O. from the JONES foster home after participating in a Staffing on August 9, 2022, where it was determined that M.O. and A.O. needed to be removed from this placement because:

    i.   JONES had been talking inappropriately about the children's mother in front of the children and their case manager despite there being a Court order prohibiting this;

    ii.   A.O. stated she has heard JONES say their mother "is crazy and is the devil;"

   iii.   JONES only met the mother once, but the team felt the mother "is great with the kids;"

    iv.   FRC did not feel that the JONES foster home was a fit for M.O. and A.O.;

    v.   The "team" felt that JONES was "putting fear into the children;"

vi.   JONES does not always give M.O. and A.O. their medication; and

vii.   The "team as a whole feels that a 30 day removal" needed to be put in place, and the "team [was] in agreement with having [M.O. and A.O.] replaced from the [JONES] foster home ideally within a 30-day time frame."

j.   Changing course and participating in a Stability Staffing on August 31, 2022, to keep M.O. and A.O. in the JONES foster home, where it was determined that the JONES foster home was the "best placement" for the children.

k.   Failing to remove M.O. and A.O. from the JONES foster home when she demanded that M.O. and A.O.'s schools be changed and instead participating in an Education MDT Staffing on or about September 6, 2022, and agreeing that it was not in M.O. and A.O.'s best interest to remain in the school or program of origin because JONES wanted them enrolled in a school near her home, and agreeing that M.O. and A.O.'s schools would change despite the fact that both children were special needs and had specialized services at their schools of origin.

l.   Failing to immediately remove M.O. and A.O. from the JONES foster home when, during a staffing on November 16, 2022, CARVALHO knew that JONES was not taking M.O. and A.O. to medical and therapy appointments, which was a known ongoing pattern with JONES and every child placed in her care, and JONES advised the staffing participants that she was not going to leave work early to transport the children to their medically necessary appointments, even though JONES was getting paid $100 day to make sure M.O. got to all of her appointments;

m.  Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother; refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments; refused to participate in treatment with M.O. and A.O., refused to support reunification, cut the children's hair without permission on multiple occasions; refused to allow the GAL to conduct home visits; limited FRC's access to the children and accused the case manager of trespassing when she arrived to the home and found the children home alone; demanded that both the GAL and case manager be reassigned; accused A.O.'s doctor of sexually abusing her and demanded that CARVALHO change her doctor; and was influencing and/or coaching A.O. to make statements and allegations against the mother which FRC stated was destroying A.O.'s relationship with her mother;

n.  Failing to report unexplained injuries to the Abuse Hotline that CARVALHO was made aware of regarding M.O., including multiple injuries to her face;

o.  Failing to address M.O. and A.O.'s significant weight loss during their placement with JONES;

p.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time CARVALHO was aware that M.O. had unexplained injuries, beginning no later than April 2023;

q.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time CARVALHO was aware that an abuse report was received due to M.O. having unexplained injuries, beginning no later than May 1, 2023, and instead notifying JONES of the abuse reports before the CPIs had a chance to respond to investigate; and

r.   Failing to immediately remove M.O. and A.O. from the JONES foster home when a change of placement request was submitted to CARVALHO on or about June 17, 2023, due to numerous abuse reports and unexplained events/injuries.

297.   CARVALHO took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm and that M.O. and A.O. would be deprived of their constitutional rights.

298.   Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O. by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs where they would receive all necessary care, treatment, services, and supervision, CARVALHO was deliberately indifferent to the substantial risk that M.O. and A.O. would be harmed and would deteriorate in the JONES foster home, and CARVALHO knowingly and recklessly disregarded an excessive risk to M.O. and A.O.'s health and safety.

299.   CARVALHO's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

300.   Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, ANTHONY CARVALHO, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

### COUNT XI – 42 U.S.C. § 1983 CLAIM AGAINST NATALIE GREEN

301.    Plaintiffs hereby reaver and reallege paragraphs 27 through 29, 52 through 96, and 129 through 196, as if fully set forth herein.

302.    This count arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

303.    The 42 U.S.C. § 1983 claim against GREEN set forth in this count is based on GREEN's own acts and omissions which violated M.O. and A.O.'s civil rights, and shall in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster home.

304.    At all times relevant hereto, GREEN, as an FRC Case Manager Supervisor, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

305.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

306.    At all times material hereto, GREEN was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

307.    GREEN violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

a.  Failing to immediately ensure that specialized placement was sought for M.O. and A.O., such as an APD home, a specialized therapeutic foster home, or a medical foster home, when GREEN was the FRC Case Manager Supervisor assigned to participate in decisions regarding M.O. and A.O.'s removal and placement on April 20, 2022;

b.  Failing to ensure that APD was immediately contacted for crisis placement and services pursuant to Florida Administrative Code Rule 65G-1.047, despite knowledge that M.O. qualified for placement in an APD specialized home with residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living;

c.  Determining that M.O. and A.O. were appropriate for placement in a "family foster home," despite knowledge that M.O. and A.O. were both autistic; M.O. was non-verbal; M.O. was unable to perform any aspects of daily living independently; M.O. was not potty trained and still wore diapers at thirteen (13) years of age; M.O. only ate pureed foods and had difficulty chewing; M.O. and A.O. both required special services to address their autism and special needs, including ABA therapy, speech therapy, and occupational therapy; M.O. had previously been determined eligible for APD HCBS Medicaid Waiver services and had been on a waitlist for these services since 2016; and M.O. and A.O. needed a higher level of care than a traditional foster home;

d.  Agreeing to explore JONES, a traditional foster parent, as a possible foster care placement for M.O. and A.O., despite knowledge that M.O. and A.O. needed a higher level of care and a qualified caregiver who could meet their special needs;

e.  Failing to recognize that JONES was an inadequate and unsuitable placement for M.O. and A.O. because she was a single foster parent who worked full time; she was already at her newly increased licensing capacity of three (3) foster children, including at least one (1) foster child who was significantly developmentally delayed; placement of M.O. and A.O. in the JONES foster home would result in the JONES foster home being over its licensed capacity by two (2) foster children; and JONES had an open abuse report which was the third (3rd) abuse report against JONES since she was initially licensed as a foster parent less than two (2) years earlier;

f.  Failing to share critical information with JONES as to M.O.'s significant special needs and her true level of functioning, including that she was non-verbal, not potty trained, only ate pureed food, and could not perform any aspects of daily living independently;

g.  Agreeing that JONES was the most appropriate placement for M.O. and A.O., despite knowledge that JONES could not meet M.O. and A.O.'s serious behavioral needs, and that M.O. and A.O. needed a higher level of care and supervision than JONES could provide;

h.  Agreeing that M.O. and A.O. should be placed in the JONES foster home despite knowing that JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; JONES was not equipped to deal

with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time; and the JONES' foster home was an inadequate and insufficient placement for M.O. and A.O. that could not meet their serious medical, disability, and behavioral health needs and could not meet M.O. and A.O.'s immediate need for protection and safety.

