**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-24196-BLOOM/D'Angelo**

M.O. and A.O., minor children,
by and through their Guardian
of the Property, ANTHONY
ROMANO JR.,

     Plaintiffs,

v.

CITRUS HEALTH NETWORK, INC., d/b/a
CITRUS FAMILY CARE NETWORK;
FAMILY RESOURCE CENTER OF SOUTH
FLORIDA, INC.; FLORIDA DEPARTMENT,
OF CHILDREN AND FAMILIES;
KENYA NEELY, individually;
MARTA TORRES, individually;
ANTHONY CARVALHO, individually;
NATALIE GREEN, individually;
ANTIWONESHA JOHNSON, individually;
MYRLANDE BREEDLOVE, individually;
SANALEE MEIKLE, individually;
MARLENE BAPTISTE, individually; and
SONIA BROOKS, individually,

     Defendants.

_____/

## <u>ORDER ON MOTIONS TO DISMISS</u>

**THIS CAUSE** is before the Court upon (i) Defendant Florida Department of Children and

Families' ("DCF") Motion to Dismiss, ECF No. [22], (ii) Defendants Marlene Baptiste and Sonia

Brooks's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. [36], (iii) Defendants

Family Resource Center of South Florida, Inc. ("FRC"), Natalie Green, Antiwonesha Johnson,

Myrlande Breedlove, and Sanalee Meikle's (the "FRC Defendants") Joint Motion to Dismiss

Plaintiff's Amended Complaint, ECF No. [39], and (iv) Defendants Citrus Health Network, Inc.,

d/b/a Citrus Family Care Network ("CFCN"), Kenya Neely, Marta Torres, and Anthony Carvalho's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. [40].

The Court referred the Motions to Dismiss to Magistrate Judge Ellen D'Angelo for a Report and Recommendation ("R&R"). ECF Nos. [28], [37], [41], and [42]. Judge D'Angelo issued her Report and Recommendation, ECF No. [77], to which the parties filed the following timely submissions:

1. Objections by CFCN, Neely, Torres, and Carvalho, ECF No. [86]; Response by M.O. and A.O., ECF No. [92];

2. Objections by the FRC Defendants, ECF No. [87]; Response by Plaintiffs, ECF No. [93];

3. Objections by Baptiste, ECF No. [88]; Response by M.O., ECF No. [91]; and

4. Objections by M.O., ECF No. [89]; Response by Brooks, ECF No. [90].

For the reasons that follow, the Report and Recommendation is adopted in part and rejected in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In their Amended Complaint, Plaintiffs allege that DCF is the state agency charged with ensuring the health, welfare, and safety of children in state custody; operating and overseeing the foster care system; performing all child protective investigations; providing substitute care services to children; and licensing, relicensing, and monitoring foster homes in Miami-Dade County. ECF No. [1-3] ¶ 17. Defendants Baptiste and Brooks were Child Protective Investigators ("CPI") employed by DCF. Id. ¶¶ 39, 43. CFCN is a private, non-governmental Florida corporation that acts as the lead agency for community-based care in Miami-Dade County. Id. ¶¶ 10, 11. Defendant FRC is a private, non-governmental Florida corporation that contracted with CFCN to provide

services related to foster care, including case management services to children in the custody of the State of Florida. *Id.* ¶ 14. Defendant Green was a Case Manager Supervisor with FRC, and Defendant Johnson was a Case Manager and Case Manager Supervisor with FRC. *Id.* ¶¶ 27, 30. Defendants Breedlove and Meikle were FRC Case Managers. *Id.* ¶¶ 26, 33.

DCF and CFCN had a contractual relationship pursuant to which CFCN provided foster care services, including ensuring safe and appropriate placement of foster children, licensure and re-licensure of foster homes, supervising foster homes, and ensuring the health and safety of all foster children in its care. *Id.* Defendant Neely was a Placement Specialist employed by CFCN. *Id.* ¶ 18. Defendant Torres was CFCN's Director of Licensing and Placement. *Id.* ¶ 21. Defendant Carvalho was a Foster Parent Liaison with CFCN. *Id.* ¶ 24.

Plaintiffs M.O. and A.O. were minor children with disabilities, including autism, who resided in Miami-Dade County and were placed in foster care. *Id.* ¶¶ 4–9, 47. Plaintiffs allege that as early as 2018, DCF and FRC were put on notice of deficiencies within the Southern Region system of foster care, due to a class action lawsuit. *Id.* ¶ 55. In 2019, when CFCN became the lead agency for foster care in the Southern Region, CFCN knew of the deficiencies within its own system of care. *Id.* ¶ 56. In March 2019, the class action settled, requiring that the identified deficiencies be remedied; DCF, CFCN, and FRC knew that a Settlement Agreement was reached in the Class Action. *Id.* ¶ 57. Still, at the time of Plaintiffs' placement in foster care, DCF, CFCN, and FRC had failed to remedy the identified deficiencies, resulting in harm to children, including Plaintiffs. *Id.* ¶ 58.

On April 20, 2022, DCF removed Plaintiffs from their biological parents due to concerns for the mother's temporary mental health condition and the father's early onset Alzheimer's

disease. *Id.* ¶ 47. DCF assigned the case to CFCN to provide foster care and related services, and CFCN assigned FRC to provide management services. *Id.* ¶¶ 48, 49.

In the process of identifying an appropriate placement, DCF, CFCN, FRC, Neely, Torres, Green, and Jonhson knew or should have known several facts about M.O., specifically regarding her disabilities, support needs, and need for a specialized placement. *Id.* ¶¶ 52, 53. Similarly, DCF, CFCN, FRC, Neely, Torres, Green, and Jonhson knew or should have known several facts about A.O., specifically regarding her disabilities, support needs, and need for specialized placement. *Id.* ¶ 54.

Notwithstanding these needs, DCF, CFCN, and Neely improperly recorded M.O. as effectively needing very little support. *Id.* ¶ 59. Furthermore, DCF, CFCN, FRC, Neely, and Green determined that Plaintiffs ought to be placed in a traditional foster home—the lowest level of licensed home with no specialized training. *Id.* ¶ 61. Thus, CFCN, FRC, DCF, Neely, and Green determined Plaintiffs could be placed at Jerry Jones' home. *Id*. This placement came notwithstanding DCF and CFCN's knowledge about the following allegations regarding Jones:

- She had been the subject of multiple abuse reports, domestic disturbance incidents, and investigations, *id.* ¶¶ 62, 64;

- She had made statements on her licensing paperwork about beating a child as a discipline tactic and never dealing with a child with behavioral disabilities or challenges, *id.*;

- She had erratic behavior and severe mood swings, *id.*;

- She had a previous foster child removed from her home due to verbal abuse, *id.* ¶ 64(i);

- Two prior foster children ran away from her home, *id.*; and

- Law enforcement had responded to her home seven times since it was relicensed, and Jones had requested the removal of at least two children from the home, *id*.

Furthermore, at the time of the placement, CFCN, Neely, and Torres knew or should have known that Jones was a single parent, worked full time, was fostering three children—one of whom was developmentally delayed—and had an open abuse report, the third abuse report against Jones since her initial licensure. *Id.* ¶ 66. The day after Plaintiffs were placed in Jones' home, DCF and CFCN put a placement hold on Jones due to the open abuse report that was received before Plaintiffs' placement. *Id.* ¶ 77.

Following Plaintiffs' placement, CFCN, FRC, and Johnson knew Plaintiffs were not receiving their required therapies in Jones' care. *Id.* ¶¶ 94–95. As of June 2022, CFCN, Carvalho, and Torres knew that Jones demanded a higher rate for fostering Plaintiffs, was complaining about M.O.'s needs and disabilities, and advised that she had provided notice for removal of M.O. but was willing to keep A.O. *Id.* ¶ 100. Even so, CFCN, Carvalho, and Torres allowed Plaintiffs to stay with Jones. *Id.* ¶ 101.

In August 2022, FRC assigned Breedlove as the next Case Manager. *Id.* ¶ 112. At that time, Breedlove knew or should have known about M.O.'s extensive special needs, necessary therapies, and required medical services. *Id.* ¶ 113. That same month, CFCN, Carvalho, FRC, and Breedlove felt that Plaintiffs needed to be removed from the Jones home within thirty days; notwithstanding this, Plaintiffs were not removed. *Id.* ¶ 114.

Then, in September 2022, as CFCN, FRC, Breedlove, and Johnson knew or should have known, M.O.'s therapist reported that M.O.'s weight loss over the four months spent in the Jones home should be assessed, along with other deficits in M.O.'s skills and functioning. *Id.* ¶ 125. That same month, A.O.'s medically necessary services stopped completely. *Id.* ¶ 126.