i.   Failing to immediately remove M.O. and A.O. from the JONES foster home when, during a staffing on November 16, 2022, GREEN, who was now the assigned FRC supervisor for M.O. and A.O,'s case, knew that JONES was not taking M.O. and A.O. to medical and therapy appointments, which was a known ongoing pattern with JONES and every child placed in her care, and JONES advised the staffing participants that she was not going to leave work early to transport the children to their medically necessary appointments;

j.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her;

k.   Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

l.   Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother; refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments; refused to participate in treatment with M.O. and A.O., refused to support reunification, cut the children's hair without permission on multiple occasions; refused to allow the GAL to conduct home visits; limited FRC's access to the children and accused the case manager of trespassing when she arrived to the

home and found the children home alone; accused A.O.'s doctor of sexually abusing her and demanded that FRC change her doctor; and was influencing and/or coaching A.O. to make statements and allegations against the mother which FRC stated was destroying A.O.'s relationship with her mother;

m. Failing to immediately remove M.O. and A.O. from the JONES foster home each time GREEN was aware that M.O. had unexplained injuries, including, but not limited to, April 28, 2023, May 1, 2023, May 2, 2023, June 16, 2023, July 7, 2023, and July 11, 2023;

n. Failing to immediately remove M.O. and A.O. from the JONES foster home each time GREEN was aware that an abuse report was received due to M.O. having unexplained injuries, including May 1, 2023, May 2, 2023, June 16, 2023, and July 11, 2023;

o. Failing to immediately remove M.O. and A.O. from the JONES foster home when GREEN was aware that on May 5, 2023, CPT observed yellow/purple bruising to the back of M.O.'s right shoulder and yellow/brown bruising on M.O.'s temple and upper right cheek, M.O. weighed only eighty-three (83) pounds, and CPT concluded that M.O. had been the victim of physical abuse;

p. Failing to immediately remove M.O. and A.O. from the JONES foster home when GREEN was aware that on May 18, 2023, CPT conducted a Specialized Interview of JONES, expressed concerns that there was no explanation as to how M.O. sustained her injuries, determined that M.O.'s autism and ADHD make her more vulnerable to maltreatment, recommended that both M.O. and A.O. be monitored for their safety in JONES' care, and again concluded that M.O. had been the victim of physical abuse;

q.  Allowing M.O. to be transported by FRC back to the JONES foster home after being discharged from the hospital on June 16, 2023, where M.O. was treated for an eye injury which doctors determined was a result of "a direct blow;"

r.  Failing to immediately remove M.O. and A.O. from the JONES foster home and instead submitted a change of placement request to CFCN on or about June 17, 2023, due to numerous abuse reports and unexplained events/injuries;

s.  Failing to report unexplained injuries to the Abuse Hotline that GREEN was made aware of regarding M.O., including multiple injuries to her face;

t.  Failing to ensure that M.O. and A.O. received APD HCBS Medicaid Waiver services, contrary to professional judgment;

u.  Failing to ensure that M.O. and A.O. consistently received ABA services as often as was medically necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

v.  Failing to ensure that M.O. and A.O. consistently received speech therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

w.  Failing to ensure that M.O. and A.O. consistently received occupational therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

x.  Failing to ensure that services professionally recommended in M.O. and A.O.'s CBHAs were implemented in a timely manner, contrary to professional judgment;

y.   Failing to ensure that services professionally recommended in M.O. and A.O.'s Neuropsychological Evaluations were implemented in a timely manner, contrary to professional judgment;

z.   Failing to ensure that M.O. received medical treatment and assessment to address her weight loss during her placement in out-of-home care, after concerns were reported by at least three (3) medical providers, contrary to professional judgment;

aa.  Failing to ensure that A.O. received a psychiatric evaluation as professionally recommended, contrary to professional judgment;

bb.  Failing to ensure that A.O. consistently received trauma-based individual counseling as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

cc.  Failing to ensure that A.O. received family therapy with her mother as professionally recommended, contrary to professional judgment;

dd.  Failing to follow and ensure compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

ee.  Failing to inform the Court that M.O. and A.O. were not consistently receiving medically necessary, professionally recommended, and Court ordered services;

ff.  Failing to inform the Court of multiple unexplained injuries to M.O. beginning in April 2023, and multiple abuse reports received regarding unexplained injuries to M.O. between May 1, 2023 and July 11, 2023; and

gg.  By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

308.   GREEN took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm.

309.   Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O., by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs, and by ensuring M.O. and A.O. received all necessary care, treatment, services, and  supervision to address their disabilities, GREEN was deliberately indifferent and/or recklessly failed to take immediate action to ensure that Plaintiffs were in an appropriate and suitable placement and that they received all medically necessary, Court ordered treatment and services.

310.   GREEN's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse; bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

311.   Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, NATALIE GREEN, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT XII – 42 U.S.C. § 1983 CLAIM AGAINST
## ANTOINESHA JOHNSON

312.    Plaintiffs hereby reaver and reallege paragraphs 30 through 32, 50 through 131, and 182 through 196, as if fully set forth herein.

313.    The 42 U.S.C. § 1983 claim against JOHNSON set forth in this count is based on JOHNSON's own acts and omissions which violated M.O. and A.O.'s civil rights,  and shall in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster home.