5

In October 2022, DCF, FRC, Breedlove, and Johnson inaccurately reported to the court that M.O. was consistently receiving her necessary services, there were no health concerns for M.O. after her last medical visit in April 2022, and M.O. and A.O. had not changed schools. *Id.* ¶ 127. They also reaffirmed the appropriateness of continued placement in Jones' home. *Id.*

In November 2022, A.O. was discharged from her in-person therapy services due to her lack of attendance, which FRC, Meikle, Green, and CFCN knew or should have known. *Id.* ¶ 131. During a staffing meeting one day later, FRC, Meikle, Green, CFCN, Carvalho, and Torres discussed Plaintiffs not attending their required medical therapies and created a plan with Jones to coordinate transporting Plaintiffs to their appointments. *Id.* ¶ 132. Still, after this meeting, Jones refused to transport Plaintiffs to their appointments, and FRC, Meikle, Green, CFCN, Carvalho, and Torres allowed Plaintiffs to remain in her care. *Id.*

Sometime before the end of 2022, CFCN and DCF became aware of a fourth abuse report against Jones, alleging mental injury of a child in her care; DCF closed the investigation with "not substantiated" findings. *Id.* ¶ 133.

Between November 2022 and January 2023, CFCN, Carvalho, Torres, FRC, Meikle, and Green knew or should have known the following:

- M.O. was observed with bruises and was losing her hair;

- A.O. was refusing to visit her mother;

- A.O. was making allegations against her mother consistent with allegations by Jones that her mother was sexually assaulting Plaintiffs;

- M.O.'s behavioral services had stopped; and

- A.O.'s services had terminated.

*Id.* ¶ 134.

In January 2023, as CFCN, Carvalho, Torres, FRC, Meikle, and Green knew or should have known, when Meikle responded to the Jones home for a visit, an unknown male opened the gate, the children were alone in the home, and Meikle observed Jones go into an RV on the side of the home where two unknown males—identified by Jones as her "backup" caregivers—were living. *Id.* ¶ 135. At this time, A.O had a bruise on her shoulder, and M.O. had an unexplained bruise and scar on her eye. *Id.*

Also in January 2023, CFCN, FRC, MEIKLE, and GREEN knew or should have known that A.O.'s ABA provider expressed difficulty providing services to A.O. due to instability and non-compliance with the schedule by Jones, A.O. had announced that she no longer wished to receive therapy, the ABA provider was not permitted to meet Jones or go to Jones' home, and the ABA provided did not know where A.O. lived or who was in charge of her. *Id.* ¶ 136. At that time, A.O.'s physical condition had deteriorated, and A.O. had developed a bad temper and appeared to be isolating herself from anyone who knew her prior to foster care. *Id.*

In January and February 2023, CFCN, FRC, MEIKLE, and GREEN knew or should have known that M.O.'s ABA provider expressed similar concerns, conveying that since M.O.'s placement in foster care, (i) M.O. did not have any services for the first half of January, (ii) M.O. only received ABA services on two days in January, (iii) M.O. appeared dirty with poor hygiene and cried a lot, (iv) M.O. suffered significant weight loss, and (v) M.O.'s ABA services were only provided twelve out of the twenty-five hours she was allotted in February 2023. *Id.* ¶ 137.

In March 2023, DCF, FRC, Meikle, and Green submitted another report to the court, again indicating that M.O. was in good health, that M.O. was consistently engaging in her medical services and therapies, and that placement in Jones' home was appropriate. *Id.* ¶ 138. CFCN, FRC, Meikle, and Green knew that on March 29, 2023, M.O. had a neuropsychological evaluation

recommending that she undergo in-home therapies, that Jones learn to implement behavior strategies to support M.O., that M.O.'s team consult with a speech and language therapist, and that M.O. continue her therapies. *Id.* ¶ 140. Though CFCN, FRC, Meikle, and Green were required to comply with this evaluation, they failed to do so. *Id.* ¶ 141.

Similarly, in April 2023, CFCN, FRC, Meikle, and Green failed to comply with nearly all the recommendations arising from A.O.'s neuropsychological evaluation in April 2023. *Id.* ¶¶ 143–44. They also knew that M.O. arrived at a supervised visit with her mother with an unexplained bruise on the left side of her face. *Id.* ¶ 146.

In May 2023, an abuse report was received on behalf of M.O.—the fifth abuse report regarding a child in Jones's care—alleging that M.O. was screaming for help at school and had a mark on the right side of her face near her ears. *Id.* ¶ 147. Baptiste, who served as a CPI for DCF, began an investigation, meeting with one of M.O.'s teachers. *Id.* ¶ 148. However, Baptiste did not speak with the teacher who saw the bruises, did not go to the Jones home, did not interview Jones, did not interview any of the other foster children in Jones' home, and did not make any other attempt that day to learn how M.O. sustained her injuries. *Id.* The next day, CFCN, FRC, Meikle, Green, DCF, and Baptiste knew that another abuse report—the sixth abuse report regarding a child in Jones's care— was received, alleging M.O. was observed with bruises on both sides of her face on the cheek area and in front of her ear, and her left eye looked swollen. *Id.* ¶ 149.

Two days after observing the bruises on M.O.'s face, Baptiste contacted the Child Protection Team ("CPT") as part of a mandatory referral. *Id.* ¶ 151. Still, when CPT asked if any injuries were observed, Baptiste did not respond. *Id.* The next day, Baptiste went to the Jones home and interviewed Jones, who stated she did not know how M.O. was injured and indicated the "DCF should investigate the mother." *Id.* ¶ 152. The day after that, CPT examined M.O., noting her

injuries and low body weight of 83 pounds and concluding that M.O. had been a victim of physical abuse. *Id.* ¶ 153. Still, DCF and Baptist took no further investigative action, and CFCN, FRC, Meikle, Green, DCF, and Baptiste allowed M.O. to return to the Jones home. *Id.*

Later in May, after conducting a specialized interview of Jones, CPT again concluded that M.O. had been the victim of physical abuse and that M.O. and A.O. should be monitored for their safety in Jones' care. *Id.* ¶ 155. Again, CFCN, FRC, Meikle, Green, DCF, and Baptiste allowed M.O. to return to Jones' home. *Id.* A week later, at a court hearing, FRC and DCF failed to inform the court of the pattern of unexplained injuries, the two open abuse reports, that neither Plaintiff was receiving their therapies, or that Plaintiffs required specialized placement. *Id.* ¶ 157.

In June 2023, CFCN, Carvalho, FRC, Meikle, and Green knew that M.O. had an unexplained black eye and looked disheveled when FRC picked up M.O. to transport her to a supervised visit with her mother. *Id.* ¶ 160. M.O. was transported to the hospital, where doctors determined that M.O.'s eye injury was the result of "a direct blow." *Id.* Still, upon M.O.'s discharge from the hospital, FRC, Meikle, Green, CFCN, and Carvalho allowed M.O. to return to the Jones home. *Id.* That same day, CFCN, FRC, DCF, Meikle, Green, and Baptiste knew another abuse report—the seventh abuse report regarding a child in Jones's care—was received on behalf of M.O. alleging she had another unexplained bruise on her left eye. *Id.* ¶ 161. The next day, FRC, Meikle, and Green submitted a request to CFCN to change Plaintiffs' placement due to the abuse reports; still, FRC, Meikle, Green, CFCN, Carvalho, and Torres failed to immediately remove Plaintiffs from the Jones home. *Id.* ¶ 163.

Later in June 2023, Baptiste acknowledged receiving the CPT reports concluding M.O. had been physically abused. *Id.* ¶ 165. Baptiste spoke with FRC and Meikle about M.O.'s black eye, interviewed other foster children who reported that M.O. bruises herself by running without paying

attention, and determined that the perpetrator of M.O.'s injuries was "unknown," finding no impending danger or threats to M.O. *Id.* ¶ 166. DCF and Baptiste later closed all three open abuse reports of physical injury as "not substantiated." *Id.* ¶ 167.

In July 2023, DCF relicensed Jones as a traditional foster parent. *Id.* ¶ 171. The next week, FRC, Meikle, and Green knew that when M.O. arrived at FRC for a supervised visit with her mother, she had marks, bruises, and scratches on her face and body, and when asked what happened to her face, M.O. began to cry. *Id.* ¶ 172. FRC and M.O.'s mother observed more bruises on M.O.'s arms, legs, and back, with M.O. being unable to explain how she sustained those injuries. *Id.* Another abuse report was received on behalf of M.O.—the eighth such report regarding a child in Jones' care and the fourth regarding M.O. specifically—this time alleging a two inch bruise on M.O.'s thorax, an inch-long bruise on her arm, and bruises to her knees; CFCN, DFC, Meikle, Green, and Brooks knew of this report. *Id.* ¶ 173.