314.    This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

315.    At all times relevant hereto, JOHNSON, as an FRC Case Manager and subsequently a Case Manager Supervisor, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

316.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

317.    At all times material hereto, JOHNSON was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

318.    JOHNSON violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

a.  Failing to immediately ensure that specialized placement was sought for M.O. and A.O., such as an APD home, a specialized therapeutic foster home, or a medical foster home, when JOHNSON was the initial FRC Case Manager assigned to M.O. and A.O.'s case on April 20, 2022;

b.  Failing to ensure that APD was immediately contacted for crisis placement and services pursuant to Florida Administrative Code Rule 65G-1.047, despite knowledge that M.O. qualified for placement in an APD specialized home with residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living;

c.  Failing to immediately remove M.O. and A.O. from the JONES foster home when, on April 21, 2022, within hours of M.O. and A.O.'s placement in the JONES foster home, JOHNSON completed a home visit with M.O. and A.O. at the JONES foster home and knew that A.O. appeared "nervous and anxious," M.O. presented with both physical and mental delays, and it was not known how M.O. was actually feeling because she was unable to speak and unable to verbalize her feelings; and it was apparent that both M.O. and A.O. needed a higher level of care than a traditional foster home;

d.  Failing to recognize that JONES was an inadequate and unsuitable placement for M.O. and A.O. because there was an open abuse report against JONES at the time of M.O. and A.O.'s placement; JONES was a single foster parent who worked full time; JONES was already at her newly increased licensing capacity of three (3) foster children, including at least one (1) foster child who was significantly developmentally delayed; JONES over her licensed capacity by

two (2) foster children; the open abuse report was the third (3rd) abuse report against JONES since she was initially licensed as a foster parent less than two (2) years earlier; JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; and JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time;

e.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her to handle;

f.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

g.  Failing to immediately remove M.O. and A.O. from the JONES foster home when JOHNSON knew no later than April 26, 2022, that both M.O. and A.O. had mental health and developmental issues and were vulnerable, and A.O. reported that JONES would leave the children outside for extended periods of time;

h.  Failing to remove M.O. and A.O. from the JONES foster home when JOHNSON knew no later than May 17, 2022, that A.O. was afraid of JONES;

i.  Failing to remove M.O. and A.O. from the JONES foster home after participating in a Staffing on August 9, 2022, where it was determined that M.O. and A.O. needed to be removed from this placement because:

      i.  JONES had been talking inappropriately about the children's mother in front of the children and their case manager despite there being a Court Order prohibiting this;

     ii.  A.O. stated she has heard JONES say their mother "is crazy and is the devil;"

   iii.  JONES only met the mother once, but the team felt the mother "is great with the kids;"

    iv.  FRC did not feel that the JONES foster home was a fit for M.O. and A.O.;

     v.  The "team" felt that JONES was "putting fear into the children;"

    vi.  JONES does not always give M.O. and A.O. their medication; and

   vii.  The "team as a whole feels that a 30 day removal" needed to be put in place and the "team [was] in agreement with having [M.O. and A.O.] replaced from the [JONES] foster home ideally within a 30-day time frame;"

j.  Changing course and participating in a Stability Staffing on August 31, 2022, to keep M.O. and A.O. in the JONES foster home, where it was determined that the JONES foster home was the "best placement" for the children;

k.  Failing to immediately remove M.O. and A.O. from the JONES foster home, when at the end of August 2022, M.O.'s ABA provider expressed the following concerns:

      i.  Despite being assigned to work with M.O. twenty-five (25) hours per week and having recommended that this be increased to thirty (30) hours

per week in April 2022, M.O. was only receiving one third of the service hours deemed medically necessary;

ii.   M.O. was only receiving ABA services at camp, aftercare, or during supervised visits;

iii.   Since M.O. had been placed in foster care, she had been going to school dirty with poor hygiene, and M.O. appeared to be poorly cared for;

iv.   M.O. is not a functional child, many of her personal care tasks must have physical or verbal help, and since she did not have the help, she was not able to take care of herself properly;

v.   M.O. was always tired and sleepy and cried a lot, but she could not express how she feels since she is non-verbal;

vi.   M.O. does not tolerate a wide variety of foods and since her diet is not current, she had lost approximately thirty (30) pounds since entering foster care;

vii.   The ABA provider had not had any contact with JONES;

viii.   JONES did not participate in information gathering for the ABA provider;

ix.   JONES did not participate in the parenting training component of ABA therapy so she could know how to properly take care of M.O. and reinforce positive behaviors at home; and

x.   M.O.'s ABA provider submitted similar reports expressing concerns that were ignored on a monthly basis;

l.   Failing to remove M.O. and A.O. from the JONES foster home when she demanded that M.O. and A.O.'s schools be changed and instead participating

in an Education MDT Staffing on or about September 6, 2022, and agreed that it was not in M.O. and A.O.'s best interest to remain in the school or program of origin because JONES wanted them enrolled in a school near her home, and agreeing that M.O. and A.O.'s schools would change despite the fact that both children were special needs and had specialized services at their schools of origin.

m.  Failing to remove M.O. and A.O. from the JONES foster home when concerns were reported by at least three (3) of M.O.'s providers that M.O. had lost a significant amount of weight while JOHNSON was the case manager and then the case manager supervisor;

n.  Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother, which A.O. denied when questioned by JOHNSON; recorded allegations made against the mother and in the recording, JONES was demanding and loud and A.O. sounded afraid and confused; refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments; refused to participate in treatment with M.O. and A.O.; refused to support reunification; and was influencing and/or coaching A.O. to make statements and allegations against the mother;

o.  Failing to report all reasonable suspicions of abuse and/or neglect to the Abuse Hotline, including knowledge of JONES leaving M.O. and A.O. outside for extended periods of time, A.O. being afraid of JONES, and M.O. losing a significant amount of weight since being placed in out-of-home care;

p.  Failing to ensure that M.O. received medical treatment and assessment to address her weight loss during her placement in out-of-home care, after

concerns were reported by at least three (3) medical providers, contrary to professional judgment;

q.  Failing to ensure that M.O. and A.O. received APD HCBS Medicaid Waiver services, contrary to professional judgment;

r.  Failing to ensure that M.O. and A.O. consistently received ABA services as often as was medically necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

s.  Failing to ensure that M.O. and A.O. consistently received speech therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

t.  Failing to ensure that M.O. and A.O. consistently received occupational therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

u.  Failing to staff the case with CFCN within fourteen (14) days of receiving the CBHAs to review the recommendations and discuss any barriers to implementing the needed behavioral health services that were professionally recommended in M.O. and A.O.'s case, failing to ensure recommendations from the CBHA were completed within seven business (7) days, and continuously failing to ensure that the recommendations from the CBHAs were complied with throughout JOHNSON's involvement in the case, contrary to professional judgment;

v.  Failing to ensure that A.O. received a psychiatric evaluation as professionally recommended, contrary to professional judgment;

w.  Failing to understand M.O. and A.O.'s diagnoses and needs, and as of July 2022, reporting that JOHNSON did not know that A.O. had an autism diagnosis despite being her case manager for nearly two (2) months;