Brooks, a CPI employed by DCF, began an investigation the next day. *Id.* ¶ 175. Brooks (i) contacted M.O.'s mother, who confirmed observing the marks during a supervised visit, (ii) interviewed Jones, who was unaware of M.O.'s injuries, (iii) met with M.O. and took photos of some of the injuries, (iv) completed a Risk Assessment determining that M.O. was at moderate risk of future abuse, and (v) contacted CPT, sending black and white photos, but later failing to respond so that M.O. could be examined by professionals. *Id.*

Two days later, CFCN, FRC, DCF, Meikle, Green, Carvalho, Torres, and Brooks knew about a fifth abuse report regarding unexplained injuries to M.O.—the ninth abuse report regarding a child in Jones's care—alleging M.O. had fresh bruises all over her buttocks, three weeks ago M.O. had a bruise that appeared to be a black eye, the bruises are not consistent with the story being told, Jones had consistently been cutting M.O.'s hair without permission, and M.O. was

observed as constantly hungry. *Id.* ¶ 179. Due to her injuries, M.O. was transported to the hospital and admitted for 36 days due to bilateral bruising, a pressure ulcer, a distended abdomen (she was emaciated and weighed only 77 pounds), and being at severe risk for cardiovascular compromise. *Id.* ¶ 182. M.O. was diagnosed with nonaccidental trauma, physical abuse, and failure to thrive. *Id.* Three days later, DCF, FRC, and Green submitted a status report notifying the court for the first time of the serious abuse reports and unexplained injuries to M.O. since May 2023. *Id.* ¶ 185.

In late August 2023, M.O. was discharged from the hospital and placed in a new foster home. *Id.* ¶ 187. A week later, M.O. was placed on an extended visit with her mother. *Id.* ¶ 188.

In September 2023, DCF and Brooks closed the abuse reports with verified findings of failure to protect, inadequate supervision, medical neglect, and substance misuse, and no indicators of physical injury. *Id.* ¶ 189. On September 10, 2023, DCF received another abuse report—the tenth abuse report regarding a child in Jones's care—alleging abuse and neglect of both A.O. and M.O., which was closed with verified findings of inadequate supervision. *Id.* ¶ 191.

In January 2024, A.O. was reunified with her mother, and Plaintiffs remain at home with their parents. *Id.* ¶¶ 193–94.

Plaintiffs filed the first Complaint on July 14, 2025 in state court. ECF No. [1] at 2. On September 11, 2025, Plaintiffs filed the Amended Complaint, alleging negligence, culpable negligence, and claims under 42 U.S.C. § 1983 against CFCN and FRC; negligence against DCF; and § 1983 claims against Defendants Neely, Torres, Carvalho, Green, Johnson, Breedlove, Meikle, Baptiste, and Brooks. *See generally* ECF No. [1-3]. On September 15, 2025, Defendants removed this case and thereafter filed the instant Motions to Dismiss, ECF Nos. [22], [36], [39], and [40].

The Court referred the Motions to Dismiss to Magistrate Judge Ellen D'Angelo for a Report and Recommendation ("R&R"). ECF Nos. [28], [37], [41], and [42]. Judge D'Angelo issued her Report and Recommendation, ECF No. [77], to which four Objections were received, ECF Nos. [86], [87], [88], [89]. The Court recites Judge D'Angelo's findings as appropriate in addressing the parties' Objections.

## II.   LEGAL STANDARD

In reviewing a report and recommendation, the district court may accept, reject, or modify, in whole or in part, a magistrate judge's recommendation. 28 U.S.C. § 636(b)(1). "In order to challenge the findings and recommendations of the magistrate judge, a party must file written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.*, 208 F. App'x 781, 783 (11th Cir. 2006) (alterations omitted) (quoting *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)). The objections must also present "supporting legal authority." S.D. Fla. L. Mag. J.R. 4(b). The portions of the report and recommendation to which an objection is made are reviewed *de novo* only if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3). If a party fails to object to any portion of the magistrate judge's report, those portions are reviewed for clear error. *Macort*, 208 F. App'x at 784 (quoting *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999)); *see also Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001).

"It is improper for an objecting party to . . . [submit] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the

apple' when they file objections to a R & R." *Marlite, Inc. v. Eckenrod*, No. 10-23641-CIV, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012) (quoting *Camardo v. Gen. Motors-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)).

### III.   ANALYSIS

#### A.   Objections by CFCN, Neely, Torres, and Carvalho (the "Citrus Defendants")

##### i.   State Actor

In her Report and Recommendation, Judge D'Angelo found that "Plaintiffs' allegations show state action on behalf of FRC and Citrus Defendants under the public function test." ECF No. [77] at 39. Judge D'Angelo explained that the relevant statutes demonstrated that "[e]ven though the Florida Legislature outsourced part of the foster care services to community-based agencies, . . . the State retains responsibility for the quality of contracted services and programs, and the State ensures the services are delivered in accordance with the law." *Id.* at 40. Thus, multiple courts have found community-based agencies that provide foster care services in Florida to be state actors under the public function test. *Id.* (collecting cases).

In their Objection, the Citrus Defendants argue that the Amended Complaint does not allege sufficient factual support for this finding. ECF No. [86] at 2. Specifically, the Citrus Defendants point out that while the statutory scheme makes clear that foster care services were *traditionally* performed by the state, it does not state that these services were *exclusively* performed by the state, as would be required to show state action. *Id.* at 6. By contrast, the Eleventh Circuit has indicated in the most closely analogous case that foster parenting is not traditionally or exclusively a state function. *Id.* at 7 (citing *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001)).

Case No. 25-cv-24196-BLOOM/D'Angelo

Plaintiffs respond that highly persuasive legal authority supports a finding that the Citrus Defendants are state actors for § 1983 purposes. ECF No. [92] at 4 (collecting cases). The statutory framework makes clear that privatization of the child welfare system does not change that the state is ultimately responsible for ensuring appropriate care for children. *Id.* at 5.

As an initial matter, the Court finds the Citrus Defendants' argument to be a mere rehashing of the arguments made in their Motion to Dismiss. Indeed, the Citrus Defendants cite to the same case law cited in their Motion to Dismiss. ECF No. [40] at 7 (citing *Rayburn ex rel. Rayburn*, 241 F.3d 1341). In this regard, this Objection is an inappropriate argument to raise in response to a report and recommendation. *Marlite, Inc.*, 2012 WL 3614212, at *2 (quoting *Camardo*, 806 F. Supp. at 382).

However, even on the merits, the Citrus Defendants' argument fails. Contrary to the Citrus Defendants' assertion, *Rayburn* does not control, as it dealt exclusively with foster parents, as opposed to foster care agencies. *Rayburn ex rel. Rayburn*, 241 F.3d 1341. As the Eleventh Circuit has not addressed the issue, the Court begins by looking to other circuits. The Sixth Circuit has held that a nominally private foster care agency could be deemed a state actor based on the close nexus between its actions and the regulatory scheme behind the actions. *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 677 (6th Cir. 2018). Similarly, in *Perez v. Sugarman*, the Second Circuit held that private child-caring institutions could be state actors where the state statutory scheme made clear that the state was "responsible for the welfare of children." 499 F.2d 761, 765 (2d Cir. 1974) (citations omitted). And the Fourth Circuit has indicated, in the context of a private foster care services organization, that "the state's delegation of an affirmative constitutional duty to [the organization's] employees may give rise to liability under § 1983."

14

*E.R.L. by & through Doe v. Adoption Advoc., Inc.*, No. 21-1980, 2023 WL 1990300, at *3 (4th Cir. Feb. 14, 2023)

By contrast, the First Circuit has held that "child care and placement is not traditionally the exclusive prerogative of the state." *Malachowski v. City of Keene*, 787 F.2d 704, 711 (1st Cir. 1986) (citations omitted). The Tenth Circuit has similarly indicated that private corporations that were "awarded a social services contract by DCF" were not state actors for § 1983 purposes. *Schwab v. Kansas Dep't of Child. & Fams.*, 851 F. App'x 110, 118 (10th Cir. 2021).

The Fifth Circuit declined to "opine on whether, if applying the public function test, a private child placement agency could be considered a state actor with respect to the foster child placement decisions it makes pursuant to a contractual relationship with a state." *Hall v. Smith*, 497 F. App'x 366, 375 (5th Cir. 2012) (citations omitted).

Under the facts as alleged, the Court finds that Plaintiffs have plausibly alleged state action. The statutory scheme indicates:

> The Legislature finds that when private entities assume responsibility for the care of children in the child protection and child welfare system, comprehensive oversight of the programmatic, administrative, and fiscal operation of those entities is essential. The Legislature further finds that the appropriate care of children is ultimately the responsibility of the state and that outsourcing such care does not relieve the state of its responsibility to ensure that appropriate care is provided.

Fla. Stat. § 409.986(b).

Similarly, another section explains, "The Legislature finds that the state has traditionally provided foster care services to children who are the responsibility of the state." Fla. Stat. § 409.993. When these services are outsourced, "[t]he department shall retain responsibility for the quality of contracted services and programs and shall ensure that services are delivered in accordance with applicable federal and state statutes and regulations." Fla. Stat. § 409.25575(2).