x.  Failing to ensure that A.O. consistently received trauma-based individual counseling as necessary, as professionally recommended, and as Court ordered, failing to transport A.O. to therapy sessions, and failing to require JONES to transport A.O. to therapy sessions, contrary to professional judgment;

y.  Failing to ensure that A.O. received family therapy with her mother as professionally recommended, contrary to professional judgment;

z.  Failing to follow and ensure compliance with, and continuously violating Court Orders regarding placement, services, supervision, and monitoring of M.O. and A.O., including, but not limited to, the Court Order entered at the Shelter Hearing on April 21, 2022, that M.O. and A.O. continue to receive all of the services they had been receiving prior to their removal from their parents;

aa.  Failing to inform the Court that M.O. and A.O. were not consistently receiving medically necessary, professionally recommended, and Court ordered services; and

bb.  By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

319.  JOHNSON took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm.

320.  Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O., by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs, and by ensuring M.O. and

A.O. received all necessary care, treatment, services, and supervision to address their disabilities, JOHNSON was deliberately indifferent and/or recklessly failed to take immediate action to ensure that Plaintiffs were in an appropriate and suitable placement and that they received all medically necessary, Court ordered treatment and services.

321.    JOHNSON's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

322.    Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, ANTOINESHA JOHNSON, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT XIII – 42 U.S.C. § 1983 CLAIM AGAINST MYRLANDE BREEDLOVE

323.    Plaintiffs hereby reaver and reallege paragraphs 33 through 35, 96, 112 through 128, 131, and 182 through 196, as if fully set forth herein.

324.    The 42 U.S.C. § 1983 claim against BREEDLOVE set forth in this count is based on BREEDLOVE's own acts and omissions which violated M.O. and A.O.'s civil rights,  and shall

in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster home.

325.    This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

326.    At all times relevant hereto, BREEDLOVE, as an FRC Case Manager, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

327.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

328.    At all times material hereto, BREEDLOVE was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

329.    BREEDLOVE violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

a.    Failing to immediately ensure that specialized placement was sought for M.O. and A.O., such as an APD home, a specialized therapeutic foster home, or a medical foster home, when BREEDLOVE was assigned as the second FRC Case Manager on or about August 4, 2022;

b.    Failing to ensure that APD was immediately contacted for crisis placement and services pursuant to Florida Administrative Code Rule 65G-1.047, despite knowledge that M.O. qualified for placement in an APD specialized home with

153

residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living;

c.  Failing to recognize that JONES was an inadequate and unsuitable placement for M.O. and A.O. because JONES was a single foster parent who worked full time; JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; and JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time;

d.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her to handle;

e.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

f.  Failing to remove M.O. and A.O. from the JONES foster home after participating in a Staffing on August 9, 2022, where it was determined that M.O. and A.O. needed to be removed from this placement because:

  i.  JONES had been talking inappropriately about the children's mother in front of the children and their case manager despite there being a Court order prohibiting this;

  ii.  A.O. stated she has heard JONES say their mother "is crazy and is the devil;"

      iii.  JONES only met the mother once, but the team felt the mother "is great with the kids;"

      iv.  BREEDLOVE did not feel that the JONES foster home was a fit for M.O. and A.O.;

      v.  The "team" felt that JONES was "putting fear into the children;"

      vi.  JONES does not always give M.O. and A.O. their medication; and

      vii.  The "team as a whole feels that a 30 day removal" needed to be put in place, and the "team [was] in agreement with having [M.O. and A.O.] replaced from the [JONES] foster home ideally within a 30-day time frame;"

g.  Changing course and participating in a Stability Staffing on August 31, 2022, to keep M.O. and A.O. in the JONES foster home, where BREEDLOVE agreed that the JONES foster home was the "best placement" for the children;

h.  Failing to immediately remove M.O. and A.O. from the JONES foster home, when at the end of August 2022, M.O.'s ABA provider expressed the following concerns:

      i.  Despite being assigned to work with M.O. twenty-five (25) hours per week and having recommended that this be increased to thirty (30) hours per week in April 2022, M.O. was only receiving one third of the service hours deemed medically necessary;

      ii.  M.O. was only receiving ABA services at camp, aftercare, or during supervised visits;

      iii.  Since M.O. had been placed in foster care, she had been going to school dirty with poor hygiene, and M.O. appeared to be poorly cared for;

iv.   M.O. is not a functional child, many of her personal care tasks must have physical or verbal help, and since she did not have the help, she was not able to take care of herself properly;

v.   M.O. was always tired and sleepy and cried a lot, but she could not express how she feels since she is non-verbal;

vi.   M.O. does not tolerate a wide variety of foods, and since her diet is not current, she had lost approximately thirty (30) pounds since entering foster care;

vii.   The ABA provider had not had any contact with JONES;

viii.   JONES did not participate in information gathering for the ABA provider;

ix.   JONES did not participate in the parenting training component of ABA therapy so she could know how to properly take care of M.O. and reinforce positive behaviors at home; and

x.   M.O.'s ABA provider submitted similar reports expressing concerns that were ignored on a monthly basis;

i.   Failing to remove M.O. and A.O. from the JONES foster home when she demanded that M.O. and A.O.'s schools be changed and instead participating in an Education MDT Staffing on or about September 6, 2022, and agreed that it was not in M.O. and A.O.'s best interest to remain in the school or program of origin because JONES wanted them enrolled in a school near her home, and agreeing that M.O. and A.O.'s schools would change despite the fact that both children were special needs and had specialized services at their schools of origin;

j.   Failing to remove M.O. and A.O. from the JONES foster home when concerns were reported by at least two (2) of M.O.'s providers that M.O. had lost a significant amount of weight while BREEDLOVE was the case manager and at least one (1) of M.O.'s providers while JOHNSON, who was later BREEDLOVE's case manager supervisor, was the case manager;

k.   Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother, which A.O. denied when questioned by FRC; recorded allegations made against the mother and in the recording, JONES was demanding and loud and A.O. sounded afraid and confused; refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments; refused to participate in treatment with M.O. and A.O.; refused to support reunification; and was influencing and/or coaching A.O. to make statements and allegations against the mother;

l.   Failing to report all reasonable suspicions of abuse and/or neglect to the Abuse Hotline, including knowledge of M.O. losing a significant amount of weight since being placed in out-of-home care;