Combined, those statutory statements render this case highly analogous to *Brent* and *Perez*. In *Brent*, the court's finding of state action largely depended on the state's "constitutional obligations" to ensure proper care of children. *Brent*, 901 F.3d at 677. The court found that delegating to a private agency the following responsibilities rendered that private agency a state actor for § 1983 purposes: supervising foster placements, making recommendations to the court regarding the children's care and custody, overseeing family visits, developing service plans, and providing counseling services to the children. *Id*. In *Perez*—a decision which the Second Circuit later re-affirmed in *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977)—the Second Circuit relied upon the New York statute providing that government officials "shall be responsible for the welfare of children who are in need of public assistance and care, support and protection" but permitting such officials to act "through an authorized agency." *Perez*, 499 F.2d at 765 (citations omitted).

Here, Plaintiffs allege that CFCN "contracted with [DCF] . . . as an independent contractor to provide foster care and related services to children in the custody of the State of Florida, including M.O. and A.O." ECF No. [1-3] ¶ 10. Furthermore, CFCN was responsible for, *inter alia*, licensure and re-licensure of foster homes, providing supervision and monitoring of foster homes, and ensuring appropriate placement of foster children. *Id.* ¶ 11. CFCN played a role in "identifying the most appropriate placement able to meet [Plaintiffs'] needs." *Id.* ¶ 52. The placement decision for Plaintiffs was made with DCF *and* CFCN and its employees, with CFCN specifically approving the placement and determining the board rate to be paid to Jones. *Id.* ¶¶ 61, 68. CFCN and DCF participated in joint staffing meetings with DCF to address abuse reports against Jones and Jones' broader handling of the children. *Id.* ¶¶ 64(b), 87.

The Court finds that Plaintiffs have plausibly alleged state action by CFCN and its employees. The state expressly situates itself as the primary responsible party and outsources decisive functions to a private actor. That is sufficient to find state action, though not necessarily directly under the "public function" test. Instead, the finding of state action rests on a closely-related theory identified by the Supreme Court: that a private actor "may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 n.1 (2019) (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)). The Eleventh Circuit has indicated that, in light of a foster child's substantive due process right to safety, "[t]he state's action in assuming the responsibility of finding and keeping the child in a safe environment places an obligation on state officials to ensure the continuing safety of that environment." *Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004).

Based on the allegations in the Amended Complaint, the state has opted to outsource the upholding of that obligation, in part, to the Citrus Defendants. That is sufficient to find state action and accords with several courts within the Eleventh Circuit that have also found state action in the provision of foster care services. *See, e.g.*, *Smith v. Beasley*, 775 F. Supp. 2d 1344, 1353 (M.D. Fla. 2011); *Woodburn v. State of Fla. Dep't of Child. & Fam. Servs.*, 854 F. Supp. 2d 1184, 1200 (S.D. Fla. 2011); *Crispell v. Fla. Dep't of Child. & Fams.*, No. 8:11-CV-1527-T-30EAJ, 2012 WL 3599349, at *2 (M.D. Fla. Aug. 20, 2012). Of course, as the factual record develops, the Citrus Defendants may well re-argue that their activities are not those of the state. However, at this juncture and crediting the allegations in the Amended Complaint, the Court overrules the Objection to the extent it disputes state action, adopts the recommendation of Magistrate Judge

D'Angelo—with the caveat that the finding of state action rests on slightly different grounds—and declines to dismiss the claims brought against the Citrus Defendants on the basis of no state action.

### ii.  Deliberate Indifference

In her Report and Recommendation, Judge D'Angelo found that Plaintiffs have sufficiently pled deliberate indifference for the Citrus Defendants. ECF No. [77] at 44. She explained that Plaintiffs allege that CFCN "knew that CPT determined multiple times that M.O. had been a victim of physical abuse, M.O. had a pattern of unexplained injuries, M.O. had a black eye that medical professionals determined was the result of a 'direct blow,' Plaintiffs were not receiving any of the medically necessary and court ordered services, and there were three abuse reports closed as non-substantiated." *Id.* at 47 (citations omitted). Moreover, despite knowing that "Plaintiffs had extensive special needs that required specialized care," the Citrus Defendants "placed them with a single, traditional foster parent, who worked full time, already had three foster care children in her care, and was not ensuring Plaintiffs were receiving their medically necessary services or medication." *Id.* at 48 (citations omitted). Furthermore, the Citrus Defendants knew of the pattern of abuse reports against Jones, including one open report at the time Plaintiffs were placed there. *Id.* (citations omitted). All of this, according to Judge D'Angelo, gives rise to a plausible inference that the Citrus Defendants were deliberately indifferent. *Id.*

In their Objection, the Citrus Defendants argue that "[t]he sufficiency of the allegations against each Citrus Defendant should be analyzed separately; the questions of sufficient knowledge and deliberate indifference (versus negligence) must be answered in the context of each defendant's role and involvement at a given time." ECF No. [86] at 9.

Plaintiffs respond that the Citrus Defendants' Objection to the form and structure of Judge D'Angelo's analysis is not tantamount to an actual objection to her findings. ECF No. [92] at 9.

Thus, her findings should be reviewed for clear error. *Id.* at 10. And there was no clear error, as the court correctly identified deliberate indifference. *Id.* at 10–15.

First, the Court finds that the Citrus Defendants have not pointed to any substantive error in Judge D'Angelo's reasoning—they do not point to knowledge attributed to the Citrus Defendants that was not actually alleged in the Amended Complaint, nor do they explain how knowledge properly attributed to the Citrus Defendants does not constitute deliberate indifference. As such, the Court reviews Judge D'Angelo's recommendation for clear error.

And here, there was no clear error. As noted above, children in foster care have a substantive due process right to safety, and the state bears an obligation to ensure that safety. *See Foltz*, 370 F.3d at 1082 (citation omitted); *Taylor By & Through Walker v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987); *Omar ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1250 (11th Cir. 2003). A state actor can be held liable under § 1983 for depriving someone of such a federal right when two requirements are met. "First, the failure to act must have been a substantial factor leading to the violation of a constitutionally protected liberty or property interest. Second, the official having the responsibility to act must display deliberate indifference." *Taylor*, 818 F.2d at 794. Deliberate indifference exists only where, in relevant part, the state actor disregards a risk of harm of which he or she is actually aware. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Thus, to show deliberate indifference, a plaintiff must allege that the defendants: (1) were objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) the conduct was more than merely negligent. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Here, Judge D'Angelo appropriately pointed to several alleged facts of which the Citrus Defendants were aware and disregarded in maintaining Plaintiffs' placement with Jones, providing citations to the Amended Complaint for each allegation. That is, for each Defendant, Judge

19

D'Angelo points to several facts that each allegedly knew and actions taken notwithstanding that knowledge, and each finding of plausibly-alleged deliberate indifference is supported by specific reference to the Amended Complaint. The Citrus Defendants do not point to findings that are unsupported by the Amended Complaint. Thus, the Court sees no reason to depart from Judge D'Angelo's findings and adopts her recommendation to the extent it finds that Plaintiffs have plausibly alleged deliberate indifference. The Court overrules the Objection to the extent it disputes deliberate indifference.

### iii.  Qualified Immunity

Judge D'Angelo concluded that the Citrus Defendants have not established they are entitled to qualified immunity, because they are private actors. ECF No. [77] at 49. That is, while the "Citrus Defendants were state actors for purposes of Section 1983 liability, the analyses are distinct, and the finding that Plaintiffs state a claim for liability alone does not mean these Defendants can claim qualified immunity." *Id.* at 50. The Citrus Defendants, Judge D'Angelo found, provided no historical or public policy support for invoking qualified immunity in this context. *Id.* As such, qualified immunity did not apply to bar Plaintiffs' claims. *Id.*

The Citrus Defendants argue that Judge D'Angelo erred in conclusively establishing that the Citrus Defendants were not entitled to qualified immunity, effectively foreclosing the argument even as the factual record remains undeveloped. ECF No. [86] at 10. Several cases, they say, support the application of qualified immunity in the foster care services context. *Id.* at 11–12 (citations omitted). Thus, Defendants argue they should not be foreclosed from raising qualified immunity at a later stage as the facts develop. *Id.* at 13.

Plaintiffs respond that the Citrus Defendants are not entitled to qualified immunity. ECF No. [92] at 15. Specifically, Plaintiffs argue "there is no 'firmly rooted' tradition of immunity

applicable to private community-based care providers of foster care and related services in Florida." *Id.* at 16. The Citrus Defendants point only to "nonbinding and inapposite cases." *Id*. Moreover, Plaintiffs argue the policy considerations for qualified immunity do not support its application here. *Id.* at 19.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (citations and quotations omitted). Importantly, "[n]ot all defendants who may be sued under § 1983 are entitled to even claim such immunity." *McDuffie v. Hopper*, 982 F. Supp. 817, 822 (M.D. Ala. 1997). The Eleventh Circuit, in *Burrell v. Board of Trustees of Georgia Military College*, left open whether qualified immunity would be available in cases where the private defendants were being sued for not "fulfill[ing] their duties under a government contract." 970 F.2d 785, 796 (11th Cir. 1992).