m.   Failing to ensure that M.O. received medical treatment and assessment to address her weight loss during her placement in out-of-home care, after concerns were reported by at least three (3) medical providers, contrary to professional judgment;

n.   Failing to ensure that M.O. and A.O. received APD HCBS Medicaid Waiver services, contrary to professional judgment;

o.   Failing to ensure that M.O. and A.O. consistently received ABA services as often as was medically necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

p.   Failing to ensure that M.O. and A.O. consistently received speech therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

q.   Failing to ensure that M.O. and A.O. consistently received occupational therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

r.   Failing to ensure that services professionally recommended in M.O. and A.O.'s CBHAs were implemented in a timely manner, contrary to professional judgment;

s.   Failing to ensure that A.O. received a psychiatric evaluation as professionally recommended, contrary to professional judgment;

t.   Failing to ensure that A.O. consistently received trauma-based individual counseling as necessary, as professionally recommended, and as Court ordered, failing to transport A.O. to therapy sessions, and failing to require JONES to transport A.O. to therapy sessions, contrary to professional judgment;

u.   Failing to ensure that A.O. received family therapy with her mother as professionally recommended, contrary to professional judgment;

v.   Failing to follow and ensure compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

> w.  Failing to inform the Court that M.O. and A.O. were not consistently receiving medically necessary, professionally recommended, and Court ordered services; and
>
> x.  By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

330.    BREEDLOVE took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm.

331.    Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O., by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs, and by ensuring M.O. and A.O. received all necessary care, treatment, services, and  supervision to address their disabilities, JOHNSON was deliberately indifferent and/or recklessly failed to take immediate action to ensure that Plaintiffs were in an appropriate and suitable placement and that they received all medically necessary, Court ordered treatment and services.

332.    BREEDLOVE's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

333.     Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, MYRLANDE BREEDLOVE, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT XIV – 42 U.S.C. § 1983 CLAIM AGAINST SANALEE MEIKLE

334.     Plaintiffs hereby reaver and reallege paragraphs 36 through 38, 96, and 129 through 196, as if fully set forth herein.

335.     The 42 U.S.C. § 1983 claim against MEIKLE set forth in this count is based on MEIKLE's own acts and omissions which violated M.O. and A.O.'s civil rights, and shall in no way be construed as a claim arising out of any act, error, or omission of JONES, including any grandparents, sons, daughters, or any other family members, residents or dependents of JONES or the JONES foster home.

336.     This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

337.     At all times relevant hereto, MEIKLE, as an FRC Case Manager, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

338.     At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

339.    At all times material hereto, MEIKLE was deliberately indifferent and/or acted with reckless disregard to Plaintiffs' health, safety, and welfare and Constitutional and federal rights.

340.    MEIKLE violated Plaintiffs' Constitutional and federal rights and exposed them to a substantial risk of serious harm by:

    a. Failing to immediately ensure that specialized placement was sought for M.O. and A.O., such as an APD home, a specialized therapeutic foster home, or a medical foster home, when MEIKLE was assigned as the third FRC Case Manager on or about November 3, 2022;

    b. Failing to ensure that APD was immediately contacted for crisis placement and services pursuant to Florida Administrative Code Rule 65G-1.047, despite knowledge that M.O. qualified for placement in an APD specialized home with residential placement support, including behavioral intervention services, therapies, and meaningful day activities because she was non-verbal, low functioning, and required assistance with all activities of daily living;

    c. Failing to recognize that JONES was an inadequate and unsuitable placement for M.O. and A.O. because JONES was a single foster parent who worked full time; JONES had no experience in dealing with children with significant disabilities like M.O. and A.O.; and JONES was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, especially with four (4) other foster children placed in the home and JONES being a single foster parent who worked full time;

    d. Failing to immediately remove M.O. and A.O. from the JONES foster home when, during a staffing on November 16, 2022, MEIKLE knew that JONES was not taking M.O. and A.O. to medical and therapy appointments, which was

a known ongoing pattern with JONES and every child placed in her care, and JONES advised the staffing participants that she was not going to leave work early to transport the children to their medically necessary appointments;

e.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES complained that M.O.'s needs were too much for her;

f.  Failing to immediately remove M.O. and A.O. from the JONES foster home each time JONES threatened their removal;

g.  Failing to remove M.O. and A.O. from the JONES foster home when JONES repeatedly made allegations against the biological mother; refused to transport M.O. and A.O. to any of their necessary medical and therapeutic appointments; refused to participate in treatment with M.O. and A.O.; refused to support reunification; cut the children's hair without permission on multiple occasions; refused to allow the GAL to conduct home visits; limited MEIKLE's access to the children, and by having the gate locked, and the home not being a "free access" home, demanding that MEIKLE leave the home or wait outside; accusing MEIKLE of trespassing when she arrived at the home, found the children home alone, and observed a bruise on A.O. that A.O. refused to allow MEIKLE to photograph; was not always giving M.O. and A.O. their medication and claimed A.O. didn't need medication; stopped A.O.'s individual therapy; accused A.O.'s doctor of sexually abusing her and demanded that MEIKLE change her doctor; and was influencing and/or coaching A.O. to make statements and allegations against the mother which MEIKLE stated was destroying A.O.'s relationship with her mother;

h. Failing to remove M.O. and A.O. from the JONES foster home when M.O.'s ABA provider expressed significant concern about M.O., including her appearing dirty with poor hygiene, crying a lot, losing a significant amount of weight, not being able to provide services as often as was medically necessary for M.O., the provider not being able to collect any data from JONES, JONES not participating in M.O.'s treatment, and the provider not knowing where M.O. lived or whom she lived with;

i. Failing to immediately remove M.O. and A.O. from the JONES foster home each time MEIKLE was aware that M.O. had unexplained injuries, including, but not limited to, April 28, 2023, May 1, 2023, May 2, 2023, June 16, 2023, July 7, 2023, and July 11, 2023;

j. Failing to immediately remove M.O. and A.O. from the JONES foster home each time MEIKLE was aware that an abuse report was received due to M.O. having unexplained injuries, including May 1, 2023, May 2, 2023, June 16, 2023, and July 11, 2023;

k. Failing to immediately remove M.O. and A.O. from the JONES foster home when MEIKLE was aware that when she transported M.O. to CPT for an examination on May 5, 2023, CPT observed yellow/purple bruising to the back of M.O.'s right shoulder and yellow/brown bruising on M.O.'s temple and upper right cheek, M.O. weighed only eighty-three (83) pounds, and CPT concluded that M.O. had been the victim of physical abuse;

l. Failing to immediately remove M.O. and A.O. from the JONES foster home when MEIKLE was aware that on May 18, 2023, CPT conducted a Specialized Interview of JONES, expressed concerns that there was no explanation as to