Later, in *Richardson v. McKnight*, the Supreme Court assessed the history and purposes of qualified immunity, determining that they did not support extending qualified immunity to prison guards employed by a private, for-profit corporation that had contracted with the state to manage the prison. 521 U.S. 399 (1997). First, the Supreme Court concluded that, although prisons had historically been run by both private and state actors, no "firmly rooted" tradition of immunity existed for privately employed prison guards. *Id.* at 404–06. Second, the Supreme Court analyzed the purpose of qualified immunity: "(1) protecting against unwarranted timidity on the part of government officials, (2) ensuring that talented candidates are not deterred from entering public service, and (3) preventing the distraction of governmental officials by lawsuits." *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *amended*, 205 F.3d 1264 (11th Cir. 2000) (citing

*Richardson*, 521 U.S. at 408–12). Ultimately, the Supreme Court held that—because of the influence of market forces on private employers—qualified immunity should not be extended to privately employed prison guards. *Richardson*, 521 U.S. at 408–12. Still, the Supreme Court contemplated that qualified immunity might apply to a private entity "briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Id.* at 413.

The Eleventh Circuit has not had occasion to consider the application of qualified immunity to ostensibly private foster care service providers in similar contexts, so the Court looks to other circuits. In *Bartell v. Lohiser*, the Sixth Circuit considered this precise issue in the context of a private organization that had contracted with the state for the provision of foster care services. 215 F.3d 550, 554 (6th Cir. 2000). The Sixth Circuit found that the not-for-profit entity, which was "closely supervised" by the state agency, was eligible for qualified immunity. *Id.* at 557. Because the organization's job in making "[d]ecisions pertaining to the welfare of a child . . . require[d] the deliberate and careful exercise of official discretion in ways that few public positions can match," the Court found particularly weighty the concern that the organization "not be over-burdened with encumbering litigation." *Id*. At least one district court has echoed this reasoning in addressing the application of qualified immunity to private foster care service providers. *P.P. v. City of New York*, No. 13 CIV. 5049 CM FM, 2014 WL 4704800, at *19 (S.D.N.Y. Sept. 19, 2014).

The case law supports finding the Citrus Defendants eligible for qualified immunity. For one, as a not-for-profit entity, the Citrus Defendants are not subject to competitive market pressures—that is, market forces cannot be counted on to draw in the most talented candidates or eliminate actors who display "unwarranted timidity." Without the safe harbor of qualified immunity, the Court finds that the Citrus Defendants would find it much more difficult to recruit

talented candidates if those candidates were to be exposed to § 1983 liability. Moreover, the Citrus Defendants appear to fall squarely into the category of those "serving as an adjunct to government in an essential governmental activity" and those "acting under close official supervision." *Richardson*, 521 U.S. at 413. That is, the statutory scheme expressly contemplates "comprehensive oversight," Fla. Stat. § 409.986(b), and contemplates the Citrus Defendants performing what Florida identifies as a service "traditionally" provided by the State. Fla. Stat. § 409.993. While there does not appear to be a "firmly rooted" history of immunity for actors such as the Citrus Defendants, the purposes of qualified immunity and the broader directives of *Richardson* nonetheless support extending the defense to the Citrus Defendants. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 439 (6th Cir. 2006), *rev'd and remanded*, 551 U.S. 291, 127 S. Ct. 2489, 168 L. Ed. 2d 166 (2007) (extending qualified immunity even where no firmly rooted history existed due to public policy concerns).

It does not follow, however, that qualified immunity applies to bar the claim. Qualified immunity does not apply to bar claims where it is "sufficiently clear that a reasonable official would understand that what he is doing violates [the applicable] right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Eleventh Circuit has provided three different ways a plaintiff can show that the state of the law gave officials fair warning of a clearly established right.

> First, she can still show that a materially similar case has already been decided. This category consists of cases where judicial precedents are tied to particularized facts. In determining whether a right is clearly established under this prong, this Court looks to judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state. Second, she can also show that a broader, clearly established principle should control the novel facts of a particular situation. The principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted. Put another way, in the light of pre-existing law the unlawfulness must be apparent. Third, she could

show that her case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary.

*Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019) (internal citations or quotations omitted).

As relevant here, the Eleventh Circuit has clearly explained a foster child's constitutional right "to be free from unnecessary pain and a fundamental right to physical safety." *Foltz*, 370 F.3d at 1082 (citing *Taylor v. Ledbetter*, 818 F.2d 791, 794–95 (11th Cir. 1987)). On multiple occasions, the Eleventh Circuit has indicated that deliberate indifference to physical abuse and neglect by a state actor constitutes a deprivation of a constitutional right. *Id.* at 1083. Here, the Court has already established that Plaintiffs have plausibly alleged deliberate indifference, which well clears the threshold of violating a clearly-established right. As such, at this stage, the Court does not find that qualified immunity applies to bar the claim. Of course, if facts develop indicating that the Citrus Defendants were not deliberately indifferent, the Citrus Defendants may reargue the application of qualified immunity. Similarly, if evidence demonstrates that the relationship between the State and Citrus Defendants is not as alleged, the question of the Citrus Defendants' eligibility for qualified immunity may be re-raised. However, at this stage, accepting the allegations as true, while it appears that the Citrus Defendants are eligible for qualified immunity, the Court cannot say that qualified immunity applies to bar the claims against them, as the allegations support an inference that the Citrus Defendants were deliberately indifferent to a manifestly unsafe foster home.

The Court adopts Judge D'Angelo's recommendation and does not find that dismissal of the claims brought against the Citrus Defendants is warranted. Thus, the Objection, ECF No. [86], is overruled, and the Citrus Defendants' Motion to Dismiss, ECF No. [40], is denied.

## B. Objections by FRC, Green, Johnson, Breedlove, and Meikle (the "FRC Defendants")

24

### i. State Actor

In her Report and Recommendation, Judge D'Angelo found, first, that Plaintiff's allegations show state action on the part of the FRC Defendants under the public function test. ECF No. [77] at 39–41. In their Objection, the FRC Defendants argue that Judge D'Angelo erred in finding that the FRC Defendants qualify as state actors. Specifically, in addition to making similar arguments to the Citrus Defendants, the FRC Defendants point out that the provision of foster care-like services predates the creations of Florida's child welfare system, so the service cannot be the *exclusive* province of the State. ECF No. [87] at 7. Plaintiffs respond that the FRC Defendants were correctly identified as a state actor, as FRC—a private non-governmental entity—assumed "a public function traditionally within the exclusive prerogative of the State," and the individual FRC Defendants are its employees. ECF No. [93] at 6.

As the Court explained above, the "public function" test is only one theory of state action, and the Supreme Court has explained that "no one criterion must necessarily be applied" to establish state action. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001). Another theory, also discussed above, focuses on circumstances in which the government outsources one of its constitutional obligations to a private entity. Insofar as the Eleventh Circuit has recognized foster children's constitutional right to safety and the corollary obligation of the state to ensure that safety, the decision by DCF to outsource its activities to FRC renders FRC a state actor for § 1983 purposes. Accordingly, the Court need not determine whether the provision of foster care services is traditionally the *exclusive* prerogative of the State. Judge D'Angelo's finding of state action was correct, the Objection is overruled to the extent it disputes state action, and the FRC Defendant's Motion to Dismiss, ECF No. [39], is denied as to this argument.

### ii. Policy or Custom

25

Judge D'Angelo found that Plaintiffs set forth sufficient facts to support the conclusion that the FRC Defendants had a policy or custom responsible for Plaintiffs' harm. As alleged in the Amended Complaint, the FRC Defendants "allow[ed] children with disabilities to be placed in untrained foster homes, fail[ed] to provide special needs children with medically necessary services, and fail[ed] to comply with court orders from the dependency court." ECF No. [77] at 44. They also failed to employ corrective measures after the prior class action lawsuit and settlement revealed deficiencies in their processes. *Id*.

The FRC Defendants object that "the R&R improperly conflated the distinct roles of DCF, Citrus, and FRC, resulting in the imposition of duties on FRC that do not exist, particularly with respect to placement decisions and applicable policies and procedures." ECF No. [87] at 9. In reality, the only allegation is that FRC provides case management services. *Id*. Plaintiffs, the FRC Defendants argue, point to no official FRC policy or unofficial custom that resulted in harm to Plaintiffs.

Plaintiffs respond that their Amended Complaint alleges how FRC caused Plaintiffs' injuries. ECF No. [93] at 7. Plaintiffs assert that the Amended Complaint contains detailed allegations of customs, policies, and/or widespread practices that exposed Plaintiffs to a substantial risk of harm. *Id.* at 8.