163

how M.O. sustained her injuries, determined that M.O.'s autism and ADHD make her more vulnerable to maltreatment, recommended that both M.O. and A.O. be monitored for their safety in JONES' care, and again concluded that M.O. had been the victim of physical abuse;

m.  Transporting M.O. back to the JONES foster home after being discharged from the hospital on June 16, 2023, where M.O. was treated for an eye injury which doctors determined was a result of "a direct blow;"

n.  Failing to immediately remove M.O. and A.O. from the JONES foster home and instead submitted a change of placement request to CFCN on or about June 17, 2023, due to numerous abuse reports and unexplained events/injuries;

o.  Reporting to the DCF CPI during child protective investigations in May and June 2023, that MEIKLE had no concerns for M.O. or A.O. in the JONES foster home;

p.  Failing to report suspicions of abuse and/or neglect to the Abuse Hotline, including unexplained injuries to M.O. including on her face, unexplained injuries to A.O.'s shoulder/back, and M.O.'s significant weight loss since being placed in out of home care;

q.  Failing to ensure that M.O. and A.O. received APD HCBS Medicaid Waiver services, contrary to professional judgment;

r.  Failing to ensure that M.O. and A.O. consistently received ABA services as often as was medically necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

s.   Failing to ensure that M.O. and A.O. consistently received speech therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

t.   Failing to ensure that M.O. and A.O. consistently received occupational therapy as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

u.   Failing to ensure that services professionally recommended in M.O. and A.O.'s CBHAs were implemented in a timely manner, contrary to professional judgment;

v.   Failing to ensure that services professionally recommended in M.O. and A.O.'s Neuropsychological Evaluations were implemented in a timely manner, contrary to professional judgment;

w.   Failing to ensure that M.O. received medical treatment and assessment to address her weight loss during her placement in out-of-home care, after concerns were reported by at least three (3) medical providers, contrary to professional judgment;

x.   Failing to ensure that A.O. received a psychiatric evaluation as professionally recommended, contrary to professional judgment;

y.   Failing to ensure that A.O. consistently received trauma-based individual counseling as necessary, as professionally recommended, and as Court ordered, contrary to professional judgment;

z.   Failing to ensure that A.O. received family therapy with her mother as professionally recommended, contrary to professional judgment;

aa. Failing to follow and ensure compliance with all Court Orders, including Orders regarding placement, services, supervision, and monitoring of M.O. and A.O.;

bb. Failing to inform the Court that M.O. and A.O. were not consistently receiving medically necessary, professionally recommended, and Court ordered services;

cc. Failing to inform the Court of multiple unexplained injuries to M.O. beginning in April 2023, and multiple abuse reports received regarding unexplained injuries to M.O. between May 1, 2023 and July 11, 2023; and

dd. By causing M.O. and A.O.'s conditions to deteriorate and directly exposing M.O. and A.O. to unnecessary risk of harm.

341.    MEIKLE took said actions knowing M.O. and A.O. would be exposed to a substantial risk of serious harm.

342.    Despite having the authority and means to remedy the unconstitutional treatment of M.O. and A.O., by seeking and securing placement in a safe, stable, and appropriate specialized home to address M.O. and A.O.'s serious disabilities and special needs, and by ensuring M.O. and A.O. received all necessary care, treatment, services, and  supervision to address their disabilities, MEIKLE was deliberately indifferent and/or recklessly failed to take immediate action to ensure that Plaintiffs were in an appropriate and suitable placement and that they received all medically necessary, Court ordered treatment and services.

343.    MEIKLE's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. and A.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse; bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and

other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. and A.O. will suffer such losses in the future.

344.    Plaintiffs are obligated to the undersigned firm for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendant, SANALEE MEIKLE, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT XV – 42 U.S.C. § 1983 CLAIM AS TO M.O. AGAINST MARLENE BAPTISTE

345.    Plaintiff, M.O., hereby reavers and realleges paragraphs 39 through 42, 147 through 167, and 182 through 196, as if fully set forth herein.

346.    This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of M.O.'s guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

347.    At all times relevant hereto, BAPTISTE, as a DCF CPI, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

348.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

349.    At all times material hereto, BAPTISTE was deliberately indifferent and/or acted with reckless disregard to Plaintiff, M.O.'s, health, safety, and welfare and Constitutional and federal rights.

350.     BAPTISTE violated M.O.'s Constitutional and federal rights and exposed M.O. to a substantial risk of serious harm by:

a.  Failing to immediately remove M.O. from the JONES foster home on May 1, 2023, when BAPTISTE was assigned to investigate an abuse report alleging that M.O. had unexplained bruises to her face, and BAPTISTE went to M.O.'s school, observed M.O. to have a bruise on each side of her face and a mark near her ear, but was unable to interview M.O. to find out how the injuries were sustained due to M.O.'s autism and language impairment;

b.  Failing to speak with the teacher who initially observed the bruises on M.O. the day the abuse report was received even though BAPTISTE responded to the school to commence the investigation;

c.  Allowing M.O. to return to the JONES foster home after observing unexplained bruises on both sides of M.O.'s face on May 1, 2023;

d.  Failing to immediately respond to the JONES foster home to conduct an investigation;

e.  Failing to interview JONES to investigate how M.O. sustained her injuries;

f.  Failing to interview the other children placed in the JONES foster home to investigate how M.O. sustained her injuries;

g.  Failing to immediately contact CPT so M.O. could be examined as this was a mandatory referral to CPT because M.O. had unexplained bruises to her face;

h.  Failing to respond to observe M.O. when another abuse report was received by BAPTISTE on May 2, 2023, which, in addition to reporting the bruises on each side of M.O.'s face, also alleged that M.O.'s eye was swollen;

i.   Failing to immediately respond to the JONES foster home to conduct an investigation of the two open abuse reports;

j.   Failing to interview JONES to investigate how M.O. sustained her injuries that resulted in two different abuse reports being called in;

k.   Failing to interview the other children placed in the JONES foster home to investigate how M.O. sustained her injuries that resulted in two different abuse reports being called in;

l.   Failing to immediately contact CPT when the second abuse report was received on May 2, 2023, so M.O. could be examined, as this was another mandatory referral to CPT because M.O. had additional unexplained injuries to her face;

m.   Failing to respond to CPT when CPT had questions about M.O.'s injuries, after BAPTISTE finally contacted them on May 3, 2023, two (2) days after the abuse report was received and two (2) days after BAPTISTE observed bruises on M.O.'s face;

n.   Failing to investigate further when JONES claimed she did not know how M.O. sustained her injuries and BAPTISTE should be investigating M.O.'s mother, when BAPTISTE finally responded to the JONES foster home on May 4, 2023, three (3) days after the abuse report was received and three (3) days after JONES was aware there was an open investigation;

o.   Failing to interview the foster children placed in the JONES foster home individually and/or outside of JONES' presence, and then accepting as true their collective statement that M.O. harms herself and trips when walking;

p.   Failing to immediately remove M.O. from the JONES foster home when BAPTISTE knew that on May 5, 2023, four (4) days after the abuse report was