To hold a municipality liable for a constitutional violation, a plaintiff must show that "the alleged constitutional harm is the result of a custom or policy." *Brennan v. Headley*, 807 F. App'x 927, 937-38 (11th Cir. 2010). "A policy is a decision that is officially adopted by the municipality or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law." *Groover v. Israe*l, 684 F. App'x 782, 787 (11th Cir. 2017) (quoting *Sewell v. Town of Lake*

*Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). "In order for a plaintiff to demonstrate a policy or custom, 'it is generally necessary to show a persistent and wide-spread practice.'" *Martin v. Wood*, 648 F. App'x 911, 914 (11th Cir. 2016) (quotation omitted). This so-called "*Monell*" liability has been extended to private parties performing municipal functions. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

The Court finds that Plaintiffs have adequately alleged a widespread policy or custom of FRC's that is responsible for Plaintiffs' harms. For instance, Plaintiffs allege that, notwithstanding its knowledge of the class action lawsuit and settlement, FRC, among others, "failed to remedy the lack of sufficient placements and provision of services, there was still a failure to maintain an even remotely adequate number and variety of foster homes and other placements for the number of children in the system and their needs, and there was still a failure to provide medically necessary therapeutic and behavioral services to children served by DCF, CFCN, and FRC in the Southern Region." ECF No. [1-3] ¶ 58. This led to Plaintiffs not having their placement and services needs met and exposed them to harm while in foster care. *Id*. Later, FRC, among others, is alleged to have determined that the Jones home was an appropriate placement for Plaintiffs despite knowledge that the home was not adequate. *Id.* ¶ 65. At other times, FRC is alleged to have failed to provide required information to Jones, failed to remove Plaintiffs from the home, failed to ensure Plaintiffs were receiving medically necessary services as required by a court order, failed to convene a staffing when required, and failed to adequately respond to at least nine abuse reports regarding a child in Jones' care (including five abuse reports regarding M.O.). *Id.* ¶¶ 70, 72, 73, 74, 179.

Plaintiffs also allege FRC's policies and customs that led to the above-described actions—indeed, they allege at least six separate policies, customs, or widespread practices. *See id.* ¶¶ 248—

27

255. The FRC Defendants may well, with greater discovery, seek to prove that their role was limited to "case management services," but at the motion to dismiss stage, Plaintiff's allegations are to be taken as true and all reasonable inferences drawn from them. Under this standard, Plaintiffs' allegations are plainly sufficient to state a claim against FRC. As a result, the Objection is overruled, and the Court adopts Judge D'Angelo's Report and Recommendation.

### iii.  Deliberate Indifference

In her Report and Recommendation, Judge D'Angelo found that Plaintiffs had sufficiently alleged that Defendants Breedlove and Johnson acted with deliberate indifference; specifically, Judge D'Angelo found that Breedlove and Johnson "knew of the risk of serious harm from a failure to properly care for Plaintiffs, particularly in light of their medical and developmental needs, and despite this knowledge, failed to ensure they received adequate care and services." ECF No. [77] at 47. As to FRC, Meikle, and Green, Judge D'Angelo similarly found that those Defendants "knew that CPT determined multiple times that M.O. had been a victim of physical abuse, M.O. had a pattern of unexplained injuries, M.O. had a black eye that medical professionals determined was the result of a 'direct blow,' Plaintiffs were not receiving any of the medically necessary and court ordered services, and there were three abuse reports closed as non-substantiated." *Id*. Notwithstanding this knowledge, they left M.O. in the Jones home. *Id.* at 48. Beyond this, despite knowing Plaintiffs needed specialized care, FRC, Meikle, and Green "placed them in a home with a non-specialized foster parent who had a pattern of abuse and openly refused to provide the necessary care for M.O. and A.O." *Id*. Judge D'Angelo found that those allegations support an inference of deliberate indifference.

The FRC Defendants object that Plaintiffs' allegations against Green, Johnson, Breedlove, and Meikle do not support an inference of deliberate indifference, because the allegations fail to

show "subjective knowledge" of a risk and "deliberate disregard" of that risk. ECF No. [87] at 11. Moreover, FRC Defendants argue that Judge D'Angelo erred in attributing to FRC Defendants defects in the placement of Plaintiffs, for which the FRC Defendants were not responsible. *Id.* at 12. Finally, even if it is taken as true that Breedlove, Johnson, Green, and Meikle were aware of the substantial risk, insofar as they did not have an ability to affect placement, they cannot be held to be deliberately indifferent. *Id*.

Plaintiffs respond that they have adequately pled FRC and Green's direct role in the placement of M.O. and A.O. in the Jones home. ECF No. [93] at 9–10. The FRC Defendants ignore the numerous allegations in the Amended Complaint of their knowledge of the substantial risk of harm and role in initiating and/or maintaining Plaintiffs' placement in the Jones home. *Id*.

The Court finds the Objection is due to be overruled. The Amended Complaint sufficiently alleges that Breedlove, Johnson, Green and Meikle each independently knew of a substantial risk of harm to Plaintiffs. To begin, Breedlove is alleged to have known of M.O. and A.O.'s disabilities, ECF No. [1-3] ¶ 113, to have completed a home visit during which concerning events occurred, *id.* ¶ 117, to have transported M.O. to a doctor's appointment where her weight loss was noted, *id.* ¶ 121, and to have known that Jones had no experience in dealing with children with significant disabilities and was not equipped to do so, especially as a single foster parent with four other children in the home, *id.* ¶ 183. Still, Breedlove failed to ensure a specialized home for Plaintiffs, failed to recognize Jones as an inadequate placement, and failed to remove Plaintiffs from the Jones home even when Jones complained that M.O.'s needs were too much for her to handle. *Id.* ¶ 329.

According to Plaintiffs, Johnson similarly knew of Plaintiffs' special needs, *id.* ¶¶ 53, 54, knew that A.O. appeared "nervous and anxious" during a home visit, *id.* ¶ 72, knew Jones would

leave the children outside for extended periods of time, *id.* ¶ 79, knew A.O. did not receive a recommended psychiatric evaluation, *id.* ¶ 84, knew that Jones sometimes forgot to give Plaintiffs their medication, *id.* ¶ 86, knew that M.O. was not consistently receiving medically necessary services, *id.* ¶ 97, and fundamentally knew that Jones had no experience in dealing with children with significant disabilities and was not equipped to do so, especially as a single foster parent with four other children in the home, *id.* ¶ 183. Nonetheless, Johnson failed to ensure a specialized home for Plaintiffs, failed to recognize Jones as an inadequate placement, and failed to remove Plaintiffs from the home despite multiple contraindications. *Id.* ¶ 318.

Green, Plaintiffs allege, similarly knew of Plaintiffs' special needs, *id.* ¶¶ 53, 54, knew Plaintiffs were not receiving required therapies, *id.* ¶¶ 130, 132, knew of injuries to M.O. and challenges with A.O., *id.* ¶ 134, knew of Jones' "backup" caregivers*, id.* ¶ 135, knew of at least eight abuse reports regarding a child in Jones' care, *id.* ¶ 173, knew of M.O.'s weight loss, *id.* ¶ 153, and knew that Jones had no experience in dealing with children with significant disabilities and was not equipped to do so, especially as a single foster parent with four other children in the home, *id.* ¶ 183. Still, Green failed to ensure a specialized home for Plaintiffs, failed to recognize Jones as an inadequate placement, and failed to remove Plaintiffs from the home despite multiple contraindications. *Id.* ¶ 307.

Finally, Meikle is alleged to have known Jones was not taking Plaintiffs to medical and therapy appointments, *id.* ¶ 132, knew of Jones' "backup" caregivers and injuries to M.O., *id.* ¶ 135, knew of M.O.'s weight loss and that she had been identified by professionals as the victim of physical abuse, *id.* ¶ 153, knew of at least eight abuse reports regarding a child in Jones' care, *id.* ¶ 173, and knew that Jones had no experience in dealing with children with significant disabilities and was not equipped to do so, especially as a single foster parent with four other children in the

home, *id.* ¶ 183. Notwithstanding this, Meikle failed to ensure a specialized home for Plaintiffs, failed to recognize Jones as an inadequate placement, and failed to remove Plaintiffs from the home despite multiple contraindications. *Id.* ¶ 340.

All of these allegations support an inference of deliberate indifference, and while the FRC Defendants may dispute that they had the ability to affect the placement of Plaintiffs, at the motion to dismiss stage, the Court accepts as true Plaintiffs allegation that the FRC Defendants had that ability. Thus, the Court overrules the Objections and adopts Judge D'Angelo's recommendation. The FRC Defendant's Motion to Dismiss, ECF No. [39], is denied to the extent it is premised on Plaintiffs failing to state a claim of deliberate indifference.