169

received, M.O. was seen by CPT for an examination, CPT observed yellow/purple bruising to the back of M.O.'s right shoulder and yellow/brown bruising on M.O.'s temple and upper right cheek, M.O. weighed only eighty-three (83) pounds, and CPT concluded that M.O. had been the victim of physical abuse;

q.  Failing to immediately remove M.O. from the JONES foster home when BAPTISTE knew that on May 18, 2023, CPT conducted a Specialized Interview of JONES, expressed concerns that there was no explanation as to how M.O. sustained her injuries, determined that M.O.'s autism and ADHD make her more vulnerable to maltreatment, recommended that both M.O. and A.O. be monitored for their safety in JONES' care, and again concluded that M.O. had been the victim of physical abuse;

r.  Failing to complete a thorough investigation to assess M.O.'s risk and determine how she sustained her injuries;

s.  Failing to perform investigative actions on this case between May 4, 2023 and June 16, 2023;

t.  Failing to take protect action for M.O. between May 1, 2023 and June 16, 2023;

u.  Failing to immediately respond to conduct an investigation when a third abuse report was received by BAPTISTE on June 16, 2023, which alleged that M.O. had another unexplained bruise, this time on her left eye, M.O. has autism, and M.O. is non-verbal;

v.  Failing to recognize that the DCF Abuse Hotline coded the June 16, 2023 abuse report incorrectly, the report was alleging new injuries to M.O.'s face, and these new injuries required immediate investigation;

w.  Failing to immediately respond to observe M.O. when the third abuse report was received on June 16, 2023, alleging that M.O. had a new bruise on her eye;

x.  Failing to immediately respond to the JONES foster home to conduct an investigation of the third abuse report;

y.  Failing to interview JONES to investigate how M.O. sustained the additional injuries that resulted in a third abuse report called in;

z.  Failing to interview the other children placed in the JONES foster home to investigate how M.O. sustained the additional injuries that resulted in a third abuse report being called in;

aa. Failing to immediately contact CPT when the third abuse report was received on June 16, 2023, so M.O. could be examined, as this was another mandatory referral to CPT because M.O. had additional unexplained injuries to her face;

bb. Failing to immediately remove M.O. from the JONES foster home when a third abuse report was received in just over a month reporting multiple unexplained injuries to M.O.'s face;

cc. Waiting until June 26, 2023, ten (10) days after the third (3rd) abuse report regarding unexplained injuries to M.O. was received, and fifty-six (56) days into the investigation, before taking any action to investigate M.O.'s new and ongoing injuries;

dd. Failing to immediately remove M.O. from the JONES foster home after reviewing the CPT reports on June 26, 2023, and knowing again that CPT concluded M.O. had been physically abused, but was unable to determine where and how the injuries were sustained;

ee. Failing to immediately remove M.O. from the JONES foster home on June 26, 2023, after speaking with M.O.'s FRC case manager, who reported M.O. was seen on June 15, 2023, for a home visit with no injuries, and had a new black eye when she came to FRC for a supervised visit on June 16, 2023, when no one seemed to know how M.O. sustained her injuries, and M.O. had sustained multiple unexplained injuries;

ff. Failing to immediately remove M.O. from the JONES foster home on June 26, 2023, after speaking with the FRC transportation driver who first saw M.O.'s black eye when M.O. was picked up from her summer program on June 16, 2023, and was advised that M.O. had the injury when picked up;

gg. Failing to immediately remove M.O. from the JONES foster home on June 26, 2023, after speaking with the summer program M.O. attended who observed M.O.'s black eye and stated M.O. was picked up from the JONES foster home that way;

hh. Failing to investigate further when BAPTISTE finally responded to the JONES foster home again on June 26, 2023, and JONES again claimed she did not know how M.O. sustained her injuries, reported that M.O. would run without paying attention, M.O. spread feces all over the wall the day before, and JONES did not want to lose her license;

ii. Failing to interview the foster children placed in the JONES foster home individually and/or outside of JONES' presence on June 26, 2023, and then accepting as true their collective statement that M.O. bruised herself by running without paying attention when she fell and hit her face near the doorknob;

jj. Failing to immediately remove M.O. from the JONES foster home on June 26, 2023, when there was no verifiable explanation as to how M.O. sustained the series of injuries BAPTISTE was supposed to be investigating;

kk. Failing to accurately assess M.O.'s risk when BAPTISTE completed a Family Functioning Assessment, on or about June 27, 2023, listed the alleged perpetrator of M.O.'s injuries as "unknown," found no impending danger threats for M.O., determined that M.O. was safe, and allowed M.O. to remain in the JONES foster home despite her knowledge that she was at substantial risk of serious harm;

ll. Failing to take protective action for M.O. between May 1, 2023 and June 28, 2023, despite knowing that M.O. had a pattern of unexplained injuries and she was at substantial risk of serious harm;

mm.   Failing to complete a thorough investigation into how M.O. sustained her multiple unexplained injuries;

nn. Closing the three (3) open abuse reports on June 28, 2023, with "Not Substantiated" findings of physical injury, meaning there was credible evidence to support the allegations, but leaving the perpetrator as "unknown" because BAPTISTE claimed "[t]he problem is that no one [is] able to tell how the bruises occurred;"

oo. Failing to remove M.O. from the JONES foster home on or before June 28, 2023, thereby leaving M.O. at a substantial risk of serious harm, because BAPTISTE was unable to determine how M.O. sustained her pattern of injuries; and

pp. By directly exposing M.O. to unnecessary risk of harm.