### iv.  Qualified Immunity

In her Report and Recommendation, Judge D'Angelo found that the FRC Defendants were not entitled to qualified immunity because they are private actors and had not pointed to historical or public policy support for applying qualified immunity to them. ECF No. [77] at 49–50.

The FRC Defendants object, first, that the Report and Recommendation erred in its reasoning because Plaintiffs made essentially no on-point argument in rebuttal to the FRC Defendants' assertion of qualified immunity, so the Court's logic in denying them qualified immunity was not based on any "issue" raised by Plaintiffs. ECF No. [87] at 14–15. Plaintiffs' counterargument should therefore be deemed waived. *Id.* at 15. Moreover, none of the cases cited by Judge D'Angelo addresses the application of qualified immunity to a private social worker in contexts similar to the present case. *Id.* at 16. By contrast, the law is clear that the FRC Defendants should be entitled to assert qualified immunity. *Id.* at 17.

Plaintiffs respond, first, that because the FRC Defendants raised a qualified immunity defense, it was proper for Judge D'Angelo to analyze it regardless of the focus of Plaintiffs'

opposition. ECF No. [93] at 16. And on the merits, Plaintiffs argue that there is no "firmly rooted" tradition of immunity exists in the child welfare context, nor do policy arguments support extending immunity to the FRC Defendants. *Id.* at 18.

Plaintiffs' inapt response to the FRC Defendants' qualified immunity argument does not mean the Court is precluded from performing its own analysis of whether qualified immunity applies. To the contrary, the Court is obliged to determine whether qualified immunity applies to bar a claim once it is raised as a defense, and the Eleventh Circuit has permitted district courts to consider the issue entirely *sua sponte*. *Lillo ex rel. Est. of Lillo v. Bruhn*, 413 F. App'x 161, 162 (11th Cir. 2011). Thus, the Court considers the role of qualified immunity in the context of this case.

For the same reasons described above, the Court finds that the FRC Defendants are eligible to assert qualified immunity, but given the sufficient allegations of deliberate indifference, the doctrine does not bar the claim against them. Plaintiffs have plausibly alleged deliberate indifference by Breedlove, Johnson, Green, and Meikle. For the same reasons that the Court finds they appear to have been deliberately indifferent, the Court finds that they would have violated Plaintiffs' clearly established rights—namely, the substantive due process right to safety in a foster home. As such, while the Court finds Breedlove, Johnson, Green, and Meikle eligible for qualified immunity, the Court cannot say that it applies to bar Plaintiffs' claims.

The Court agrees with Judge D'Angelo's ultimate conclusion and does not find that dismissal of the claims brought against the FRC Defendants is warranted. Thus, the Objection is overruled and FRC Defendants' Motion to Dismiss, ECF No. [39], is denied.

### C. Objections by Baptiste

#### i. Deliberate Indifference

32

In her Report and Recommendation, Judge D'Angelo found that qualified immunity did not apply to bar Plaintiffs' claim against Baptiste. ECF No. [77] at 26–27. Judge D'Angelo explained that because it is clearly established that foster children have a constitutional right to be free from unnecessary pain and to have physical safety, Baptiste's alleged deliberate indifference precludes the application of qualified immunity at this stage. *Id.* at 27. Specifically, Plaintiffs allege that Baptiste received an abuse report regarding M.O. and observed her with injuries, received another abuse report, knew that professionals had concluded M.O. was a victim of physical abuse, received another abuse report, knew of another professional conclusion that M.O. was a victim of physical abuse, and knew that M.O. came out of Jones' home with visible injuries. *Id.* at 28–29. Nonetheless, M.O. remained in Jones' home for more than thirty days while Baptiste was involved with her investigation. *Id.* at 30. That demonstrates actual knowledge of a substantial risk of physical harm to M.O. in the Jones home, which is enough at this stage of the litigation. *Id.* at 30–31.

In her Objection, Baptiste argues that Judge D'Angelo's Report and Recommendation did not determine that Baptiste knew that Jones or someone in the Jones home was the source of the abuse, and such a conclusion is required as a matter of law. ECF No. [88] at 3. That is, the allegations do not show that Baptiste actually drew the inference that M.O. was at a substantial risk of physical harm in the Jones home. *Id.* at 4. At most, the allegations amount to mere negligence or carelessness. *Id*. Fundamentally, Plaintiff's allegations amount to inferences Baptiste *should have* drawn, not inferences she actually *did* draw. *Id.* at 7.

Plaintiffs respond that they sufficiently pled deliberate indifference by Baptiste so as to avoid dismissal. ECF No. [91] at 8. Plaintiffs assert that "deliberate indifference may be established not only through actual knowledge of a risk of harm, but also through allegations

sufficient to raise an inference that [Baptiste] knew there was a substantial risk of harm to M.O. in the Jones foster home and deliberately disregarded that risk." *Id.* at 12. A complaint that pleads specific facts sufficient to justify an inference is sufficient to overcome a motion to dismiss that argues that the complaint fails to allege that the defendants actually drew the inference. *Id.*

The Court begins by recounting the factual allegations relevant to Baptiste, a Child Protective Investigator.

- On May 1, 2023, Baptiste knew that an abuse report was received regarding M.O. and that this was the fifth abuse report regarding a child in Jones' care; still, she did not remove Plaintiffs from the Jones home. ECF No. [1-3] ¶ 147. Though she began an investigation, she did not speak with the teacher who had actually observed the bruises, did not go to the Jones home, did not interview Jones, did not interview any other foster children in Jones' home, and did not attempt to learn how M.O. sustained her injuries. *Id.* ¶ 148.

- On May 2, 2023, Baptiste knew that another abuse report was received regarding injuries to M.O., the sixth abuse report regarding a child in Jones' care; still, Baptiste allowed Plaintiffs to remain in Jones' care, taking no meaningful investigative steps. *Id.* ¶¶ 149–50.

- On May 3, 2023, Baptiste contacted the Child Protection Team because a referral was mandatory but failed to report M.O.'s injuries when asked. *Id.* ¶ 151.

- On May 4, 2023, Baptiste spoke with Meikle who expressed no concerns for M.O. in the Jones home, interviewed foster children in the Jones home who reported that M.O. harms herself and trips when walking, and interviewed Jones who claimed she did not know how M.O. was injured. *Id.* ¶ 152. When M.O. was twice concluded by the Child Protection Team to be a victim of physical abuse, Baptiste allowed M.O. to return to the Jones home. *Id.* ¶¶ 153, 155.

- On June 16, 2023, Baptiste knew of another abuse report regarding unexplained injuries to M.O. and knew that this was the seventh abuse report regarding a child in Jones' care; still, Baptiste allowed M.O. to return to the Jones home and failed to investigate the new injuries or take protective action. *Id.* ¶¶ 161, 162.

- On June 26, 2023, Baptiste acknowledged receiving and reviewing the Child Protection Team's report which concluded that M.O. had been physically abused, spoke with multiple individuals, and allowed Plaintiffs to remain in Jones' home. *Id.* ¶ 165.

- On June 27, 2023, Baptiste completed a Family Functioning Assessment, concluding—in relevant part—that M.O. was safe and there were no impending threats to her. *Id.* ¶ 166.

- On June 28, 2023, Baptiste closed the three open abuse reports with "Not Substantiated" findings because no one could determine how the bruises occurred and allowed Plaintiffs to remain in Jones home. *Id.* ¶ 167.

- At all relevant times, Baptiste knew that Jones had no experience dealing with children with significant disabilities and was not equipped to deal with a child with behavioral challenges like M.O.'s, especially as a single foster parent with four other foster children in the home. *Id.* ¶ 183.

Still, time and time again, Baptiste allegedly failed to ensure a specialized home for M.O., failed to recognize Jones as an inadequate placement, and failed to remove M.O. from the home despite multiple contraindications. *Id.* ¶ 350.

As Baptiste correctly points out, to establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Whether a[n] official had the requisite knowledge of a substantial risk is a question of fact subject

to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.

A jury may, therefore, "conclude that a prison official knew of a substantial risk from the very fact

that the risk was obvious." *Id*. In such a case, an official "would not escape liability if the evidence

showed that he merely refused to verify underlying facts that he strongly suspected to be true, or

declined to confirm inferences of risk that he strongly suspected to exist[.]" *Id.* at 843 n.8.

At the motion to dismiss stage, the alleged failure of an official to take action in the face

of an "obviously dire condition" is sufficient to state a claim. *Foster v. Maloney*, 785 F. App'x

810, 816 (11th Cir. 2019). That is, the allegation of facts that support an inference of a substantial

risk of harm and the allegation that the official knew of such facts are sufficient at the motion to

dismiss stage.