351.     BAPTISTE took said actions knowing M.O. would be exposed to a substantial risk of serious harm.

352.     Despite having the authority and means to remedy the unconstitutional treatment of M.O. by removing M.O. from the JONES foster home, BAPTISTE was deliberately indifferent and/or recklessly failed to take immediate action to ensure that M.O. was in a safe, appropriate and suitable placement.

353.     BAPTISTE's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse; bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. will suffer such losses in the future.

354.     Plaintiff, M.O., is obligated to the undersigned firm for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff, M.O., demands judgment against Defendant, MARLENE BAPTISTE, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## COUNT XVI – 42 U.S.C. § 1983 CLAIM AS TO M.O. AGAINST SONIA BROOKS

355.     Plaintiff, M.O., hereby reavers and realleges paragraphs 43 through 46, 87, and 173 through 196, as if fully set forth herein.

356.     This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of M.O.'s guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws.

357.     At all times relevant hereto, BROOKS, as a DCF CPI, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

358.     At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

359.     At all times material hereto, BROOKS was deliberately indifferent and/or acted with reckless disregard to Plaintiff, M.O.'s, health, safety, and welfare and Constitutional and federal rights.

360.     BROOKS violated M.O.'s Constitutional and federal rights and exposed M.O. to a substantial risk of serious harm by:

> a.  Failing to immediately respond to investigate an abuse report received on July 11, 2023, that was assigned to BROOKS alleging that M.O. was seen with a two-inch bruise on her thorax, an inch long bruise on her arm, and bruises to her knees on July 7, 2023, during a supervised visit, and it was unknown how M.O. sustained these injuries.
>
> b.  Failing to immediately recognized that M.O. was at substantial risk of serious harm because this was the fourth (4th) abuse report regarding unexplained injuries to M.O. since May 1, 2023, the most recent in a series of abuse reports involving M.O. was closed only thirteen (13) days earlier, and BROOKS had investigated other abuse reports against JONES involving other children in the past, including when M.O. was first placed in the JONES foster home;

c. Failing to immediately remove M.O. from the JONES foster home when BROOKS contacted M.O.'s mother on July 12, 2023, and she confirmed that she observed marks on M.O.'s knees, arm and face at a supervised visit on July 7, 2023, M.O. was autistic, and M.O. could not explain how she got the marks;

d. Failing to immediately remove M.O. from the JONES foster home when BROOKS responded to the JONES foster home on July 12, 2023, and interviewed JONES who reported she had five (5) foster children in her care; she did not know M.O. had injuries on July 7, 2023, because no one told her; she alleged that M.O. falls a lot and hits herself in the face a lot; she alleged that three (3) weeks ago M.O. fell and hit her face on the cabinet; she claimed she was unaware of M.O. having any current injuries; she alleged that M.O. is violent when she comes back from visits with her mother; she reported that she had asked for M.O. to be removed from her home in the past; and she advised that she thinks M.O. needs to be in a home where she can be monitored all the time;

e. Failing to immediately remove M.O. from the JONES foster home when BROOKS met with M.O. at her summer program on July 12, 2023, and observed M.O. to be a "very thin/slender 14-year-old girl who did not appear her age," took photos of scratches that were observed on M.O.'s knee but did not observe marks on M.O.'s thorax, back or neck;

f. Allowing M.O. to return to the JONES foster home after observing unexplained bruises on M.O. and observing her to be underweight on July 12, 2023;

176

g.  Failing to interview the other children placed in the JONES foster home to investigate how M.O. sustained her injuries that resulted in two different abuse reports being called in;

h.  Failing to interview the FRC visitation supervisor who also observed the bruises to M.O. on July 7, 2023;

i.  Failing to contact FRC's case management team to find out if they had any concerns about M.O.;

j.  Failing to contact CFCN's licensing department to find out if they had any concerns about M.O.;

k.  Failing to remove M.O. from the JONES foster home despite completed a Risk Assessment on July 12, 2023, finding M.O. to be at "Moderate Risk" for future abuse;

l.  Failing to respond to CPT after initially contacting them on July 12, 2023, when CPT had questions that same day, advised the pictures BROOKS sent them of M.O. were black and white and they could not see anything in them, and asked if M.O. had visible marks that day;

m.  Finally responding to CPT on July 14, 2023, two (2) days after CPT had questions so they could schedule an examination of M.O., and advising CPT that M.O. only had scratches to her hand and her knee when BROOKS saw her on July 12, 2023, and BROOKS was more concerned about M.O.'s weight because she was extremely thin;

n.  Failing to take any protective action for M.O. between July 11, 2023 and July 14, 2023, despite knowing that she was at substantial risk of serious harm in the JONES foster home;

177

      o.  Failing to perform any investigative actions on this case between July 12, 2023 and July 14, 2023; and

      p.  By directly exposing M.O. to unnecessary risk of harm.

361.    BROOKS took said actions knowing M.O. would be exposed to a substantial risk of serious harm.

362.    Despite having the authority and means to remedy the unconstitutional treatment of M.O. by removing M.O. from the JONES foster home, BROOKS was deliberately indifferent and/or recklessly failed to take immediate action to ensure that M.O. was in a safe, appropriate and suitable placement.

363.    BROOKS' deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including M.O. suffering emotional harm; deteriorating mental health; neglect; physical abuse; emotional abuse, bodily injury and resulting pain and suffering; deterioration; discomfort; disability; mental anguish; loss of capacity for the enjoyment of life; expenses incurred for medical care and treatment; exacerbation, aggravation and/or activation of preexisting conditions or disease; and other reasonably foreseeable damages.  These losses are either permanent or continuing in nature, and M.O. will suffer such losses in the future.

364.    Plaintiff, M.O., is obligated to the undersigned firm for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff, M.O., demands judgment against Defendant, SONIA BROOKS, for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable in this case.

DATED this 14<u>th</u> day of <u>July</u>, 2025.

Respectfully submitted,

**JUSTICE FOR KIDS** ®
a division of KELLEY KRONENBERG
*Counsel for Plaintiff*
10360 West State Road 84
Ft. Lauderdale, Florida 33324
Telephone:    (754) 888-KIDS
Facsimile:    (954) 644-4848

<u>*s/ Stacie J. Schmerling*</u>
STACIE J. SCHMERLING
Florida Bar No. 83862
LELIA M. SCHLEIER
Florida Bar No. 107019
stacie@justiceforkids.com
lelia@justiceforkids.com
erica@justiceforkids.com

179