Here, the Court has already counted the multiple rounds of unexplained injuries, reports of

abuse of children in the Jones home, and deficiencies in Jones' care of which Baptiste was alleged

to be aware. Though there is no allegation that Baptiste knew the injuries were produced by Jones

or someone in particular in the home, those factual allegations plausibly support an inference that

the Jones home was a source of substantial risk of harm. Consider the Supreme Court's analysis

in *Farmer*:

> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk .... If, for example, prison officials were aware that inmate "rape was so common and uncontrolled that some potential victims dared not sleep [but] instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station," it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

*Farmer*, 511 U.S. at 843–44 (internal citations omitted). Consistent with *Farmer*, Plaintiffs need not allege that Baptiste drew the inference that Jones or any particular individual in the home would specifically cause harm to Plaintiffs. Instead, Plaintiffs need only allege that Baptiste drew the inference that the Jones home was a substantial risk of harm, and they have done so, alleging that Baptiste knew of multiple injuries and physical harm to M.O., knew of multiple reports of abuse of children in the Jones home, knew M.O. had been concluded to be a victim of abuse, and knew of deficiencies in Jones' care. That is sufficient to overcome a motion to dismiss that argues the Amended Complaint fails to allege that Baptiste actually drew the relevant inference. As such, the Objection is overruled, and the Court adopts Judge D'Angelo's recommendation.

### D.  Objections by M.O.

In her Report and Recommendation, Judge D'Angelo found that Plaintiffs had not sufficiently alleged that Brooks knew about a substantial risk of harm and acted with deliberate indifference. ECF No. [77] at 31. Judge D'Angelo found that the allegations against Brooks pointed to negligence or carelessness more than deliberate indifference and the Plaintiffs had not alleged sufficient relevant knowledge by Brooks. *Id.* at 32.

M.O. objects to Judge D'Angelo's recommendation that Brooks' Motion to Dismiss be granted. ECF No. [89]. Specifically, M.O. argues that the Amended Complaint alleges her constitutional right to reasonable safety in the Jones home and alleges Brooks' deliberate indifference to harm being experienced by M.O. *Id.* at 10. M.O. points to allegations in the Amended Complaint that Brooks knew of the seven abuse reports regarding children in Jones' care, investigated some of the abuse reports, knew of multiple injuries to M.O., knew of and was concerned by M.O.'s weight loss, and "knew of ongoing concerns that Jones was not taking foster children to medical appointments, was braiding children's hair too tightly, and was depriving

children of air conditioning in South Florida." *Id.* at 15–16. Notwithstanding this knowledge, Brooks:

> (1) failed to interview the FRC visitation supervisor who also observed the bruises on M.O. on July 7, 2023; (2) failed to interview any of the other foster children placed in the Jones foster home; (3) failed to contact the FRC case management team; (4) failed to contact the lead agency CFCN; (5) failed to immediately respond to CPT regarding her observations of M.O.'s physical condition; and (6) failed to ensure that M.O. was immediately examined by CPT and receive immediate medical care and treatment.

*Id.* at 16–17. All of this is sufficient to infer deliberate indifference so as to overcome qualified immunity. *Id.*

Brooks responds by, first, pointing out that Plaintiffs' allegations make clear that Brooks was assigned to investigate just two days before M.O. was ultimately removed from the Jones foster home. ECF No. [90] at 4. That timeframe, combined with the actions Brooks took during it, cannot support a finding of deliberate indifference. *Id.* Moreover, Plaintiffs admit that Brooks "should have" known of a substantial risk of harm, rather than alleging that she actually did know of such a risk. *Id.* at 5.

Again, in analyzing this issue, the Court finds it helpful to recount the allegations made against Brooks.

- On May 12, 2022, Brooks is first alleged to have participated in a staffing meeting on the Jones foster home, at which time she knew that Jones "would not transport children to medical appointments and felt that it was not her job, [] was braiding the children's hair too tightly, and [] would turn the air conditioner off during the day to force the children to go outside." ECF No. [1-3] ¶ 87.

38

Case No. 25-cv-24196-BLOOM/D'Angelo

- On July 11, 2023, Brooks is alleged to have known of another abuse report regarding M.O., the eighth abuse report regarding a child in Jones' care and the fourth regarding M.O. *Id.* ¶ 173. The report alleged multiple bruises to M.O. *Id*.

- On July 12, 2023, Brooks began an investigation, contacting M.O.'s mother who confirmed observing injuries to M.O., visiting the Jones foster home and interviewing Jones (who had five foster children in her home at the time and had asked for M.O. to be removed), met with M.O. and observed her to be thin and appearing younger than her age, completed Risk Assessment determining that M.O. was at Moderate Risk for future abuse, and contact CPT but did not respond to CPT's follow-up inquiries. *Id.* ¶ 175.

- On July 14, 2023, Brooks responded to CPT, advising that M.O. only had scratches to her hand and knee and that Brooks was more concerned about M.O.'s weight. *Id.* ¶ 177.

- Also on July 14, 2023, Brooks knew that the ninth abuse report regarding a child in Jones' care was received, the fifth regarding M.O. since May 1, 2023. *Id.* ¶ 179. The report alleged, among other things, fresh bruises to M.O.'s buttocks, an apparent black eye, that Jones had been cutting M.O.'s hair without permission, and that M.O. had been observed hungry. *Id*.

- At all times, Brooks knew that Jones had no experience in dealing with children with significant disabilities like Plaintiffs', was not equipped to deal with a child with behavioral challenges as significant as M.O.'s, and was a single foster parent working full time with four other foster children in the home. *Id.* ¶ 183.

- On July 20, 2023, Brooks participated in a staffing regarding the open abuse reports, at which time it was reported that a specialized home was being sought for M.O. *Id.* ¶ 186.

- On September 8, 2023, Brooks close the abuse reports with verified findings of failure to protect, inadequate supervision, medical neglect, and substance misuse, and no indicators of physical injury. *Id.* ¶ 189.

Still, Brooks failed to immediately respond to the July 11, 2023 abuse report, failed to immediately remove M.O. from the Jones home on July 12, 2023, failed to respond to CPT after initially contacting them on July 12, 2023, and generally failed to perform investigative action on the case between July 12, 2023 and July 14, 2023. *Id.* ¶ 360.

The question, then, is whether these allegations—taken as true—could support a finding of deliberate indifference so as to overcome a qualified immunity defense. The Court finds that they can. It is not clear from the Amended Complaint when Brooks first became involved in the investigation of Plaintiff's treatment, but it is clear that by July 11, 2023, Brooks was assigned to the case as a Child Protective Investigator. *Id.* ¶ 173. At that time, Brooks knew of allegations of bruises to M.O.'s thorax, arm, and knees. *Id*. Moreover, Brooks knew that this was the eighth abuse report regarding a child in Jones' care and the fourth abuse report regarding M.O. in the span of approximately two months. *Id*. By July 12, 2023, Brooks had met with M.O. and therefore knew her to be thin and appearing younger than her age. *Id*. ¶ 175. She completed a Risk Assessment and determined that M.O. was at Moderate Risk for future abuse. *Id*.

Ultimately, the Court finds that such information taken together supports an inference of actual knowledge of a substantial risk of harm. At the very least, the Court finds plausible the inference of deliberate indifference where Brooks knew of injuries to M.O., knew of her thinness, knew that a risk existed of future abuse, and nonetheless allowed M.O. to return to the home for at least three more nights before she went to the hospital.

Of course, as the factual record develops, it may become clear Brooks was not deliberately indifferent, such that qualified immunity applies to bar claims against her. However, at the motion to dismiss stage, taking the facts in the light most favorable to Plaintiffs and drawing all inferences in Plaintiffs' favor, the Court finds the conclusion of deliberate indifference plausible. Thus, the Court rejects Judge D'Angelo's Report and Recommendation in this regard, sustains the Objection, and denies the Motion to Dismiss, ECF No. [36], to the extent it operates with respect to Brooks.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Report and Recommendation, **ECF No. [77]**, is **ADOPTED IN PART** and **REJECTED IN PART.**

2. The Citrus Defendants' Objections, **ECF No. [86]**, are **OVERRRULED.**

3. The FRC Defendants' Objections, **ECF No. [87]**, are **OVERRULED.**

4. Baptiste's Objections, **ECF No. [88]**, are **OVERRULED.**

5. M.O.'s Objections, **ECF No. [89]**, are **SUSTAINED.**

6. The Florida Department of Children and Families' Motion to Dismiss, **ECF No. [22]**, is **DENIED**.

7. Marlene Baptiste and Sonia Brooks' Motion to Dismiss, **ECF No. [36],** is **DENIED.**

8. Family Resource Center of South Florida, Inc., Myrlande Breedlove, Natalie Green, Antiwonesha Johnson, and Sanalee Meikle's Motion to Dismiss, **ECF No. [39]**, is **DENIED**.

9.  Citrus Health Network, Inc., Anthony Carvalho, and Kenya Neely, Marta Torres'

Motion to Dismiss, **ECF No. [40]**, is **DENIED**.

10. Defendants shall file their Answers to the Amended Complaint by **June 26, 2026**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 15, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record